## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WP COMPANY LLC** <br> **d/b/a THE WASHINGTON POST**, <br><br> 1301 K Street, N.W. <br> Washington, D.C. 20071 <br><br> Plaintiff, <br><br> v. <br><br> **SPECIAL INSPECTOR GENERAL FOR** <br> **AFGHANISTAN RECONSTRUCTION** <br><br> 2530 Crystal Drive <br> Arlington, VA 22202, <br><br> Defendant. | Civil Action No. 1:18-cv-2622 |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff WP Company LLC d/b/a *The Washington Post* ("the *Post*") brings this suit against Defendant Special Inspector General for Afghanistan Reconstruction ("SIGAR").   In support thereof, the *Post* states as follows:

### INTRODUCTION

1.      This is an action brought pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for declaratory, injunctive, and other appropriate relief.  Through FOIA, the *Post* has sought records of more than 400 interviews conducted pursuant to SIGAR's "Lessons Learned Program" relating to the war in and reconstruction of Afghanistan.

2.      In violation of FOIA, SIGAR has withheld in whole or in part hundreds of records responsive to the *Post*'s request.  No FOIA exemption properly applies to these withholdings.

## PARTIES

3.      Plaintiff, the *Post*, is a news organization based in Washington, D.C.  It publishes the leading daily newspaper, by print circulation, in the nation's capital, as well as the website washingtonpost.com, which reaches more than 65 million unique visitors per month, according to independent auditor comScore.  Since 1936, the *Post* has won 65 Pulitzer Prizes.

4.      Defendant, SIGAR, was created under Section 1229 of the National Defense Authorization Act for Fiscal Year 2008 (Pub. L. No. 110-181) to provide independent and objective oversight of Afghanistan reconstruction projects and activities.  SIGAR is an agency within the meaning of 5 U.S.C. § 552(f)(1).  SIGAR has possession and control of the records requested by the *Post*.

## JURISDICTION AND VENUE

5.      This action arises under FOIA.  This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) & (a)(6)(C)(i).  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

6.      Venue is proper in this judicial district under 5 U.S.C. § 552(a)(4)(B).

## FACTUAL ALLEGATIONS

### I.  SIGAR'S LESSONS LEARNED PROGRAM

7.      The war in Afghanistan is the longest running armed conflict in U.S. history. More than 1,800 U.S. service members have been killed in action in Afghanistan since 2001.

8.      According to SIGAR, the U.S. has appropriated more than $125,000,000,000 for relief and reconstruction efforts in Afghanistan since 2002.  These funds have been used to build the Afghan National Security Forces, promote good governance, conduct development assistance, and engage in counter-narcotics and anti-corruption efforts, among other purposes.

9.      Congress created SIGAR in 2008 to provide independent and objective oversight of Afghanistan reconstruction projects and activities.  The *Post* has reported on SIGAR's work dozens of times since that office was created.[1]

10.     According to its website, SIGAR carries out its congressionally-mandated responsibilities in several ways.  First, its Audits and Inspections Directorate "conducts audits and inspections of reconstruction activities in Afghanistan."  Second, its Investigations Directorate "conducts criminal and civil investigations relating to programs and operations supported with U.S. reconstruction dollars."  Third, its Special Projects team "examine[s]

---

[1] *See, e.g.*, Pamela Constable, *U.S. watchdog on Afghanistan releases corrected Afghan troop numbers*, The Washington Post (May 16, 2018), https://www.washingtonpost.com/world/asia_pacific/us-watchdog-on-afghanistan-releases-corrected-afghan-troop-numbers/2018/05/16/e3f36d6a-5890-11e8-9889-07bcc1327f4b_story.html; Max Bearak, *Afghan government controls just 57 percent of its territory, U.S. watchdog says*, The Washington Post (Feb. 2, 2017), https://www.washingtonpost.com/news/worldviews/wp/2017/02/02/afghan-government-controls-just-57-percent-of-its-territory-says-u-s-watchdog/; Erin Cunningham, *The U.S. spent billions building roads in Afghanistan. Now many of them are beyond repair*, The Washington Post (Oct. 30, 2016), https://www.washingtonpost.com/news/worldviews/wp/2016/10/30/the-u-s-spent-billions-building-roads-in-afghanistan-now-many-of-them-are-beyond-repair/; Dan Lamothe, *In Afghanistan, more multimillion-dollar buildings built and barely used by the U.S. military*, The Washington Post (July 20, 2015), https://www.washingtonpost.com/news/checkpoint/wp/2015/07/20/in-afghanistan-more-multi-million-dollar-buildings-built-and-barely-used-by-the-u-s-military/; Ernesto Londono, *Fire-prone buildings to be left at Afghan bases, watchdog for reconstruction warns*, The Washington Post (July 17, 2014), https://www.washingtonpost.com/world/national-security/fire-prone-buildings-to-be-left-at-afghan-bases-watchdog-for-reconstruction-warns/2014/07/16/ba8659b4-0d2c-11e4-8341-b8072b1e7348_story.html; Tim Craig, *U.S. contractors' failure to pay Afghans is causing grave problems, watchdog says*, The Washington Post (June 20, 2013), https://www.washingtonpost.com/world/asia_pacific/us-contractors-are-cheating-afghan-firms-workers-watchdog-says/2013/06/20/3f646e76-d9d2-11e2-9df4-895344c13c30_story.html; Karen DeYoung, *U.S. finds Afghan anti-corruption efforts 'deeply troubling'*, The Washington Post (Dec. 11, 2012), https://www.washingtonpost.com/world/national-security/us-finds-afghan-anti-corruption-efforts-deeply-troubling/2012/12/11/e0c57b80-43b3-11e2-8061-253bccfc7532_story.html; Richard Lardner, *2 deputies fired from Afghan watchdog group*, The Washington Post (Jan. 5, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/04/AR2011010405254.html; Karen DeYoung, *Development aid in key Afghan province lacking in oversight, audit finds*, The Washington Post (Oct. 26, 2010), http://www.washingtonpost.com/wp-dyn/content/article/2010/10/26/AR2010102607140.html.

emerging issues and deliver[s] prompt, actionable reports to federal agencies and the Congress."
And fourth, its Lessons Learned Program "identif[ies] and preserve[s] lessons from the U.S.
reconstruction experience in Afghanistan, and [makes] recommendations to Congress and
executive agencies on ways to improve our efforts in current and future operations."

11.     SIGAR's website further explains that the product of the Lessons Learned
Program's efforts are the "Lessons Learned Reports," which "focus on key aspects of the
reconstruction effort and document what the U.S. government sought to accomplish, assess what
it achieved, and evaluate the degree to which these efforts helped the United States reach its
strategic goals in Afghanistan."

12.     To date, SIGAR has publicly released on its website seven Lessons Learned
Reports, the most recent of which is entitled "Counternarcotics: Lessons from the U.S.
Experience in Afghanistan," published on June 14, 2018 (the "June 2018 Report"),
https://www.sigar.mil/pdf/lessonslearned/SIGAR-18-52-LL.pdf.

13.     The June 2018 Report states that as part of SIGAR's information-gathering
process, its "research team interviewed or held informal discussions with more than 80
individuals," including "current and former U.S. civilian and military officials who deployed to
Afghanistan, intelligence officers, and officials," as well as "experts from academia, think tanks,
and NGOs."  June 2018 Report at 209.  The June 2018 Report further states that these
"[i]nterviews provided valuable insights into the rationale behind decisions, debates within and
between agencies, and frustrations that spanned the years, but often remained unwritten."  *Id.*

## II.  THE PRIOR FOIA LAWSUIT

14.     On August 24, 2016, *Post* reporters Greg Miller and Craig Whitlock submitted a
FOIA request to SIGAR seeking records of any interviews conducted by the Lessons Learned

Program with Lt. Gen. Michael Flynn (U.S. Army, ret.), who at the time was a top national

security advisor to Republican presidential nominee Donald Trump.  Compl. ¶¶ 15-16, *WP Co.*

*LLC v. SIGAR*, No. 1:17-cv-2114-ABJ (D.D.C. Oct. 12, 2017), Dkt. No. 1.

15.     SIGAR denied the *Post*'s request in January 2017 – by which point President

Trump had been inaugurated and Lt. Gen. Flynn had been named his National Security Advisor

– asserting that the records were exempt from disclosure under Exemption 5.  *Id.* ¶¶ 17-19.

16.     After an administrative appeal, SIGAR's FOIA Appellate Authority remanded the

request for reconsideration in May 2017.  *Id.* ¶ 24.  SIGAR did not substantively respond to the

*Post*'s request following remand, forcing the *Post* to file suit in October 2017.  *Id.* ¶¶ 25-26.

17.     In December 2017, SIGAR produced to the *Post* a redacted copy of the "Record

of Interview" with Lt. Gen. Flynn.  Status Report, *WP Co. LLC v. SIGAR*, No. 1:17-cv-2114-

ABJ (D.D.C. Jan. 30, 2018), Dkt. No. 11 at 1.  SIGAR produced a copy of the same record to the

*Post* with fewer redactions in January 2018.  *Id.*  SIGAR also produced an audio recording of the

interview with Lt. Gen. Flynn in February 2018, and the matter was dismissed by agreement

shortly thereafter.  Stipulation of Dismissal, *WP Co. LLC v. SIGAR*, No. 1:17-cv-2114-ABJ

(D.D.C. Feb. 27, 2018), Dkt. No. 12.

### III.  THE INSTANT ACTION

18.     On March 23, 2017, *Post* reporter Craig Whitlock requested from SIGAR "[a]ll

transcripts and audio recordings of interviews conducted for SIGAR's Lessons Learned

Program."  A true and correct copy of the *Post*'s March 23, 2017 request (the "Request") is

attached hereto as Exhibit A.

19.     The Request noted, for the avoidance of doubt, that it sought "full, unedited

transcripts and complete audio recordings of ***all*** interviews conducted for the Lessons Learned

program, regardless of whether they are labeled as 'on the record,' or if the interviewee was granted anonymity, or if they were cited in a particular report or not." *Id.* at 1.

20.     The *Post* sought expedited processing of the Request and a fee waiver as a representative of the news media. *Id.* at 2.

21.     The Request explained why records of SIGAR's interviews are of significant interest and importance to the public, stating that "[t]he unvarnished views and assessments of current and former U.S. officials – as well as the many other experts and officials interviewed as part of SIGAR's Lessons Learned program – could have a profound impact on shaping the new Trump Administration's policies regarding the war in Afghanistan," and that "[a] delay in releasing records of interviews from SIGAR's Lessons Learned Program could undermine public confidence not only in the U.S. government's policy toward counterterrorism in Afghanistan, but also in the whole premise of SIGAR's Lessons Learned Program." *Id.*

22.     SIGAR assigned the Request handling number 2017-F-014.

23.      In a February 23, 2018 email, a true and correct copy of which is attached hereto as Exhibit B, SIGAR General Counsel John Arlington informed the *Post* that SIGAR's Lessons Learned Program had "conducted 410 interviews to date." Ex. B at 1. Mr. Arlington stated that 374 interviews were conducted "without an audio recording or transcript," but in those cases "[t]he interviewer . . . took notes." *Id.* Of the 36 remaining interviews, SIGAR possesses both transcripts and recordings for 9, transcripts alone for 19, and recordings alone for 8. *Id.*

24.     Mr. Arlington noted that SIGAR categorizes certain interviews as "not for attribution" when "the person being interviewed requested anonymity." *Id.* Mr. Arlington further asserted that "SIGAR is prohibited by law from disclosing the identity of a source who wishes to remain anonymous." *Id.* On this point, Mr. Arlington quoted "Section 8L(b)(2)(B) of

the Inspector General Act of 1978" as providing that "[t]he Inspector General of each Agency shall not disclose the identity of any individual making a report under this paragraph without the consent of the individual unless the Inspector General determines that such a disclosure is unavoidable during the course of an investigation." *Id.*

26. Mr. Arlington admitted that in some cases, "SIGAR researchers went back to the person who was interviewed and asked permission to use specific quotes in the report and to use their names, and they gave permission," but he asserted that "the remainder of those interviews remain 'not for attribution.'" *Id.*

26. Finally, Mr. Arlington sought "clarification" from the *Post* about the scope of the Request, asking whether the Request seeks "interviewer's notes" taken during the interviews that were conducted "without either a transcript or recording." *Id.* at 2.

27. In a February 26, 2018 email to SIGAR, a true and correct copy of which is attached hereto as Exhibit C, the *Post* responded to Mr. Arlington's letter, informing SIGAR that the Request seeks "all records related to interviews conducted to SIGAR's Lessons Learned Program, including, but not limited to, transcripts, verbatim transcripts, handwritten and typed notes, records of interviews, audio recordings, video recordings, interview excerpts and interview summaries," as well as "any spreadsheets, databases or datasets . . . that track, list or index the interviews conducted for the Lessons Learned Program, along with any associated record layouts or field descriptions." Ex. C.

28. On February 28, 2018, Mr. Arlington replied to the *Post* by email, a true and correct copy of which is attached hereto as Exhibit D, confirming that SIGAR has "offered to provide [the *Post*] with interview notes, since . . . the vast majority of the interviews were not recorded and there was no transcript." Ex. D.

29.     However, Mr. Arlington stated that SIGAR would "review these interview notes to remove the names and identifying information for people who do not want their names revealed," once again asserting that SIGAR is "prohibited by law from revealing those sources without their permission." *Id.*

30.     The *Post* responded by email to SIGAR on February 28, 2018, a true and correct copy of which is attached hereto as Exhibit E, memorializing the *Post*'s position that the email exchange constituted "the equivalent of either a clarified or amended FOIA request that includes the notes or other records of the interviews." Ex. E.

31.     In an April 17, 2018 letter, a true and correct copy of which is attached hereto as Exhibit F, the *Post*'s Deputy General Counsel James McLaughlin wrote to SIGAR to "raise two concerns: (1) the agency's interpretation of the Inspector General Act as precluding it from identifying the interviewees in most cases, which [the *Post*] believe[s] is misplaced; and (2) the pace of production of the interviews so far, and SIGAR's refusal to provide even an estimated timetable for releasing the rest of the records." Ex. F at 1.

32.     Addressing SIGAR's refusal to identify the vast majority of its interviewees, the *Post* noted that the provision of the Inspector General Act that Mr. Arlington had referenced in his February 23 email concerns "[i]information on websites of offices of Inspectors General," and has been renumbered. *Id.* at 1-2. The *Post*'s letter informed SIGAR that, in context and in its current form, that subsection provides:

> (b)  Requirements for Inspectors General websites.--
>
>     * * *
>
> (2)  Reporting of fraud, waste, and abuse.--
>
>         (A) In general.--The Inspector General of each Federal agency and designated Federal entity shall establish and maintain a direct link on the homepage of the website of

the Office of the Inspector General for individuals to report fraud, waste, and abuse. Individuals reporting fraud, waste, or abuse using the direct link established under this paragraph shall not be required to provide personally identifying information relating to that individual.

(B) Anonymity.--The Inspector General of each Federal agency and designated Federal entity shall not disclose the identity of any individual making a report under this paragraph without the consent of the individual unless the Inspector General determines that such a disclosure is unavoidable during the course of the investigation.

*Id.* at 2 (quoting 5 U.S.C. App. 3 § 8M(b)(2)).

33.     The *Post*'s letter observed that "[t]his provision plainly applies to information provided through the 'direct link on the homepage of the website' of the OIGs," and "therefore does not shield SIGAR interviewees from disclosure, because the Lessons Learned interviews were not derived from reports of fraud, waste, or abuse made through the SIGAR website." *Id.* The *Post* stated that it accordingly "expects SIGAR to comply with its obligations under FOIA with respect to identifying the Lessons Learned interviewees." *Id.*

34.     Regarding the pace of SIGAR's production of records, the *Post* noted that as of April 2018 – more than a year after the *Post* submitted the Request – SIGAR had produced records of only 35 interviews, with another 12 interviews expected to be produced by June 2018. *Id.* Acknowledging that "SIGAR must review the records before it can release them," the *Post* asked SIGAR to "provide a concrete, even if estimated, timetable for producing the remaining batches of interviews, as [it] has repeatedly sought." *Id.* at 3.

35.     SIGAR has never responded to the *Post*'s April 17, 2018 letter.

36.     Mr. McLaughlin followed up on the April 17, 2018 letter with a May 14, 2018 email, a true and correct copy of which is attached hereto as Exhibit G, in which the *Post* requested a phone call to discuss the identification issue and the pace of production.  Ex. G at 1.

37.     SIGAR has never responded to the *Post*'s May 14, 2018 email.

38.     In an August 31, 2018 letter to SIGAR, a true and correct copy of which is attached hereto as Exhibit H, undersigned counsel for the *Post* wrote that, as of that date, "SIGAR has produced only 42 of the 47 'on the record' interviews, seven of the 17 audio recordings, and 86 of 363 'on-background' interviews," such that "barely a quarter of the 410 responsive interviews have been produced after nearly 18 months – a pace at which the Request will not be completely fulfilled for years."  Ex. H at 1.

39.     The August 31, 2018 letter objected again to SIGAR's refusal to identify "on-background" interviewees and its redaction of "names and other identifying information" from "on-background" interview records that it had produced.  *Id.*  The letter noted that the provision of the Inspector General Act previously cited by Mr. Arlington "on its face applies only to protect the identity of persons who provide information through the 'direct link on the homepage of the website' of offices of Inspectors General."  *Id.* at 2 (quoting 5 U.S.C. App. 3 § 8M(b)(2)).

40.     The *Post* reminded SIGAR about the prior FOIA lawsuit concerning Lt. Gen. Flynn's interview, and "ask[ed] that SIGAR not force the *Post* to again file a lawsuit to secure the disclosure of the remaining interview records," adding that, should the *Post* be forced to litigate, it "will request that the Court award . . . its full attorney's fees and costs."  *Id.*

41.     The *Post* proposed that SIGAR "process and release the remaining Lessons Learned interview records on a rolling basis" over a period of 90 days, explaining that "Mr. Whitlock has been advised by SIGAR's public affairs office that SIGAR has already located and assembled all of the responsive interview records."  *Id.*  The *Post* added that it also would "be willing to discuss a different, reasonable timeframe."  *Id.*

42.     SIGAR has never responded to the *Post*'s August 31, 2018 letter.

43.     To date, SIGAR has produced, in whole or in part, records of:

a.      43 of the 47 "on the record" interviews;

b.      187 of the 363 "on background" interviews; and

c.      7 of the 17 audio recordings of interviews.

44.     SIGAR has not provided the *Post* with even an estimated timetable for the production of the remaining records responsive to the Request, which, according to the information provided, would include 4 "on the record" interviews, 176 "on-background" interviews, and 10 audio recordings of interviews.

45.     In the records produced to date, SIGAR has unlawfully redacted the names of all "on-background" interviewees.  SIGAR also has redacted information from the records of both "on-background" and "on the record" interviews.  All of these redactions are marked "(b)(3)," "(b)(6)," "(b)(7)(C)," or some combination thereof.

46.     On information and belief, SIGAR expressly advised interviewees that the records of their interviews would be subject to FOIA.  Those representations make untenable SIGAR's current position that it must redact names and other identifying information from all "on background" interview records.

47.     The inconsistency in the redactions themselves confirms that SIGAR's withholdings are improper.  For example, SIGAR has produced two versions of the "Record of Interview" for Jeff Raleigh, a former communications officer for the Afghanistan Reconstruction Group.  One version, a true and correct copy of which is attached hereto as Exhibit I, contains multiple redactions, while the other, a true and correct copy of which is attached hereto as Exhibit J, is unredacted.  In addition to this inconsistency, reviewing these records, it is clear that SIGAR had no basis to withhold the redacted text.  *Compare* Ex. I (redacted record), *with* Ex. J

(unredacted record).

48.     Similarly, SIGAR produced a redacted record of an "on-background" interview conducted on February 17, 2017 concealing the interviewee's name, a true and correct copy of which is attached hereto as Exhibit K.  This interview contains the interviewee's statement that "Afghans knew this influx of funds wouldn't last, and they wanted to make the best of the windfall without endangering themselves."  Ex. K at 2.  That same statement is attributed to Barnett Rubin, senior advisor to the U.S. Special Representative for Afghanistan and Pakistan, in the Lessons Learned Report that SIGAR published in May 2018.  *See* SIGAR, *Stabilization: Lessons from the U.S. Experience in Afghanistan* (May 24, 2018), https://www.sigar.mil/pdf/lessonslearned/SIGAR-18-48-LL.pdf at 159-60 & n.1038 (noting that SIGAR interviewed Dr. Rubin on February 17, 2017).  SIGAR therefore had no basis to redact Mr. Rubin's name from this interview in releasing it to the *Post*.

49.     Knowing that the interviewee in question is Dr. Rubin – a leading U.S. expert on Afghanistan – makes the interview record of far greater public interest.  For instance, Dr. Rubin's observation that Special Representative Richard Holbrooke "had political goals and spent most of his time promoting himself," Ex. K at 1, provides the public with an even better understanding of the operations of the U.S. government in Afghanistan given Dr. Rubin's credentials and the fact that he himself advised Mr. Holbrooke.

## CLAIM FOR RELIEF

### COUNT I
### (Declaratory and Injunctive Relief:
### Violation of the Freedom of Information Act, 5 U.S.C. § 552)

50.     The *Post* realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

51.     FOIA provides this Court with "jurisdiction to enjoin [SIGAR] from withholding

agency records and to order the production of any agency records improperly withheld from [the *Post*]." 5 U.S.C. § 552(a)(4)(B).

52.     The requested records referenced above are agency records in SIGAR's control.

53.     FOIA requires that within 20 working days of receiving a FOIA request, absent circumstances not present here, an agency must notify a requester of, inter alia, the scope of the documents that the agency will produce and the scope of the documents that the agency plans to withhold under any FOIA exemptions.  *See* 5 U.S.C. § 552(a)(6)(A)(ii).

54.     SIGAR received the *Post*'s Request on March 23, 2017.  Ex. A at 1.

55.     Pursuant to FOIA, SIGAR was required to respond to the *Post*'s Request by April 20, 2017.  5 U.S.C. § 552(a)(6)(A)(ii).

56.     More than 18 months after that deadline, SIGAR has not provided a complete response to the *Post*'s Request.

57.     In the course of producing records responsive to the Request, SIGAR has cited only a single, irrelevant statutory provision as the basis for some, but not all, of its withholdings.

58.     In the course of producing records responsive to the Request, SIGAR has never informed the *Post* that it can appeal the withholdings.

59.     As of the date of this filing, therefore, SIGAR has not made and communicated to the *Post* a "determination" on the Request within the meaning of 5 U.S.C. § 552(a)(6)(A)(i).

60.     There is no basis under FOIA to withhold, in whole or in part, the records requested by the *Post*.  SIGAR has wrongfully withheld agency records in violation of FOIA.

61.     SIGAR's failure to make a "determination" as to the Request or produce the requested records in full within the statutory deadline is tantamount to a denial under FOIA, as the *Post* is "not required to exhaust administrative appeal remedies before filing [this] FOIA

suit." *CREW v. FEC*, 711 F.3d 180, 183 (D.C. Cir. 2013); 5 U.S.C. § 552(a)(6)(C)(i).

62.    The *Post* requests a declaratory judgment that SIGAR has violated FOIA and that the *Post* is entitled to immediately receive the documents referenced above.

63.    The *Post* further requests that, pursuant to 5 U.S.C. § 552(a)(4)(B), the Court issue an injunction to SIGAR to produce all of the requested agency records in full.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that SIGAR's failure to provide responsive records is unlawful under FOIA;

B. Enter an injunction that directs SIGAR to make all requested records available to the *Post*, unredacted, and without further delay;

C. Provide for expeditious proceedings in this action;

D. Award the *Post* its costs and reasonable attorneys' fees incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E); and

E. Grant such other and further relief as the Court may deem just and proper.

Dated: November 14, 2018          Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com

*Counsel for Plaintiff WP Company LLC*
*d/b/a The Washington Post*

14