**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| WP COMPANY LLC ) | |
| d/b/a THE WASHINGTON POST, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Civil Action No. 1:18-cv-2622-ABJ |
| ) | |
| SPECIAL INSPECTOR GENERAL FOR) | |
| AFGHANISTAN RECONSTRUCTION, ) | |
| ) | |
| *Defendant*. ) | |
| _____ ) | |

**DECLARATION OF MICHAEL A. HUBBARD**

I, Michael A. Hubbard, declare as follows:

1. I serve as Freedom of Information Act ("FOIA") Officer in the Office of General Counsel, Office of the Special Inspector General for Afghanistan Reconstruction ("SIGAR"), located in Arlington, Virginia.

2. I have held the position of FOIA Officer since January 2018, when FOIA duties were transferred to the Office of General Counsel from the Office of Management and Support following the departure of the former SIGAR FOIA clerk.

3. I make this declaration based on my personal knowledge, as well as on information received and considered by me in the performance of my official duties.

**SIGAR Background**

4. SIGAR is a temporary agency established by Section 1229 of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), Pub. L. No. 110-181, 122 Stat. 3 (Jan. 28, 2008).  Unlike most inspectors general, SIGAR is an independent organization, not

located within any larger federal agency. While other inspectors general have jurisdiction only over the programs and operations of their respective agencies, the NDAA confers on SIGAR audit and investigative authority over all reconstruction programs and operations in Afghanistan that are supported with U.S. dollars, regardless of the agency involved.[1]

5. SIGAR is a law enforcement and auditing agency, with fewer than 190 employees. SIGAR's staff, including investigators with the power of arrest, auditors, inspectors, program analysts, engineers, and attorneys, work in both the United States and Afghanistan. SIGAR is headquartered in Arlington, Virginia, and has an office in Afghanistan with approximately 30 auditors, investigators, and others.

6. Afghanistan reconstruction is a national security priority for the United States. SIGAR's statutory mission is to prevent and detect waste, fraud, and abuse in U.S.-funded reconstruction programs and operations in Afghanistan. The statute also requires SIGAR to make recommendations on policies designed to prevent waste, fraud, and abuse by promoting economy, efficiency, and effectiveness in the administration of reconstruction programs and operations, and to keep Congress and the Secretaries of State and Defense informed about problems and deficiencies related to the U.S. reconstruction effort.[2]

### The SIGAR Lessons Learned Program

7. The SIGAR Lessons Learned Program ("LLP") was established in 2014 to extract lessons from the U.S. reconstruction experience in Afghanistan, and to make recommendations to

---

[1] National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1229(a)(1) (2008), 122 Stat. 378-85 (establishing the Office of the Inspector General for Afghanistan Reconstruction, or "SIGAR"), as amended by Pub. L. No. 111-38, 123 Stat. 1932-33 (2009).

[2] National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1229(a)(2) (2008), 122 Stat. 378-85, as amended.

Congress and Executive Branch agencies on ways to improve reconstruction efforts in

current and future overseas contingency operations.  LLP's reports focus on key aspects of

the reconstruction effort and document what the U.S. government sought to accomplish,

assess what it achieved, and evaluate the degree to which these efforts helped the United

States reach its strategic goals in Afghanistan.[3]  These reports make findings, draw

conclusions, and provide recommendations to Congress and Executive Branch agencies.

LLP currently has a staff of 15 employees, which primarily includes subject matter experts,

research analysts, and editors.

8. LLP draws upon a wide variety of sources for its reports.  Much of the documentary research

   is focused on publicly available material, including reports from Executive Branch agencies,

   the Government Accountability Office ("GAO"), the North Atlantic Treaty Organization

   ("NATO"), the Congressional Research Service, the United Nations Development Program,

   and Congressional testimony given by government officials and experts.  LLP research teams

   also benefit from SIGAR's access to material that is not publicly available, including

   documents possessed by Executive Branch agencies.  LLP's research teams also draw from

   SIGAR's own work, embodied in its quarterly reports to Congress and its investigations,

   audits, inspections, and special projects.

9. In addition to reviewing documents, LLP's research teams have interviewed hundreds of

   individuals with direct and indirect knowledge of U.S. reconstruction programs.  These

---

[3] E.g., SIGAR, *Corruption in Conflict: Lessons from the U.S. Experience in Afghanistan*
(September 2016), https://www.sigar.mil/pdf/lessonslearned/SIGAR-16-58-LL.pdf; SIGAR,
*Stabilization: Lessons from the U.S. Experience in Afghanistan* (May 2018),
https://www.sigar.mil/pdf/lessonslearned/SIGAR-18-48-LL.pdf; *Counternarcotics: Lessons from
the U.S. Experience in Afghanistan* (June 2018),
https://www.sigar.mil/pdf/lessonslearned/SIGAR-18-52-LL.pdf.

interviews have provided insights into the rationale behind government decisions, the debates within and between agencies, and the frustrations that span years but often remain formally unacknowledged.  Interviews have also provided significant information concerning government conduct that potentially constitutes waste, fraud, or abuse.

10. Each interview was conducted, consistent with section 7 of the Inspector General Act of 1978 ("IG Act"), 5 U.S.C. app. 3 § 7, with the express assurance of confidentiality.  SIGAR routinely asked each informant whether he or she wanted the interview to be "on the record," "off the record", "on background", or "non attribution".    "On the record" interviews are interviews in which the informant consented to being identified as the source of the information provided in the interviews.  "Off the record" and "on background" interviews are interviews in which the informant did not consent to being identified as the source of the information provided to SIGAR.  In some instances, interviewers noted that an informant requested "non-attribution."  Similar to "off the record" and "on background," "non-attribution" interviews are interviews in which the informant did not consent to being identified as the source of the information provided to SIGAR.  If the informant requested that the interview be "off the record," "on background" or "non-attribution" SIGAR considered that to mean that the informant did not want to be identified and SIGAR expressly assured the informant that the agency would keep his or her identity confidential.

11. Confidentiality is vital to SIGAR's success in fulfilling its mission because if we could not assure our sources that their identities will be protected, it is highly likely that the vast majority of individuals in possession of useful information would refuse to share that information with SIGAR given their understandable and well-founded fear of unwanted contact and reprisal.  Indeed, a majority of the informants interviewed by SIGAR wished to

remain anonymous due to the politically sensitive nature of many of the matters discussed and their fears of harassment, retaliation, damage to their careers, and other adverse consequences.  For those still working for or with government agencies and organizations, confidentiality was and is particularly important due to their fears of punishment for reporting possible waste, fraud, and abuse.  For Afghans who were interviewed, confidentiality was also viewed as essential to their personal safety, given the pervasive corruption and violence in the environment in which they live and work.

12. I am aware that informants' fears of adverse consequences are well founded, given widely publicized examples of how government employees, contractors, and others have been punished for reporting and revealing waste, fraud, abuse, and other government misdeeds and embarrassments.

13. As a result of these concerns, and consistent with section 7 of the IG Act, when LLP staff wanted to quote an informant in a lessons learned report, LLP staff first contacted the informant to obtain permission.  Sometimes that permission was granted and other times it was not.  In some instances the informant agreed to be quoted or paraphrased, but only with a generic description, such as "a USAID official."

**Plaintiff's FOIA Request**

14. On March 24, 2017, Mr. Craig Whitlock of The Washington Post submitted to SIGAR a Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552, *et seq.*, request dated March 23, 2017, for copies of "[a]ll transcripts and audio recordings of interviews conducted for SIGAR's Lessons Learned Program."  Plaintiff's FOIA request was assigned control number 2017-F-014 (Plaintiff's FOIA request").  Compl., *WP Co. LLC v. SIGAR*, No. 1:18-cv-2622-ABJ (D.D.C. Nov. 14, 2018), Dkt. No. 1, Exh. A.  Although the Plaintiff's FOIA request was

sent on March 24, 2017, SIGAR had no record of it until Mr. Whitlock sought

acknowledgment that the request had been received.  SIGAR then confirmed receipt of the

FOIA request in an April 17, 2017 email with an attached acknowledgment letter.  On May

15, 2017, SIGAR sent Mr. Whitlock a letter stating that it required an extension of at least 10

days to process the request.  On May 31, 2017, SIGAR sent Mr. Whitlock a letter stating that

it required an extension of 30 days to process the request and that he had the right to appeal

any adverse determination should he wish to do so and to send his appeal in writing within

90 days to a specified address.

15. Shortly after receiving the request, SIGAR conducted an initial search for transcripts and

audio files responsive to Plaintiff's FOIA request.  SIGAR delayed making a final

determination on the release of these records due to the pendency of litigation regarding

Plaintiff's earlier, related request seeking records pertaining to SIGAR's interview with

Lieutenant General Michael Flynn.  The Flynn request was ultimately resolved in February

2018.  *See* Stipulation of Dismissal, *WP Co. LLC v. SIGAR*, No. 1:17-cv-2114-ABJ (D.D.C.

Feb. 27, 2018), Dkt. No. 12.

16. On February 2, 2018, the Special Inspector General and SIGAR senior staff met with the

requester, Mr. Whitlock, a reporter for the Washington Post, to discuss the March 23, 2017,

FOIA request and how to work together to provide as much information as possible.  In that

meeting, SIGAR described the nature of the LLP interviews and the fact that many of the

people interviewed did not want their names made public for fear of adverse repercussions.

SIGAR explained it was prohibited by the IG Act from disclosing the identity of sources who

wished to remain anonymous and that SIGAR had promised those sources confidentiality.  It

became apparent that Mr. Whitlock was under the impression that SIGAR had transcripts and

6

audio recordings for all of the LLP interviews, which SIGAR staff explained was not the case.  Mr. Whitlock requested a list of the interviews and SIGAR agreed to construct one despite the fact that the FOIA does not require agencies to create records.  SIGAR staff noted, however, that there might be some errors in the list.  SIGAR staff also made it clear that the list would not include names of confidential sources.

17. On February 14, 2018, SIGAR provided to Mr. Whitlock a list in which LLP staff identified interviews thought to be on the record and those thought to be off the record/not for attribution, and indicated whether SIGAR had located a transcript or audio recording for the interview.

18. In a February 23, 2018 email SIGAR notified Mr. Whitlock that it was granting the  FOIA request for "all transcripts and audio recordings of interviews conducted for SIGAR's Lessons Learned Program."  Compl., *WP Co. LLC v. SIGAR*, No. 1:18-cv-2622-ABJ (D.D.C. Nov. 14, 2018), Dkt. No. 1, Exh. B.   In the same email, Mr. Arlington, SIGAR's General Counsel, stated, "I would like clarification from you . . .  strictly speaking, your FOIA request was for transcripts and recordings.  As explained above, the majority of our interviews were conducted without either a transcript or recording; for these there are only the interviewer's notes.  Are you requesting copies of these also?  If so, please let me know, as this will require substantially more time and resources to review." *Id*.

19. Responding by email on February 26, 2018, Mr. Whitlock, stated, "to be clear, as part of my March 23, 2017 FOIA request, The Washington Post is requesting all records of interviews conducted as part of SIGAR's Lessons Learned Program."  Compl., *WP Co. LLC v. SIGAR*, No. 1:18-cv-2622-ABJ (D.D.C. Nov. 14, 2018), Dkt. No. 1, Exh. C.

20. On February 28, 2018 Mr. Arlington responded, "Regarding what it was that you asked for in your FOIA request:  I went back to take a look at your March 23, 2017, FOIA request, and I see that you requested only 'All transcripts and audio recordings of interviews conducted for SIGAR's Lessons Learned Program.'  You did not request any other records . . . . Nevertheless, I provided you with a list of all interviews conducted by the Lessons Learned Program and I offered to provide you with interview notes, since as I explained in my last email, the vast majority of the interviews were not recorded and there was no transcript.  In other words, we want you to have this information, but I'm hoping you will understand that it will take some time for us to review these interview notes to remove the names and identifying information for people who do not want their names revealed.  As I explained in my email, we are prohibited by law from revealing those sources without their permission.  As a journalist, I'm sure you appreciate the need to protect confidential sources."  Compl., *WP Co. LLC v. SIGAR*, No. 1:18-cv-2622-ABJ (D.D.C. Nov. 14, 2018), Dkt. No. 1, Exh. D..

21. On February 28, 2018, Mr. Whitlock replied, "I take your point about the wording of the original FOIA request -- in retrospect, it should have specified more clearly that The Post is seeking any records of the interviews, including notes, not just transcripts or recordings . . ."  Compl., *WP Co. LLC v. SIGAR*, No. 1:18-cv-2622-ABJ (D.D.C. Nov. 14, 2018), Dkt. No. 1, Exh. E.  Mr. Whitlock went on to say that he assumed that SIGAR was "treating this email exchange as the equivalent of either a clarified or amended FOIA request."  *Id.*

22. Over the ten years of SIGAR's existence, SIGAR has received approximately 256 FOIA requests.  The FOIA request that is the subject of this litigation is only the second request to ever end up in litigation and the only request that SIGAR has not been able to resolve amicably. As a result, SIGAR has no prior experience processing a request of this magnitude

or complexity, and this is the first FOIA request that I have worked on as a FOIA Officer with SIGAR.

**SIGAR's Search for Records**

23. By federal government standards, SIGAR is a tiny agency.  SIGAR employs fewer than 190 people and its general counsel's office—which is tasked with processing FOIA requests, in addition to its other duties—consists of only five people:  the general counsel, the deputy general counsel, an investigative counsel, an ethics counsel, and myself.

24. In my capacity as SIGAR's FOIA Officer, I worked with the Director of SIGAR's Lessons Learned Program to identify records responsive to Plaintiff's request and to process those records for release to Plaintiff.  Because Plaintiff's request sought records pertaining to the LLP interviews, the General Counsel, Mr. Arlington, determined that responsive records were most likely located in LLP's files.  LLP's files are digital and are kept in digital folders on a computer network that is accessible to all LLP staff.   To ensure a thorough search for records responsive to Plaintiff's FOIA request, the Director of LLP instructed his staff on February 12, 2018, to search their digital files for all transcripts, audio recordings, and records of interview ("ROIs").[4] On or about March 1, 2018, the Director of LLP clarified that the search should be made for records that existed prior to February 28, 2018.  The search was conducted by LLP staff manually, by opening and visually searching the digital folders, and electronically by searching all LLP files using terms such as "interview," "transcript," "record of interview," "ROI," "recording," and "audio".

---

[4] A record of interview (ROI) is a document that contains an LLP analyst's notes, impressions, thoughts, and advice concerning information collected during an interview with an informant. An ROI is not a transcript.

25. The Director of LLP personally supervised the search for ROIs and confirmed with his staff that the searches were carried out correctly.  In addition, he assigned a program manager to do an independent search to confirm that all responsive records had been found.

26. As a result of these searches, SIGAR identified a total of 461 records responsive to Plaintiff's revised request, totaling 2,145 pages.

   a.  Sixteen of the 461 responsive records were audio recordings.  Six of the audio recordings were of "on the record" interviews and were released in full; one of the audio recordings was an "on the record" interview and was released in part; one of the audio recordings was partially "on the record" and partially "off the record," and was released in part; and eight of the audio recordings were of "off the record" interviews and withheld in full.

   b.   Twenty-eight of the 461 responsive records consist of transcripts.  Twenty-four of the transcripts were of "on the record" interviews and released in full; one transcript was "on the record" and released in part; one transcript was partially "on the record" and partially "off the record," and was released in part; and two of the transcripts were of "off the record" interviews and released in part.

   c.  One of the 461 responsive records is a list of interviews that SIGAR LLP conducted and hoped to conduct.  This list was released in part.

   d.  Four hundred and sixteen of the 461 responsive records were records of interviews ("ROIs").  Thirty ROIs summarized "on the record" interviews and were released in full; 18 of the ROIs summarized "on the record" interviews and were released in part; 367 ROIs summarized "off the record" interviews and were released in part; and one ROI summarized an "off the record" interview and was withheld in full.

27. Of the 18 ROIs that summarized on-the-record interviews but that were released in part, SIGAR released the identity of the informant but withheld a limited amount of other information in each record.  The remaining 368 ROIs that were either released in part or withheld in full were either not conducted on the record and/or the informant did not expressly consent to the disclosure of his or her identity.  Accordingly, SIGAR withheld these informants' names, titles, interview codes and other personally identifying information. With respect to the ROIs, the vast majority of records do not contain the informant's name. Rather, the informant is identified in the ROI by title and/or interview code.  An interview code is a unique identifier assigned to a particular informant.  Some interview codes contained in off-the-record ROIs were not redacted owing to clerical error.

28. On February 21, 2018, with the release of five transcripts totaling 303 pages to Mr. Whitlock without redactions, SIGAR began producing responsive records to Plaintiff on a rolling basis. SIGAR made this decision consistent with its long-standing policy to make as much information available to the public as it can.

29. SIGAR produced the non-exempt portions of 227 responsive records prior to November 14, 2018, when Plaintiff filed this lawsuit.

30. SIGAR produced the non-exempt portions of the remaining 234 responsive records after Plaintiff filed this lawsuit.

31. SIGAR released 60 records in full; 392 records were released in part; and 9 records were withheld in full.

32. In preparing for summary judgment, SIGAR again reviewed the records and determined that additional information could be released to Plaintiff.  SIGAR accordingly reprocessed the records and produced the records to Plaintiff with a Bates stamp appearing on each page.

## Discussion of Exemptions Claimed

33. We reviewed the responsive audio recordings, transcripts, and ROIs with an eye to making as much of their contents public as we could.  Although we realized that these records were predecisional and deliberative in their entirety and, therefore, SIGAR could have invoked FOIA Exemption (b)(5) to withhold the entire record set, we chose to release as much information as possible, withholding only information to maintain the confidentiality of our sources under Exemptions 3, 6, 7(C), and 7(D) and the privacy of third parties.  We also redacted a limited amount of information pursuant to Exemption 5.

34. When reviewing the ROIs, we also realized that some information contained in the records might be considered so sensitive by other federal agencies that it might be classified or otherwise withheld from public disclosure.  SIGAR does not have the authority to classify information.  Therefore, SIGAR referred those ROIs containing potentially sensitive information to the relevant agency or agencies for consultation.  This consultation process required substantial extra time.

35. The federal agencies to which SIGAR referred the ROIs for consultation were seeing those records for the first time.  As a result, it was not surprising that some of the information contained in those records was subsequently classified, or redacted for national security reasons, as described below.  Portions of those records were withheld under Exemptions 1, 3, 6, 7(A), 7(E), and 7(F), which are addressed separately in declarations by the State Department ("State"), the United States Special Operations Command ("SOCOM"), the United States Central Command ("CENTCOM"), and the Drug Enforcement Agency ("DEA").  Accordingly, this declaration incorporates by reference the State Declaration, the

SOCOM Declaration, the CENTCOM Declaration, and the DEA Declaration as filed contemporaneously.

### FOIA Exemption (b)(1) – Classified Information

36. The State Department invoked Exemption 1 to withhold information that is currently classified in accordance with Executive Order 13,526.  The State Department Declaration and the accompanying State Department Vaughn are appended to this declaration.

### FOIA Exemption (b)(3) – Exempt by Statute

37. Exemption 3 permits the withholding of information that is "specifically exempted from disclosure by statute provided such statute . . . requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue."  5 U.S.C. § 552(b)(3).

38. Three federal statutes are cited as the basis for FOIA Exemption 3 in this matter:  Section 7(b) of the Inspector General Act of 1978, as amended ("IG Act"); 10 U.S.C. § 130b, and Section 102A(i)(l) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(l). The SOCOM declaration addresses information withheld pursuant to 10 U.S.C. § 130b and the State and CENTCOM Declarations address information withheld pursuant to the National Security Act of 1947.

39. Section 7(b) of the IG Act prohibits SIGAR from disclosing the identity of individuals  who report waste, fraud, and abuse, and provide other information concerning government conduct and operations without their consent.  LLP relied on this provision to promise confidentiality to those it interviewed.

40. Although approximately  72 interviews occurred "on the record," meaning the informant consented to being identified as the source of the information provided to SIGAR, a majority of the informants made it clear to SIGAR that they wanted to remain anonymous for a

number of reasons.  SIGAR promised these informants that their identities would be kept

confidential.  Therefore, most interviews were conducted "off the record," "on background"

or for "non-attribution."  Only if informants gave "consent" to have their names associated

with specific information provided to SIGAR, did SIGAR release their names in association

with that *specific* information. An informant may have provided consent to SIGAR to release

his or her name in association with some information, but not all information provided during

the interview.

41. For the informants who did not make clear their "consent" to the disclosure of their identity,

SIGAR, consistent with section 7 of the IG Act, redacted their names and other personally

identifying information, such as official title, dates of employment, and duties, where their

identities would be made apparent by such detailed information and its context in the record.

For ROIs that were off the record, on background, or not for attribution, the informant's

name and other identifying information were redacted.  For 367 ROIs, instead of or in

addition to the informant's name, a unique interview code assigned to that informant was

listed in the ROI, and this code was also redacted.  As noted above, in some instances

informants provided limited consent regarding the use of their information in a SIGAR

public report.  For example, when LLP staff wanted to quote an informant in a lessons

learned report, the staff first contacted the informant to obtain permission.  Sometimes that

permission was granted and other times it was not.  In some instances the informant agreed to

be quoted or paraphrased, but only with a generic description, such as "a USAID official."

Most often, the informant consented to a quote being attributed to himself or herself, but did

not consent to the entirety of an interview record being attributed to himself or herself.  In

these instances, SIGAR redacted the name and interview code associated with the informant, but released the additional information contained in the interview record.

42. If the identities of these informants were to be revealed, it could result in harm to these sources, including harassment, public and private vilification, ostracization, demotion, employment termination, or other forms of retaliation.  SIGAR depends on the courage of government employees, contractors, and others to come forward to provide candid information regarding waste, fraud, and abuse, and other information important to the efficient operation of federal agencies involved in the reconstruction of Afghanistan.  If SIGAR were not able to assure these sources that their identities will be protected, the majority would be unwilling to provide their candid observations and experiences, and SIGAR's Lessons Learned Program, investigations, and audits would be severely limited and substantially less effective, to the detriment of Congress, the Executive Branch, and the public.

43. These redactions are therefore critical to "assure a free flow of information to the Inspector General" and to protect whistle-blowers who "might face retaliation if their identities were revealed . . . ."  *Iglesias v. USAID*, No. 17-cv-285, 2018 WL 4954148, at *8-9 (D.D.C. Oct. 12, 2018) (internal citation and quotations omitted).

### FOIA Exemption (b)(5) – Predecisional and Deliberative Information

44. FOIA Exemption b5, 5 U.S.C. § 552(b)(5), is invoked to withhold materials protected by the deliberative process privilege.  Release of this material would expose SIGAR's internal deliberations, expose the preliminary personal thoughts of SIGAR analysts, other SIGAR staff, and the employees of other agencies, impede and deter the frank and candid exchange

of ideas and information within the agency and among employees of collaborating agencies, and ultimately have a chilling effect on agency decision making.

45. The informants acted as "consultants" to SIGAR to provide it with the necessary information to produce its lessons learned reports and to conduct audits and investigations.  Many of the informants fall within the "consultant corollary" to the Exemption 5 threshold because they acted as outside experts, and it was SIGAR who sought their advice.  *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 338 (D.C. Cir. 2011).

46. Although all of the ROIs are covered by Exemption 5 because they contain predecisional, deliberative information that assist in the development of the lessons learned reports, in the spirit of transparency, SIGAR used its discretion to release as much information as possible, only asserting Exemption 5 as the sole basis for withholding certain predecisional, deliberative information.  SIGAR invoked Exemption 5 for portions of only 63 of 416 ROIs.

47. The ROIs are notes made by an interviewer; they are not a transcript.  They are deliberative because they are the thoughts of the interviewer, who is interpreting what the informant is saying, and then writing something down.  What the interviewer decides to write can vary from word-to-word, phrase-to-phrase, and sentence-to-sentence, from "quotes" to "interpretations" to "analysis" to added thoughts.  There is even a possibility that some of what the interviewer writes may be an inaccurate representation of what the informant said.  That, for example, is one reason why SIGAR goes back to informants to verify the accuracy of what they said before using it in a lessons learned report.   In addition, the ROIs are "predecisional" because a major purpose of the interviews is to obtain information to contribute to a lessons learned report in which SIGAR will make findings, draw conclusions, and make recommendations.  Even though many of the withholdings are factual, they fall

within the privilege's scope because they are intended to facilitate development of SIGAR's final position on the relevant issues in a future report.

48. All of the records at issue were generated as part of a continuing process of agency decision making.  The information in these documents contributes to a larger decision making process within SIGAR, namely the drafting of lessons learned reports and, in some instances, decisions whether to begin law enforcement investigations or audits.  The records requested are deliberative because they contain opinions, advice, and recommendations offered in the course of SIGAR's decision making with respect to those reports.  Moreover, any facts discussed in the context of these records are those selected by the interviewer out of a larger group of facts and thus represent a judgment call of what the interviewer believes is important and should be reported to others within SIGAR.

49. The release of the portions of these records would have a chilling effect on SIGAR's ability to obtain information in the future from individuals with knowledge of Afghanistan reconstruction.  This would harm both SIGAR's ability to provide recommendations to Congress and other Executive Branch agencies through lessons learned reports and its ability to obtain information that could be useful in ongoing or future investigations of waste, fraud, and abuse.

**FOIA Exemption 6 – Personally Identifiable Information**

50. Apart from the confidentiality mandated by Section 7 of the IG Act, FOIA Exemption 6, 5 U.S.C. § 552(b)(6), permits SIGAR to withhold the identity of individuals who have not authorized release of their names and other personally identifiable information.

51. To determine whether Exemption 6 may be applied to withhold the names and personally identifying information of the informants who were interviewed by LLP staff, as well as the

names of other individuals referenced in the ROIs, I was required to engage in a four-part

analysis.  First, I was required to determine whether the information at issue is a personnel,

medical, or "similar file"; second, I was required to determine whether there is a significant

privacy interest in the requested information; third, I was required to evaluate Plaintiff's

asserted FOIA public interest in disclosure; and finally, if there is a significant privacy

interest in non-disclosure and a FOIA public interest in disclosure, I was required to balance

those competing interests to determine whether disclosure "would constitute a clearly

unwarranted invasion of personal privacy."

52. I first determined that the ROIs at issue are "similar files" for purposes of Exemption 6.  I am

aware that the U.S. Supreme Court has held that Congress intended the term "similar files" to

be interpreted broadly, rather than narrowly.  *U.S. Department of State v. Washington Post

Co.*, 456 U.S. 595, 599-603 (1982).  Here, the individuals interviewed by SIGAR provided

their personal thoughts, observations, critiques, complaints, and analyses to a SIGAR

interviewer.  Each interview was between an individual and a SIGAR employee.  The

essence of the interview was that it was personal and intended to be candid.  In addition,

many of the informants provided information about third parties, including their names and

other identifying information, and characterized their activities, opinions, and actions.  I

concluded that this information was clearly linked to particular individuals, and therefore the

ROIs are "similar files".

53. Second, I determined there was, in fact, a significant privacy interest in this information.  In

*U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, the Supreme

Court stated that "both the common law and the literal understandings of privacy encompass

18

the individual's control of information concerning his or her person."[5]  Here, consistent with

section 7 of the IGA, SIGAR interviewers assured informants that their identities would not

be disclosed absent consent and the informants at issue requested non-disclosure.  If the

identities of these sources were to be revealed, the informants could be subjected to serious

adverse consequences, including harassment, public and private vilification, ostracization,

demotion, employment termination, or other forms of retaliation.  In the case of Afghan

informants and non-Afghans who travel to Afghanistan, disclosure of this information could

expose them to personal harm, due to the pervasive corruption and violence in Afghanistan.

Third parties referenced in the ROIs, transcripts and audio recordings could be exposed to

similar harms. I therefore concluded that these individuals have a significant privacy interest

in maintaining the confidentiality of their identities.

54. Many of the informants requested that their statements be off the record/on background or

that SIGAR contact them prior to release of their name and the information they disclosed in

the interview.

55. Accordingly, for ROIs that were off the record, on background, or not for attribution, SIGAR

redacted the informant's name and other identifying information unless the informant clearly

and expressly consented that their identity could be disclosed.

56. For 367 ROIs, instead of the informant's name, a unique interview code assigned to that

informant was listed in the ROI, and this code was also redacted.[6]  As noted above, in some

instances, informants provided limited consent regarding the use of their identifying

information in a SIGAR public report.  For example, the informant consented to a quote

being attributed to himself or herself, but did not consent to the entirety of an interview

---

[5] 489 U.S. 749, 763 (1989).

[6] The transcripts and audio recordings did not have interview codes.

record being attributed to himself or herself. In these instances, SIGAR redacted the name

and interview code associated with the informant, but released the additional information

contained in the interview record.

57. SIGAR withheld in full eight off the record audio recordings, because the agency determined

that release of the informants' voices would reveal their identities.

58. In total, SIGAR withheld the names and other identifying information from 378 responsive

records.  SIGAR withheld the names, interview codes, titles, ranks, dates of deployment,

dates of employment, location where the interview took place, and other information that

could be used to identify the informant or a third party and constitute a clearly unwarranted

invasion of personal privacy.  SIGAR is aware, through long experience working with

whistle-blowers and other informants, that all of these informants risk being embarrassed,

humiliated, or possibly harassed if their identities are released.  Of these, it appears that at the

time of the interviews about half were U.S. government civilian employees; about 25 percent

were U.S. military; many of the rest were foreign nationals, including members of allied

military forces, academics, and others.  Overall, about 35 percent were former military or

civilian government employees, *i.e.*, private citizens, and that number may have grown over

time; 10 percent were very high ranking military and civilian employees, *i.e.*, ambassadors,

generals, and assistant secretaries; and 15 percent were law enforcement and intelligence

personnel in sensitive positions.  A few were foreign civilians, including Afghans.[7]

59. Third, I noted that in its complaint, Plaintiff asserted that it was in the public interest to know

who had made certain statements to SIGAR, because a statement might have more

significance if it were made by certain people rather than others.  In considering this public

---

[7] It should be noted that these categories often overlap, which is why the numbers do not equal 100 percent.

interest, I noted the vast majority of the substantive information contained in the ROIs had been disclosed.  Disclosure of the names of the informants and third parties named in the ROIs would do little to shed additional light on government operations.   Additionally, I determined there is a strong public interest in assuring that individuals will share information with SIGAR in the future.  SIGAR depends on the courage of government employees, contractors, and others to come forward to provide candid information regarding waste, fraud, and abuse, and other information important to the efficient operation of federal agencies involved in the reconstruction of Afghanistan.  If SIGAR were not able to assure these sources that their identities will be protected, the majority would be unwilling to provide their candid observations and experiences, and SIGAR's Lessons Learned Program, investigations, and audits would be severely limited and substantially less effective, to the detriment of Congress, the Executive Branch, and the public.

60. Finally, I weighed the privacy interests of the informants and third parties against the FOIA public interest asserted by The Washington Post.  I concluded that the informants and third parties had a very strong privacy interest in preserving their confidentiality, as described above, while the Plaintiff was able to articulate only the possibility that there would be some value in knowing who said what.  While knowing the names of SIGAR's sources might be intriguing to those interested in the machinations of personalities, it would shed little light on the operations and activities of government.  Further, as discussed above, the public has an interest in ensuring that individuals will share information with SIGAR in the future.

61. Accordingly, I conclude that disclosure of these names would constitute a clearly unwarranted invasion of privacy, since disclosure would reveal little, if anything, of substance about an agency's activities.

**FOIA Exemption 7**
**Records or Information Compiled for Law Enforcement Purposes**

62. FOIA Exemption 7, 5 U.S.C. § 552(b)(7), protects six categories of law enforcement

information from disclosure.  To protect any of this information, the records or information

must be compiled for law enforcement purposes, by a law enforcement agency.  SIGAR

withheld information pursuant to Exemptions 7(C) and 7(D).  In addition, the DEA withheld

information pursuant to Exemptions 7(A), 7(E), and 7(F), and CENTCOM and SOCOM both

withheld information pursuant to Exemption 7(E).  These withholdings are addressed in the

DEA Declaration, the CENTCOM Declaration, and SOCOM declaration filed

contemporaneously with this declaration.

63. SIGAR meets Exemption 7's threshold requirements.  SIGAR is a law enforcement agency.

SIGAR's mission is to prevent and detect waste, fraud, and abuse in Afghanistan

reconstruction programs and operations.[8]  SIGAR's two main functions are to conduct law

enforcement investigations and audits.[9]  SIGAR has the authority to issue subpoenas and

make arrests.[10]  SIGAR's Special Agents investigate crimes involving federal procurement

fraud, contract fraud, theft, corruption, bribery of government employees and public officials,

and a variety of civil matters pertaining to waste, fraud, and abuse.  SIGAR auditors conduct

performance audits, financial audits, and inspections, and to date have found more than $1

billion in questioned costs and savings.  Additionally, SIGAR pursues the prosecution of

criminal wrongdoing using prosecutors detailed from the Department of Justice in federal

---

[8] National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1229(a)(1)
(2008), 122 Stat. 378-85, as amended.
[9] National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1229(f)
(2008), 122 Stat. 378-85, as amended.
[10] 5 U.S.C. app. §§ 4, 6.

courts, in military courts under the Uniform Code of Military Justice, and in investigations with the Afghan Attorney General's Office.

64. SIGAR's lessons learned reports are a critical part of its law enforcement mission.  SIGAR's authorizing statute requires it not only to carry out audits and investigations of waste, fraud, and abuse in Afghanistan, but also to make recommendations for improvements to the reconstruction effort aimed at deterring and preventing waste, fraud, and abuse.[11]  The LLP is one way SIGAR carries out that duty.  Accordingly, the lessons learned reports it produces are an integral part of SIGAR's law enforcement mission.

65. The ROIs at issue here were compiled for law enforcement purposes, serving as a critical part of SIGAR's ongoing investigation of waste, fraud, and abuse relating to Afghanistan reconstruction programs and operations supported by appropriated funds.  SIGAR relied on the ROIs in formulating its lessons learned reports, which include recommendations for combatting waste, fraud, and abuse.  For example, SIGAR's first full lessons learned report, *Corruption in Conflict*, published in September 2016, was centered entirely on law enforcement issues.  The report made 11 recommendations to Congress and Executive Branch agencies designed to improve anticorruption efforts in Afghanistan and in future overseas contingency operations.  Information obtained in the interviews and memorialized in the ROIs made a substantial contribution to that report, and most of the ROIs contained information obtained from confidential sources.  In September 2017, SIGAR published *Reconstructing the Afghan National Defense and Security Forces,* which, among other things, investigated the failure to develop an effective police function in Afghanistan and

---

[11] National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1229(a)(1) (2008), 122 Stat. 378-85, as amended .

made related findings and recommendations.  Information contained in the ROIs was used to produce that report also.  And in June 2018, SIGAR published *Counternarcotics*, which examined the U.S. counternarcotics effort in Afghanistan.  The report made detailed findings and recommendations for improvements to the counternarcotics program, all of which were law enforcement centered.  Information contained in a majority of these ROIs came from confidential sources, and contributed substantially to these reports and others.

66.  In addition, LLP staff have shared information obtained in the course of their research, including information obtained during the interviews memorialized in the ROIs, with SIGAR's investigations and audit directorates both informally and in regular weekly meetings, since the inception of LLP.  The weekly meeting was established by the Special Inspector General specifically for the purpose of sharing information across directorates.  In this way, LLP staff have in the past alerted the investigators and auditors to relevant information obtained in the course of their interviews, as well as information obtained from other sources.  In sum, information contained in the ROIs has in the past, and we expect will in the future, make a significant contribution to SIGAR's law enforcement mission. Thus, the responsive records were compiled not only to inform Congress and the Executive branch about law enforcement efforts in Afghanistan such as those to combat corruption and narcotics trafficking, but also to further SIGAR's own investigations.

### FOIA Exemption 7(A) --
### Information Expected to Interfere with Enforcement Proceedings

67.  FOIA Exemption (b)(7)(A) protects information that is compiled for law enforcement purposes that could reasonably be expected to interfere with enforcement proceedings. 5 U.S.C. § 552(b)(7)(A).

68. As noted above, Exemption 7(A) was invoked by the Drug Enforcement Agency ("DEA") to withhold certain information pertaining to law enforcement methods used by DEA in apprehending criminals.  This is explained in detail in DEA's Declaration, which is filed contemporaneously with this declaration.

**FOIA Exemption 7(C) -- Invasion of Personal Privacy**

69. FOIA Exemption 7(C) is intended to protect information the disclosure of which could reasonably be expected to constitute an unwarranted invasion of personal privacy.  5 U.S.C. § 552(b)(7)(C).

70. SIGAR redacted the names and other personally identifying information of informants who requested that their interviews be conducted off the record, on background, or stated the information provided to SIGAR was not for attribution.  Thus, to be clear, unless an informant expressly gave their consent to have their personal privacy exposed, SIGAR redacted the informant's name and other personally identifying information – such as official title, dates of employment, and duties – where their identities would be made apparent by such detailed information in the record and its context.

71. For 367 ROIs, instead of the informant's name, a unique interview code assigned to that informant was listed in the ROI, and this code has been redacted.   SIGAR withheld in full eight off-the-record audio recordings, because the agency determined that release of the informants' voices would reveal their identities.

72. In some instances, informants provided limited consent regarding the use of their identifying information in a SIGAR public report.  For example, the informant consented to a quote being attributed to himself or herself, but did not consent to the entirety of an interview record being attributed to himself or herself.  In these instances, SIGAR redacted the name

and/or interview code associated with the informant, but released the additional information
contained in the interview record.

73. If the identities of these informants were to be revealed, it could result in serious adverse
consequences to these sources, including harassment, public and private vilification,
ostracization, demotion, employment termination, or other forms of retaliation. In the case of
Afghan informants and non-Afghans who travel to Afghanistan, disclosure of this
information could expose them to personal harm, due to the pervasive corruption and
violence in Afghanistan.  To invoke Exemption 7(C), SIGAR was required to weigh the
privacy interest of the informants and third parties identified in the responsive records against
the public interest in disclosure of this information.

74. To determine whether this exemption should be applied to withhold the names and
identifying information of the informants and third parties named in the ROIs, I applied the
balancing test used for Exemption 6, recognizing that for this exemption the privacy interest
of the individual is accorded more weight than under Exemption 6.  See ¶¶ 58-60

75. Using this analysis, I concluded that the names and identifying information of these
individuals should be withheld because their privacy interests outweigh any public interest in
their identities.  See ¶¶ 58-60.  This included informants who were foreign nationals (who
maintain privacy interests under this exemption), and higher ranking government officials.

76. In total, SIGAR withheld the names and other identifying information from 378 responsive
records.  SIGAR withheld the names, interview codes, titles, ranks, dates of deployment,
dates of employment, location where the interview took place, and other information that
could be used to identify the informant or a third party and constitute a clearly unwarranted
invasion of personal privacy.  SIGAR is aware, through long experience working with

whistle-blowers and other informants, that all of these informants risk being embarrassed, humiliated, or possibly harassed if their identities are released.

77. Of those interviewed, it appears that at the time of the interviews about half were U.S. government civilian employees; about 25 percent were U.S. military; many of the rest were foreign nationals, including members of allied military forces, academics, and others. Overall, about 35 percent were former military or civilian government employees, *i.e.*, private citizens, and that number may have grown over time; 10 percent were very high ranking military and civilian employees, *i.e.*, ambassadors, generals, and assistant secretaries; and 15 percent were law enforcement and intelligence personnel in sensitive positions. A few were foreign civilians, including Afghans.[12]

### FOIA Exemption 7(D) --
### Disclosure of the Identity of a Confidential Source

78. FOIA Exemption 7(D) permits an agency to withhold from disclosure records which "could reasonably be expected to disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D).

79. SIGAR invoked this exemption to withhold the names and identifying information of informants who did not consent to the disclosure of their identity. The records to which this exemption were applied are indicated in the Vaughn Index. SIGAR expressly promised confidentiality to informants who requested it. This was standard practice for the lessons learned interviews. Notations to this effect were made on the ROIs at the time of the interview, such as "off the record", "on background", or "non-attribution." In addition, in the vast majority of instances the informants were not identified on the ROIs. Instead, an interview code was placed on the ROIs when SIGAR promised the informants

---

[12] It should be noted that these categories often overlap, which is why the numbers do not equal 100 percent.

confidentiality, keyed to a separate list of the informants' names.  Courts have held that both

of these actions demonstrate that express promises of confidentiality were made.  See, e.g.,

*Roth v. DOJ*, 642 F.3d 1161, 1186 (D.C. Cir. 2011)(FBI properly withheld documents that

contained positive indications that the FBI gave the sources express assurances of

confidentiality as evidenced by words "protect identity" and notation that source "desired to

remain anonymous"); *Clemente v. FBI*, 741 F.Supp. 2d 64, 87 (D.D.C. 2010)(agreeing that

FBI's declaration showed that informants with source symbol numbers received express grant

of confidentiality).

80. SIGAR took these precautions for several reasons:  (1) Section 7 of the IGA requires that the

names of informants be kept confidential unless the informant consents to their release; (2) in

most cases, the informants feared retaliation by their employers, including possible job loss

or other adverse consequences; (3) Afghan informants feared not only potential job loss, but

feared for their personal safety should it become known that they had provided information

to the U.S. government; and (4) it is unlikely that most informants would have consented to

be interviewed had they not received assurance from SIGAR that theirs names would be kept

in confidence.

81. Confidential sources providing information to SIGAR pursuant to assurances of

confidentiality should be secure in the knowledge that their assistance will be held in

confidence. Release of these names and identifying information could cause some sources to

withdraw their cooperation with SIGAR and have a chilling effect on other current and

potential sources, who need to know they can trust SIGAR's assurances of confidentiality.

**FOIA Exemption 7(E) --**
**Techniques or Procedures for Investigations**

82. FOIA Exemption 7(E) protects information compiled for law enforcement that could disclose techniques or procedures for investigations or prosecutions, or guidelines that could be expected to risk circumvention of the law.  5 U.S.C. § 552(b)(7)(E).

83. DEA, CENTCOM, and SOCOM each withheld portions of the ROIs under Exemption 7(E). Information regarding these withholdings is set forth in the DEA Declaration, CENTCOM Declaration, and SOCOM Declaration, which are filed contemporaneously with this declaration.

**FOIA Exemption 7(F) --**
**Information Expected to Endanger the Life or Physical Safety of an Individual**

84. FOIA Exemption 7(F) protects information that is compiled for law enforcement proposes the disclosure of which could reasonably be expected to endanger the life or physical safety of an individual.

85. DEA applied Exemption 7(F) in conjunction with Exemption 7(E) to withhold information describing the location of where DEA agents sleep while in Afghanistan.  This is explained in detail in DEA's Declaration, filed contemporaneously with this declaration.

**Segregability**

86. SIGAR reviewed each record line-by-line to identify information that was required by statute to be withheld or that should be withheld under a FOIA exemption.  SIGAR made every effort to segregate material that could be disclosed entirely or with minimal redactions in accordance with the exemptions discussed herein.  It was not possible to reveal additional information without revealing the substance of the information exempted from release under

FOIA.  I determined that no additional, meaningful information can be segregated and released from these records.

**Foreseeable Harm**

87. As discussed above, SIGAR strongly believes that release of the withheld information could cause harm to one or more interests protected by the cited FOIA exemptions.  Specifically, release of this information could reasonably be expected to reveal classified information, reveal statutorily exempt information, subject individuals to harassment or retaliation by revealing confidential sources, and interfere with law enforcement proceedings, techniques, and procedures, as well as potentially compromising the personal safety of individuals and law enforcement personnel.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 16, 2019.

Michael A. Hubbard
FOIA Officer
Office of General Counsel
Office of the Special Inspector General
    for Afghanistan Reconstruction