## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| WASHINGTON POST COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 18-2622 (ABJ) |
| ) | |
| SPECIAL INSPECTOR GENERAL ) | |
| FOR AFGHANISTAN ) | |
| RECONSTRUCTION, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## <u>MEMORANDUM OPINION</u>

This Freedom of Information Act ("FOIA") case involves a request for records made by the Washington Post Company (the "Post") to the Special Inspector General for Afghanistan Reconstruction ("SIGAR"), the federal agency charged with auditing and supervising the U.S. reconstruction efforts in Afghanistan. After several battles concerning the pace of production, SIGAR eventually produced hundreds of responsive records, but it redacted some material made pursuant to various FOIA exemptions. It also declined to produce several documents in full under FOIA exemptions. The Post contests a large portion of the withholdings, *see generally* Compl. [Dkt. # 1], and both parties have now moved for summary judgment. *See generally* Def.'s Mot. for Summ. J. [Dkt. # 19] ("Def.'s Mot."); Def.'s Mem. in Supp. of Def.'s Mot. [Dkt. # 19-1] ("Def.'s Mem."); Pl.'s Cross-Mot. for Summ. J. [Dkt. # 22] ("Pl.'s Cross-Mot."); Pl.'s Cross-Mem. in Supp. of Pl.'s Mot. [Dkt. # 22-1] ("Pl.'s Cross-Mem."). For the following reasons, both parties' motions will be granted in part and denied in part.

## BACKGROUND

SIGAR is an independent organization – not located within a larger federal agency – that was established by the National Defense Authorization Act in 2008.  Declaration of Michael A. Hubbard [Dkt. # 19-4] ("Hubbard Decl.") ¶ 4.  It is a law enforcement and auditing agency that has "audit and investigatory authority over all reconstruction programs and operations in Afghanistan that are supported with U.S. dollars, regardless of the agency involved."  *Id*. ¶¶ 4–5. Its mission is "to prevent and detect waste, fraud, and abuse in U.S.-funded reconstruction programs and operations in Afghanistan," which it accomplishes, in part, through its Lessons Learned Program ("LLP"), which aims to extract lessons from the reconstruction experience and makes recommendations to Congress and federal agencies on ways to improve the reconstruction efforts.  *Id*. ¶¶ 6–7.

The Learned Lesson Program involves reviewing documents in the possession of other federal agencies and conducting interviews with "hundreds of individuals with direct and indirect knowledge of U.S. reconstruction programs."  *Id*. ¶¶ 8–9.  According to the agency, these interviews are "not simply histories of what has happened in Afghanistan reconstruction," but they are used to help SIGAR "make actionable recommendations to Congress and the Executive Branch agencies, including on law enforcement matters such as ways to deter and prevent waste, fraud, and abuse."  Supplemental Declaration of Michael A. Hubbard [Dkt. # 24-1] ("Supp. Hubbard Decl.") ¶¶ 6–7.

On March 23, 2017, Craig Whitlock, a *Washington Post* reporter, submitted a FOIA request to SIGAR that sought "full, unedited transcripts and complete audio recordings of ***all*** interviews conducted for the Lessons Learned program, regardless of whether they were labeled as 'on the record,' or if the interviewee was granted anonymity, or if they were cited in a particular report or

not." Ex. A to Compl. [Dkt. # 1-1] ("Request") at 1 (emphasis in original).  The request also sought expedited processing and a fee waiver.  *Id*. at 2.  The next day, Whitlock sent an email to SIGAR asking it to confirm it received the request.  *See* Ex. 1 to Def.'s Mem. [Dkt. # 19-2] ("Confirm. Email") at 1.

SIGAR's Public Information Manager acknowledged receipt of the request on April 17, 2017, and informed Whitlock that the request for expedited processing had been approved.  *See* Ex. 1 to Def.'s Mem. [Dkt. # 19-2] at 1.  On May 15, 2017, SIGAR invoked its right to an extension of at least ten days due to the volume of material requested.  *See* Ex. 2 to Def.'s Mem. [Dkt. # 19-3] at 1.  On May 31, 2017, SIGAR informed Whitlock that it required an additional thirty-days and that he "ha[d] the right to appeal any adverse determination(s) . . . should [he] wish to do so." Ex. 1 to Answer [Dkt. # 9-1].

On February 23, 2018, the General Counsel for SIGAR informed Whitlock, "[w]e are granting your FOIA request for the audio recordings and transcripts of interviews conducted by our Lessons Learned Program."  Ex. B to Compl. [Dkt. # 1-2] ("Feb. 23 Email") at 1.  The email explained that the Lessons Learned Program had conducted 410 interviews to date, and that the majority (374) had been completed without audio recordings or transcripts; the interviewer "simply took notes of whatever he or she thought was interesting."  *Id*.  Of the thirty-six interviews that were recorded, nineteen were interviews of Afghans that were conducted in Afghanistan through an interpreter and later transcribed for SIGAR.  *Id*.  The agency reported that given all of those circumstances, it possessed only seventeen recorded interviews, and only nine of those were transcribed.  *Id*.  The General Counsel added "SIGAR is prohibited from law from disclosing the identity of a source who wishes to remain anonymous," citing the Inspector General Act of 1978.

3

*Id.* The email concluded by asking Whitlock if he was requesting copies of interview notes, which were not explicitly called for in the FOIA request. *Id.* at 2.

Whitlock promptly responded, "The Washington Post is requesting all records of interviews conducted as part of SIGAR's Lessons Learned Program. . . .  The Post would like all records . . . including, but not limited to, transcripts, verbatim transcripts, handwritten and typed notes, records of interviews, audio recordings, video recordings, interview excerpts and interview summaries." Ex. C to Compl. [Dkt. # 1-3] ("Feb. 26 Response").

Thereafter, there were a series of communications between SIGAR and Whitlock, and between the agency and James McLaughlin, a Deputy General Counsel at the Post, in which the Post repeatedly voiced concerns about the completeness and the pace of the production. *See* Ex. D to Compl. [Dkt. # 1-4] (2/28/18 email from SIGAR to Whitlock); Ex. F to Compl. [Dkt. # 1-5] (4/17/18 McLaughlin letter to SIGAR); Compl. ¶¶ 35, 37–42.

Ultimately, the Post filed suit on November 14, 2018.  The complaint alleged that as of that date, SIGAR had produced only: "43 of the 47 'on the record' interviews;" "187 of the 363 'on background' interviews;" and "7 of 17 audio recordings of interviews." Compl. ¶ 43.  It sought declaratory and injunctive relief ordering SIGAR to produce the remaining materials and challenging SIGAR's withholding of certain documents. *Id.* at 14.

After SIGAR answered, [Dkt. #9], the Court established a schedule for the production of the remainder of the requested documents. *See* Min. Order (Feb. 12, 2019).  On June 17, 2019, SIGAR reported to the Court that it had completed production "of all releasable records" to plaintiff.  Status Report [Dkt. # 15] ¶ 3.

Defendant filed its motion for summary judgment on August 16, 2019, Def.'s Mot., and plaintiff submitted its cross-motion on September 6, 2019.  Pl.'s Cross-Mot.  The matter is fully

briefed.[1]  On June 2, 2020, the Court ordered defendant to deliver for *in camera* inspection the documents that had been withheld pursuant to Exemption 5.  *See* Min. Order (June 2, 2020).  The files were delivered on June 8, 2020.  *See* Notice of Delivery for *In Camera, Ex Parte* Inspection [Dkt. # 26].

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted).  When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Id*. at 247–48.  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id*. at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

---

1    See Def.'s Reply in Supp. of Def.'s Mot. for Summ. J. and Opp. to Pl.'s Cross-Mot. [Dkt. # 23] ("Def.'s Reply"); Pl.'s Reply in Further Supp. of Pl.'s Cross-Mot. [Dkt # 25] ("Pl.'s Reply").

When considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record.  *See* 5 U.S.C. § 552(a)(4)(B).  The court may grant summary judgment based on information provided in an agency's affidavits or declarations when they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted), and "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  Such affidavits or declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard*, 926 F.2d at 1200 (citation and internal quotation marks omitted).

## ANALYSIS

### I.      The Court has jurisdiction to hear this case.

"To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing is a necessary predicate to any exercise of federal jurisdiction, and if it is lacking, then the dispute is not a proper case or controversy under Article III, and federal courts do not have subject matter jurisdiction to decide the case.  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).  "When there is doubt about a party's constitutional standing, the court must resolve the doubt, *sua sponte* if need be." *Lee's Summit v. Surface Transp. Bd.*, 231 F.3d 39, 41 (D.C. Cir. 2000).

To comply with the Article III standing requirements, a plaintiff must show that:  "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

6

by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000).

SIGAR challenges the Post's standing to bring certain claims in this case on the grounds that it was not the FOIA requester.  It submits that Whitlock "made it appear that the request was on his behalf," by writing the FOIA request in the first person: "I am seeking . . .; I further request . . . ," and that SIGAR did not know he was corresponding on behalf of *The Washington Post* until a February 26, 2018 email made an explicit reference to the newspaper.  *See* Def.'s Mem. at 6 n.2.  As a result, defendant argues, "[t]o the extent [p]laintiff challenges any documents produced or actions taken by SIGAR prior to [February 26, 2018], it lacks standing."  Def.'s Mem. at 6 n.2.[2]  There is very little, if anything, that took place before that date that is at issue in the cross motions for summary judgment, but the Court has satisfied itself that it has jurisdiction in any event.

The record fully supports a finding that the FOIA request was made on behalf of *The Washington Post*.  The FOIA request was sent on company letterhead bearing the company name in its signature font at the top of the page along with its address.  Request at 1–2.  It is signed, Craig Whitlock, "Staff writer," reflecting that he authored the letter in his capacity as a Post employee.  *Id.* The body of the letter also indicates that Whitlock was acting as an agent of the publication; in support of the request for expedited processing, the writer explained that "[a]s a

---

2    In its motion for summary judgment, defendant addresses the standing issue in a single footnote.  *See* Def.'s Mem. at 6 n.2.  In that same footnote, it states that "[t]his Court must satisfy itself that it possesses subject-matter jurisdiction, specifically that Plaintiff has standing."  Def.'s Mem. at 6 n.2.  But beyond these statements, the defendant does not move to dismiss any claims pursuant to Federal Rule of Civil Procedures 12(b)(1) or clearly state that it is moving for summary judgment for lack of jurisdiction.  And in its reply, defendant devotes a section of its memorandum to its contention that plaintiff lacks standing, but it again fails to state whether it is moving for summary judgment or to dismiss some of the claims based on this argument.  *See* Def.'s Reply at 3–5.

journalist for The Washington Post, I am assigned full-time to cover national security and am primarily engaged in disseminating information to our worldwide readership.  Further, the records I am seeking are urgently needed in order to inform the public concerning government activity . . . .”  *Id*. at 2.   The letter asks for a fee waiver on the grounds that “furnishing of the information sought by this request is likely to contribute significantly to public understanding of the operations or activities of government because it will result in a news article in The Washington Post.”  *Id*.  Whitlock ended the letter by including his office telephone number and @washpost.com email address.  *Id*.

If that were not enough to show that this is an unserious objection, other documents submitted by both parties confirm that Whitlock was acting on behalf of the Post.  The March 24, 2017 email sent by Whitlock to SIGAR’s FOIA officer asking for confirmation that SIGAR received the FOIA request bore the subject line: “new FOIA request from the Washington Post,” Confirm. Email at 1, and Whitlock’s February 26, 2018 email to SIGAR names the newspaper as the requestor, *see* Feb. 26 Email at 1 (“The Washington Post is requesting . . . .  The Post would like all records related to interviews . . .”), and asks that the Post’s deputy counsel be included on future communications.  *Id*.

These records confirm that the initial FOIA request was made on behalf of the Washington Post, and it, therefore, has standing to bring this case.

## II.    The Freedom of Information Act

FOIA requires government agencies to release records upon request in order to “ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.”  *NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978).  The statute provides that:  “each agency, upon any request

for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. *See id.* § 552(b); *FBI v. Abramson*, 456 U.S. 615, 630–31 (1982).  This framework "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential."  *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 925 (D.C. Cir. 2003), citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  To prevail in a FOIA action, an agency must first demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  Second, the agency must show that "materials that are withheld . . . fall within a FOIA statutory exemption."  *Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.D.C. 2005), citing *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

"[W]hen an agency seeks to withhold information, it must provide a relatively detailed justification" for the withholding, *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007), quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 219 (D.C. Cir. 1987) (internal quotation marks omitted), through a *Vaughn* index, an affidavit, or by other means.  *Gallant v. NLRB*, 26 F.3d 168, 172–73 (D.C. Cir. 1994).  The general rule in FOIA cases is that

> If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone.

*ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

After asserting and explaining the use of particular exemptions, an agency must release "[a]ny reasonably segregable portion of a record," 5 U.S.C. § 552(b), unless the non-exempt portions are "inextricably intertwined with exempt portions" of the record. *Johnson v. Exec. Off. for U.S. Atty's*, 310 F.3d 771, 776 (D.C. Cir. 2002), quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). "In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability," although "the agency is not required to provide so much detail that the exempt material would be effectively be disclosed." *Id.*, citing *Mead Data Cent.*, 566 F.2d at 261. Just as with the exemption analysis, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material[,]" *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007), citing *Boyd v. Criminal Div. of U.S. Dep't of Just.*, 475 F.3d 381, 391 (D.C. Cir. 2007), and "[a] court may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. U.S. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008), citing *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

### A.  This case is not barred by a failure to exhaust administrative remedies.

In FOIA cases, "[e]xhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003), quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990); *see* 5 U.S.C. § 552(a)(6). While "the exhaustion requirement is not jurisdictional because the FOIA does not unequivocally make it so[,]" judicial review is precluded as a

jurisprudential matter because "'the purposes of exhaustion' and the 'particular administrative scheme' support such a bar." *Hidalgo*, 344 F.3d at 1258–59, quoting *Oglesby*, 920 F.2d at 61.

Although the exhaustion requirement falls on the requestor, the FOIA statute also outlines how an agency must inform a requestor of its right to engage in the administrative process. It mandates that an agency must:

> (i)     determine within 20 days . . . after the receipt of any [FOIA] request whether to comply with such request and shall immediately notify the person making such request of –
>
> (I)     such determination and the reasons therefor;
> (II)    the right of such person to seek assistance from the FOIA Public Liaison of the agency; and
> (III)   in the case of an adverse determination –
>
> (aa)    the right of such person to appeal to the head of the agency . . . ; and
>
> (bb)    the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency . . . .

5 U.S.C. § 522(a)(6)(A)(i).

According to the D.C. Circuit, the statutory requirement that the agency provide "the reasons" for its "determination" is meant to refer to "reasons that are particularized to the 'determination' – most obviously, the specific exemptions that may apply to certain withheld records." *Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n*, 711 F.3d 180, 186 (D.C. Cir. 2013). It observed that "[t]he statutory requirement would not make a lot of sense if . . . the agency were merely required to state within 20 working days its future intent to eventually produce documents and claim exemptions," *id.*, and the "requirement that the agency notify the requestor about administrative appeal rights further indicates that the 'determination' must be substantive . . . ." *Id.*

SIGAR maintains that it placed the Post on notice of an adverse determination and triggered the exhaustion requirement in February of 2018, and that because plaintiff failed to engage in the administrative process, "any of [p]laintiff's claims regarding pre-suit records should be dismissed." Def.'s Mem. at 7–8. But the record does not support that conclusion. Instead, the emails fall squarely within the category described by the Court of Appeals as inadequate: mere expressions of an intent to produce documents and claim exemptions in the future.

The February 23 email begins, "[w]e are granting your FOIA request, . . ." and ends, "[w]e are reviewing the transcripts and recordings that we have not yet provided and will get them to you as soon as we complete those reviews." Feb. 23 Email at 1–2. It does not inform the Post that SIGAR would be redacting or withholding records, or on what grounds. The email includes a statement that pursuant to Section 8L(b)(2)(B) of the Inspector General Act of 1978, SIGAR is "prohibited by law from disclosing the identity of a source who wishes to remain anonymous," but it does not explain how that requirement is being applied to the responsive documents. *Id.* at 1.

The agency's February 28, 2018 email says even less. It simply states that the agency was continuing to review documents and that it would determine whether it would "need to refer [recordings, transcripts, and notes] to other government agencies for classification review." Feb. 28 Email. Such information hardly qualifies as a particularized statement explaining the agency's "determination." Furthermore, both emails fail to notify the Post of any right to appeal a determination.[3]

---

3      SIGAR's argument that it "did inform [p]laintiff it had 'the right to appeal any adverse determination(s),'" Def.'s Mem. at 3, is disingenuous at best. The document SIGAR cites to support that contention is its May 31, 2017 letter informing the Post that it was availing itself of its right to an additional thirty days to process the Post's request. *See* Dkt. # 9-1. While the letter includes the standard language informing the requester of its right to appeal an adverse determination, in context, it pertains to the extension and not to any substantive decision.

Because SIGAR failed to fulfill its obligations under FOIA to inform the Post of the reasons for its determinations and the grounds for any withholdings, the Post was not in a position to initiate the administrative appeal that is generally required before a suit can be brought.  So it would not be appropriate as a jurisprudential matter to deny plaintiff relief on this record; therefore, defendant's motion summary judgment on exhaustion grounds will be denied, and plaintiff's cross-motion for judgment on this issue, *see* Pl.'s Cross-Mem. at 14, will be granted.

> **B. Plaintiff's claim related to SIGAR's delay in issuing a determination and producing documents is moot.**

As of November 11, 2018, the date the complaint was filed, SIGAR had failed to communicate any decision on the FOIA request or to produce all responsive documents.  *See* Compl. ¶¶ 54–63.  Indeed, it took SIGAR an additional seven months to finally produce the body of responsive records to the Post.  *See* June 17, 2019 Status Report [Dkt. # 15] ¶ 3.  But SIGAR eventually did produce all relevant documents and, therefore, the allegations in the complaint concerning the timeliness of SIGAR's production are now moot.  *See Crooker v. U.S. Dep't of State*, 628 F.2d 9, 10 n.1 (D.C. Cir. 1980), quoting *Ackerly v. Ley*, 420 F.2d 1336, 1340 (D.C. Cir. 1969) ("Once the records are produced 'the lawsuit has lost its substance as . . . the only specific relief appellant seeks is compelled disclosure and that has been rendered moot by the disclosure . . . which has now actually been made.'"); *Tijerina v. Walters*, 821 F.2d 789, 799 (D.C. Cir. 1987), quoting *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982) ("'[H]owever fitful or delayed the release of information under the FOIA may be . . . if we are convinced appellees have, however belatedly, released all nonexempt material, we have no further judicial function to

perform under the FOIA.'").  For that reason, defendant's motion for summary judgment on plaintiff's claim that the production was not timely will be denied as moot.[4]

### C.  SIGAR conducted a reasonable search for records.

An agency seeking judgment in its favor in a FOIA action must first demonstrate that it has made "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68.  To fulfill the goals of FOIA, courts require agencies "to follow through on obvious leads to discover requested documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F. 3d 321, 325 (D.C. Cir. 1999).  An agency "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Id.*, quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  Compliance with that standard is often established by the submission of a "reasonably detailed affidavit" describing the search. *Oglesby*, 920 F.2d at 68.  But when "a review of the record raises substantial doubt" that certain materials were intentionally overlooked, the presumption of good faith normally accorded to agency affidavits may be overcome.  *Valencia-Lucena*, 180 F.3d at 326.

Here, defendant has submitted the declaration of Michael Hubbard, SIGAR's FOIA Officer.  *See* Hubbard Decl. ¶ 1.  It explains that after in-person and electronic discussions with Whitlock regarding the scope of the Post's request, Hubbard began working with SIGAR's General Counsel to determine where responsive records were most likely to be located.  *Id.*

---

4       The Court notes that plaintiff does not contest this argument in its cross-motion, but "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition.  The 'burden is always on the movant to demonstrate why summary judgment is warranted.  The nonmoving party's failure to oppose summary judgment does not shift that burden.'"  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016), quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015).

¶¶ 16-21; 24.  They determined that because the request pertained to the Lessons Learned Program, the responsive records were most likely to be found in LLP's files, which are kept in digital form. *Id*. ¶ 24.  The Director of LLP then "instructed his staff . . . to search their digital files for all transcripts, audio recordings, and records of interview ("ROIs")," and a search was conducted manually by LLP staff. *Id*.  The search was overseen by the Director of LLP. *Id*. ¶ 25.

Hubbard's description of the search satisfies the Court that the search was reasonably calculated to uncover all relevant documents.  For that reason, summary judgment will be granted in favor of SIGAR on this point.[5]

## III.    FOIA Exemptions

SIGAR has relied on Exemptions 1, 3, 5, 6, and 7 to withhold responsive records in full or in part.  The Court will grant judgment in favor of the agency with respect to its withholdings under Exemptions 7(A), 7(E), and 7(F) but more information is needed with respect to Exemptions 1, 6 and 7(C), 3, and 5.

### A.  Exemption 1

FOIA Exemption 1 provides that matters that are "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder" are exempt from production under FOIA.  5 U.S.C. § 552(b)(1).  The Supreme Court has stated that the decisions of people with the authority to withhold information to protect national security "are worthy of great deference," because they are "familiar with 'the whole picture' as judges are not," and

---

5       The Post did not move for summary judgment on the grounds that the search was inadequate.  But again, the Court is not granting summary judgment for defendant on the grounds that this issue has been "conceded," *Winston & Strawn*, 843 F.3d at 505, and it has made an assessment based on the record before it.

because of the interests and risks at stake. *CIA v. Sims*, 471 U.S. 159, 179 (1985). Applying that principle, the D.C. Circuit has emphasized that "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927. "The [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011) ("*ACLU I*"), quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007); *see Morley v. CIA,* 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified.").

The Circuit has also cautioned, though, that deference "is not equivalent to acquiescence," *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), and an affidavit supporting the invocation of Exemption 1 satisfies an agency's burden "only if it is sufficient to afford . . . the district court an adequate foundation to review[] the soundness of the withholding." *Id*. "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

Here, the Hubbard declaration states that upon reviewing the responsive ROIs, SIGAR determined that some of "the records might be considered so sensitive by other federal agencies that it might be classified or otherwise withheld from public disclosure." Hubbard Decl. ¶ 34. SIGAR, therefore, referred those documents to the relevant agencies. *Id*. One of the agencies was the United States Department of State, which submitted a declaration by its Director of the Office of Information Programs and Services. *See* Declaration of Eric F. Stein [Dkt. # 19-6] ("Stein

Decl."). The State Department also included its own *Vaughn* Index ("Department *Vaughn*") for the documents it designated as classified. *See id.* at ECF 7–18.[6]

Stein explains that in his role as Director, he has been delegated the authority to classify documents by the Under Secretary of State for Management pursuant to section 5.4(d) of Executive Order 13,526 ("EO 13,526"). Stein Decl. ¶ 11. He states that he withheld certain documents under Exemption 1 pursuant to that Executive Order, Stein Decl. ¶ 7, specifically, pursuant to sections 1.4(b)–(d), which provide that:

> Information shall not be considered for classification unless . . . it pertains to one or more of the following: (b) foreign government information; (c) intelligence activities (including covert actions), intelligence sources or methods, or cryptology; [or] (d) foreign relations or foreign activities of the United States, including confidential sources . . . .

75 Fed. Reg. at 709. And although the documents may not have been classified before the agency received the Post's FOIA request, Stein explains that section 1.7(d) of the Executive Order "contemplates that in certain situations decisions to classify information may need to be made after the information has been requested under the FOIA." Stein Decl. ¶ 10.[7]

---

6       A page range preceded by "ECF" refers to the page of the PDF that has been docketed on the Court's Electronic Case Filing system.

7       Section 1.7(d) of EO 13,526 states:

> Information that has not previously been disclosed to the public under proper authority may be classified or reclassified after an agency has received a request for it under the Freedom of Information Act (5 U.S.C. 552) . . . only if such classification meets the requirements of this order and is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under section 5.4 of this order.

75 Fed. Reg. at 711.

Section 1.1 of the Executive Order sets forth four requirements for the classification of national security information: (1) an original classification authority classifies the information; (2) the U.S. Government owns, produces, or controls the information; (3) the information is within one of eight protected categories listed in section 1.4 of the Order; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages. 75 Fed. Reg. at 707. It is uncontested that Stein and the Department satisfy the first three prongs of this test. So the only question left for the Court is whether the declaration and the State Department's *Vaughn* Index adequately explain why Stein, as the classifier, believes the information withheld could reasonably be expected to result in a specific level of damage to national security. Based on a review of these records, the Court concludes that Stein's explanation is too vague and conclusory to satisfy the test.

The declaration itself is devoid of reasons for withholding documents under Exemption 1. And the State Department's *Vaughn* Index uses identical boilerplate language to justify each Exemption 1 withholding without addressing the specific harm to national security that would flow from the release of any particular document in whole or in part:

> The Department withheld information in this document under Exemption 1, pursuant to E.O. 13526, section 1.4(d), which pertains to foreign relations or foreign activities of the United States. These frank discussions of foreign relations, including assessment of foreign government officials and policies, if revealed, could damage or impair foreign relations and national security. These assessments could negatively affect the foreign policy environment, not only in Afghanistan, but also in other countries mentioned and in other countries that consider themselves similarly placed. Therefore, the information remains properly classified.

*See generally* Department *Vaughn*.

18

This is the type of broad explanation that the Court in *Larson* warned would not suffice to satisfy the invocation of Exemption 1. *See* 565 F.3d at 864. Other courts in this district have declined to sustain withholdings under that Exemption when the agency affidavits failed to demonstrate "a connection between the withheld information and harm to national security," finding that "if [an agency] does not sustain its burden of demonstrating a 'logical or plausible' connection to a damaged national-security interest, the fault lies with the [agency]." *Cable News Network, Inc. v. FBI* ("*CNN*"), 384 F. Supp. 3d 19, 35 (D.D.C. 2019), citing *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 86 (D.D.C. 2018). The Court in *CNN* found the agency's explanation to be deficient because it "provided no line of reasoning linking the disclosure of these redactions to any harm to the United States' relations with a foreign country or leader and a consequent harm to national security." *Id.*

Similarly, here, the conclusory explanation used to support each instance of the invocation of Exemption 1 does not provide enough detail to permit the Court to assess the propriety of any individual decision or explain how disclosing any particular record would harm national security. Therefore, the Court will deny both parties' motions with respect to Exemption 1 without prejudice and remand the matter to the State Department for a more fulsome explanation of how the redacted information could logically be expected to result in a threat to national security.

### B.  Exemptions 6 and 7(C)

Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]" 5 U.S.C. § 552(b)(6). The purpose of Exemption 6 is "to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982). And "[t]he Supreme Court has made

clear that Exemption 6 is designed to protect personal information in public records, even if it is not embarrassing or of an intimate nature[.]" *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989), citing *Wash. Post Co.*, 456 U.S. at 600.

To determine whether Exemption 6 applies, a court must "weigh the 'privacy interest in non-disclosure against the public interest in the release of the records.'" *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999), quoting *Horner*, 879 F.2d at 874. Exemption 7(C) protects from disclosure "records or information compiled for law enforcement purposes . . . [if] the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Here, SIGAR has relied on Exemption 6 and 7(C) to withhold names and other identifying information from 378 responsive records. Hubbard Decl. ¶ 58. It also withheld eight "off the record" audio recordings in their entirety based on the same exemptions, "because the agency determined that the release of the informants' voices would reveal their identities." *Id.* ¶ 57.

Courts undertake a similar balancing test when assessing an agency's reliance on Exemption 7(C) or its use of Exemption 6. *See ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011). But since the threshold of harm in Exemption 7(C) is lower than the "clearly unwarranted" requirement in Exemption 6, *see Dep't of Just. v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989) ("[T]he standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records complied for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files."), the Court will analyze SIGAR's redactions under Exemption 7(C) first. It finds that while a majority of the redactions SIGAR applied to information identifying interviewees and third parties named in interviews are substantiated by the record, SIGAR has failed to adequately support its redaction

of randomly assigned interview codes, the locations where interviews took place, and the eight

fully withheld audio recordings under either exemption.

### i. SIGAR meets the law enforcement requirements to invoke Exemption 7(C).

To invoke Exemption 7(C), the agency must first make the threshold showing that the

records were compiled for law enforcement purposes.  5 U.S.C. § 552(b)(7)(C); s*ee also Rural*

*Hous. All. v. U.S. Dep't of Agric.*, 498 F.2d 73, 80 (D.C. Cir. 1974).  "'Law enforcement entails

more than just investigating and prosecuting individuals,'" *Elec. Priv. Info. Cntr. v. Dep't of*

*Homeland Sec.* ("*EPIC*"), 777 F.3d 518, 522 (D.C. Cir. 2015), quoting *Pub. Emps. for Envtl. Resp.*

*v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C.

Cir. 2014), it "'includes . . . proactive steps designed to prevent criminal activity and to maintain

security.'"  *Id.*, quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring).

Therefore, "[i]n assessing whether records are compiled for law enforcement purposes, . . . the

focus is on how and under what circumstances the requested files were compiled, . . . and 'whether

the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'"

*Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002), quoting *Rural Hous. All.*, 498 F.2d at 80.

Here, SIGAR has made the requisite showing.  The Hubbard declaration explains that

SIGAR is a law enforcement agency, and that it employs "investigators with the power of arrest,

auditors, inspectors, . . . and attorneys," who assist SIGAR to carry out its statutory mission "to

prevent and detect waste, fraud, and abuse in U.S.-funded reconstruction programs and operations

in Afghanistan."  Hubbard Decl. ¶¶ 5–6.  "SIGAR has the authority to issue subpoenas and make

arrests . . . [and] pursues the prosecution of criminal wrongdoing using prosecutors detailed from

the Department of Justice in federal courts, in military courts, . . . and in investigations with the

Afghan Attorney General's Office."  *Id.* ¶ 63.  And while plaintiff argues that the primary purpose

of the Learned Lessons Program is not law enforcement but information gathering, Pl.'s Cross-Mem. at 41, Hubbard explains that "[t]he main purpose of SIGAR's Lessons Learned reports is to make actionable recommendations to Congress and the Executive Branch agencies, including on law enforcement matters such as ways to deter and prevent waste, fraud, and abuse."  Supp. Hubbard Decl. ¶ 6.   Importantly, he adds that "the Lessons Learned Program staff share information obtained in the course of their research, including information obtained during interviews, with SIGAR's Audits and Investigation Directorates."  *Id*. ¶ 9.

Based on this information, the Court concludes that SIGAR is properly characterized as a law enforcement agency – one that is not only charged with assisting with criminal prosecutions, but also investigating and reporting on maintaining safety and stability in Afghanistan.  In addition, the Court finds that the Lessons Learned Program, while not necessarily operating in pursuit of a criminal investigation, operates in a manner to help serve the law enforcement goals of the agency as a whole.  Therefore, Exemption 7, and as relevant to the instant discussion, Exemption 7(C) may properly be invoked by the defendant.

### ii.  Interviewees and third parties identified in interviews have a legitimate privacy interest in keeping their identities from being disclosed.

SIGAR has withheld many of the "names and identifying information of the informants and third parties named in ROIs," pursuant to 7(C).  Hubbard Decl. ¶¶ 70, 74.  Hubbard explains that he personally undertook an analysis of the ROIs at issue to determine whether identifying information in them should be redacted.  Hubbard Decl. ¶ 74.  In total, SIGAR redacted names, as well as the titles, ranks, dates of deployment, dates of employment, the location where interviews

took place, the randomly assigned codes associated with interviews, "and other information that could be used to identify the informant or a third party" from 378 responsive records.  *Id.* ¶ 76.[8]

The first step an agency must take after making the thresholding showing that records were compiled for law enforcement purposes, is to articulate a privacy interest that would be violated by disclosure.  *See Reporters Comm.*, 489 U.S. at 756.  And the D.C. Circuit has instructed that people involved in investigations:  "witnesses, informants, and the investigating agents . . . have a substantial interest in seeing that their participation remains secret."  *Senate of Puerto Rico v. Dep't of Just.*, 823 F.2d 574, 588 (D.C. Cir. 1987).

With respect to the privacy interests of interviewees, Hubbard declares that the ROIs contain the "personal thoughts, observations, critiques, complaints, and analyses" provided by interviewees, and that the "essence of the interview[s] w[ere] that [they] [w]ere personal and intended to be candid."  Hubbard Decl. ¶ 52.[9]  He submits that "[i]f the identities of these sources were to be revealed, the informants could be subjected to serious adverse consequences, including harassment, public and private vilification, ostracization, demotion, employment termination, or other forms of retaliation," and that the third parties named in the interviews would also face similar harms.  *Id.* ¶ 53.

---

8      The declarations of Mark K. Herrington, Associate Deputy Counsel in the Office of General Counsel of the United States Department of Defense, [Dkt. # 19-8] ("Herrington Decl."), and James C. Boisselle, the civilian Deputy Chief of Staff of the United States Special Operations Command ("USSOCOM"), [Dkt. # 19-9] ("Boisselle Decl."), were also submitted to support those agency's withholding of certain information in SIGAR's production.  Both declarations contain nearly identical explanations for those agency's reliance on Exemption 6 as was proffered in the Hubbard Decl.  *See* Herrington Decl. ¶ 6; Boisselle Decl. ¶¶ 27–28.

9      The citations to the Hubbard declaration in this section refer to its discussion of the redactions made pursuant to Exemption 6.  As Hubbard explains, he applied the same balancing test he used for Exemption 6 to analyze the records under Exemption 7(C) because " . . . the privacy interest of the individual is accorded more weight than under Exemption 6."  Hubbard Decl. ¶ 74.

Importantly, Hubbard explains that "SIGAR interviewers assured informants that their identities would not be disclosed absent consent and the informants at issue requested non-disclosure," *id*., and that "each Lessons Learned interview was conducted with the express assurance of confidentiality, consistent with Section 7 of the Inspector General Act of 1978." Supp. Hubbard Decl. ¶ 13. He also submits that "the vast majority of the substantive information contained in the ROIs ha[s] been disclosed." Hubbard Decl. ¶ 59.

The Court finds that these facts show that the informants not only agreed to be interviewed with the understanding that their identities would be kept private, but that many could face serious consequences if their identities were revealed. For these reasons, the Court finds that SIGAR has supported its position that the interviewees have a significant privacy interest in remaining anonymous.[10]

With respect to third parties named in redacted ROIs, Hubbard submits that "[i]t was [] highly likely that these third parties were unaware they had been named or what had been said about them," and that "whatever the informant said about [them] could be inaccurate, defamatory, or intended to cause reputational or professional harm." Supp. Hubbard Decl. ¶ 29. The result of release of identifying information about third parties could also expose them to "personal harm, due to the pervasive corruption and violence in Afghanistan." Hubbard Decl. ¶ 53.

Hubbard has identified the harm that third parties identified in ROIs could plausibly face as a result of being named in the records of a law enforcement agency in Afghanistan, and the

---

10    To the degree that SIGAR is withholding the names of individuals who submitted to interviews "on the record," *see* Pl.'s Cross-Mem. at 37, the Court's analysis does not apply. Despite knowing the interviews could be off the record – as is supported by the Hubbard declaration – these interviewees chose to be interviewed without any privacy protection. For that reason, if SIGAR has redacted or withheld information that an interviewee has given permission to keep on the record, it must produce that information to plaintiff.

Court finds that SIGAR has articulated a substantial privacy interest in keeping their identities private.

### iii.  The public interest does not outweigh individuals' privacy rights.

Once a legitimate privacy interest has been established, a FOIA requestor must "establish a sufficient reason for the disclosure." *Nat. Archives and Recs. Admin. v. Favish*, 541 U.S. 157, 172 (2004).  This requires the requestor to "show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and that "the information is likely to advance that interest." *Id*.  A relevant public interest that outweighs an individual's legitimate privacy interest is "the citizens' right to be informed about 'what their government is up to,'" which is "not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Reporters Comm.*, 489 U.S. at 773.  Indeed, in *SafeCard Servs. Inc., v. SEC*, the D.C. Circuit "adopted a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Shrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003), quoting *SafeCard*, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

The Post argues that the public interest involved is the "need for complete transparency concerning the U.S. involvement in Afghanistan."  Pl.'s Cross-Mem. at 37.  It submits that this interest is "so compelling . . . as to override all but the most life-threatening privacy concerns." Pl.'s Cross-Mem. at 3.  Because the public "need[s] to know the identities of the interviewees to better evaluate the records," which will shed light on SIGAR's "performance of its statutory duties," the Post contends that the identifying information must be produced.  Pl.'s Mem. at 37-38.

While the requests made to SIGAR directly advanced the right of the public to be informed about what its government is doing overseas, that interest has been largely served by the release of the substantive information contained in the ROIs, and it is not enough to outweigh the privacy interests that led to the limited excision of the names of the interviewees and third parties whose names were mentioned.  Therefore, the Court is inclined to grant summary judgment in favor of the defendant with respect to the withholding of the majority of the interviewees' and third parties' titles, ranks, dates of deployment, and dates of employment.[11]

But the Court notes that the legal authorities upon which SIGAR relies refer specifically to "private citizens." *See Reporters Comm.*, 489 U.S. at 773; *Shrecker*, 349 F.3d at 661.  And the Court is concerned that the agency did not necessarily adhere to this distinction.  In its Minute Order of June 2, 2020, the Court directed defendant to produce the ROIs that were withheld from plaintiff pursuant to Exemption 5 for *in camera* review, and to "clearly identify the portions of the ROIs it seeks to redact in order to aid in the determination *of this issue*."  Min. Order (June 2, 2020) (emphasis added).  The agency elected, however, to produce fifty ROIs that had been annotated to identify and reveal the portions that were being withheld under Exemptions 3, 6, and 7(C) as well. It is apparent from the material provided to the Court that some of the names were those of public officials, including high ranking public officials, and therefore, it is not clear that the privacy interests outweigh the public interests in every case.   For these reasons, the agency must supplement its declaration indicating whether each individual whose identity is being protected could be properly characterized as a "private citizen" at the time of the interview and/or the events described during the interview, and whether the interviewee or individual named falls within the

---

11      Because the Court finds that the redactions properly fall under Exemption 7(C)'s provisions, it need not examine the same issue under Exemption 6.

proper scope of the exemptions.  Until the Court receives the supplemental information, both parties' motions will be denied without prejudice.

> iv. **There is inadequate support for SIGAR's redaction of randomly assigned code numbers, locations of interviews, and its withholding of eight full audio recordings.**

While SIGAR has justified its redaction of certain categories of identifying information, it has not provided sufficient information to support its redaction of "unique interview codes" assigned to informant interviews, the location of informant interviews, or its withholding of eight audio recordings that the agency has purportedly determined would reveal the identities of the informants through their voices.  Hubbard Decl. ¶ 56–57.  Indeed, SIGAR does not provide any justification for withholding unique interview codes that were assigned to informants in lieu of their names.  *See id.* at 56.  These anonymous labels could easily be segregated from other identifying information and produced to the Post in accordance with the agency's statutory duty to produce any reasonably segregable portion of the information requested.  *See* 5 U.S.C. § 552(b).  The same is true for interview locations.  Neither the Hubbard declaration nor SIGAR's *Vaughn* Index, [Dkt. # 19-5] ("SIGAR *Vaughn*") explains why identifying where an interview took place would reveal private information about an interviewee, and without that information, SIGAR's reliance on Exemption 7(C) is not supported by the record.

Similarly, SIGAR has not supported its insistence on withholding the audio recordings in full on the grounds that the Post would be able to identify interviewees by their voices. The agency does not explain why redacting other identifying information within the recordings, or providing the redacted recordings under some sort of protective order would not suffice, and it has failed to provide notes or transcripts of the recordings.  Thus, the conclusory assertions made by Hubbard,

which are repeated in SIGAR's *Vaughn* Index, fail to show that SIGAR has performed its duty to segregate and produce releasable information from these interviews.

For these reasons, the Court will remand these discrete issues to SIGAR and require it to either supplement its pleadings with additional information explaining how those pieces of data would tend to identify interviewees, or provide the data, including all reasonably segregable portions of the audio recordings, to the Post.[12]  Both parties' motions are denied without prejudice, then, as to the unique interviewee codes, the interview locations, and the audio recordings.

### C.  Additional Exemption 7 Withholdings

Along with invoking Exemption 7(C) to withhold personally identifying information from its ROIs, SIGAR also invoked Exemptions 7(A), 7(D), 7(E), and 7(F) to withhold certain other data.[13]

#### i.  SIGAR properly relied on Exemption 7(A).

FOIA Exemption 7(A) permits agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C.  §  552(b)(7)(A).  To justify the withholding of records under Exemption 7(A), the DEA must "demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'"

---

12    Because FOIA's segregability requirement applies equally to both Exemption 6 and Exemption 7, 5 U.S.C. § 552(b), SIGAR would also be required to undertake this step if the Court were analyzing the withholdings under an Exemption 6 analysis.

13    The Court need not reach the issue of SIGAR's withholding of personally identifying information of interviewees under Exemption 7(D) because that information is duplicative of the redactions the Court has already upheld under Exemption 7(C).

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1096 (D.C. Cir. 2014), quoting *Mapother v. U.S. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993).

The DEA, which was consulted by SIGAR, has invoked Exemption 7(A) to withhold two sentences from ROIs that discuss "the strategy of the take down of Bashir Noorzai who was prosecuted and sentenced to life in prison for heroin trafficking," because "he is linked to multiple DEA active investigations and cases." Hertel Decl. ¶ 13. The DEA explains that release of the two sentences, "would cause harm because targets of active investigations could receive investigative details that would either alert them to efforts directed toward them / or would allow them to analyze pertinent information about counternarcotics investigations." Hertel Decl. ¶ 14. This information could be used to "escape prosecution and thwart current investigative efforts." *Id*.

Plaintiff does not contest SIGAR's invocation of Exemption 7(A) as to these sentences, *see* Pl.'s Cross-Mem. at 40 n.10, and the Court finds that the explanation meets all of the criteria for withholding the information: the DEA has detailed that the redacted information would disclose information about ongoing investigations that could jeopardize the success of those investigations. The Court will, therefore, grant summary judgment for SIGAR with regard to its invocation of Exemption 7(A).

### ii. SIGAR properly invoked exemption 7(E).

The DEA, OSSOCOM, and the Department of Defense each submitted declarations to substantiate their withholdings of information from ROIs that "could disclose techniques or procedures for investigations or prosecutions, or guidelines that could be exempted to risk circumvention of the law," as is contemplated by FOIA Exemption 7(E). 5 U.S.C. § 552(b)(7)(E). Exemption 7(E) allows an agency to withhold:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or

> information . . . would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would disclose guidelines
> for law enforcement investigations or prosecutions if such disclosure could
> reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).  "Under [D.C. Circuit] precedents, Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, [E]xemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law,'" *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011), quoting *Mayer Brown, LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009).  "[W]here an agency 'specializes in law enforcement, its decision to invoke [E]xemption 7 is entitled to deference.'" *Lardner v. U.S. Dep't of Just.*, 638 F. Supp. 2d 14, 31 (D.D.C. 2009), quoting *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998).

Each of the appended declarations explains that the agency withheld portions of ROIs that would reveal specific law enforcement strategies.  *See* Hertel Decl. ¶ 17 (withholding portions of ROIs "which revealed sensitive counternarcotics strategy including case prioritization, training techniques, surveillance techniques and location of surveillance equipment, and law enforcement equipment design, weaknesses, and capabilities"); Herrington Decl. ¶ 8 (redacting "information regarding specific tactics, techniques and procedures regarding the use of suspension and debarment in Afghanistan to combat . . . corruption"); Boisselle Decl. ¶ 31 (redacting information that reveals "the composition of a unit, the number of individuals within the unit, and the unit's association with others," and well as "actual duty positions within the unit").  Each declaration also includes potential risks the agency could encounter if the information were to be revealed, including security concerns and a decrease in the efficacy of the law enforcement techniques.

The Post does not contest SIGAR's invocation of Exemption 7(E) as to these records, *see* Pl.'s Cross-Mem. at 40 n.10, and given the detailed information included in the declarations, the record is clear that the agencies properly redacted the pertinent information pursuant to Exemption 7(E).   Summary judgment will be granted for defendant on the withholdings under 7(E).

### iii.  SIGAR has justified its invocation of Exemption 7(F).

The DEA has invoked Exemption 7(F) to withhold information that would reveal a location where DEA agents sleep in Afghanistan.   Hertel Decl. ¶ 20.   Exemption 7(F) protects from disclosure information in law enforcement records that "could reasonably be expected to endanger the life or physical safety of any individual."   5 U.S.C. § 552(b)(7)(F).   The "phrase 'any individual' makes clear that Exemption 7(F) . . . shields the life or physical safety of any person." *Elec. Priv. Info. Ctr.*, 777 F.3d at 525; *see also Pub. Emps. for Envtl. Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 205 (D.C. Cir. 2014) (citation omitted). In addition, "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *Pub. Emps. for Envtl. Resp.*, 740 F.3d at 205 (emphasis in original).

As with Exemptions 7(A) and 7(E), the Post does not dispute that this information is exempt from disclosure.   *See* Pl.'s Cross-Mem. at 40 n.10.   And the Hertel declaration, which states that "violence is inherent in the drug trade, and the release of the identities and/or locations of agents has resulted in physical attacks, threats, harassment, murder, and attempted murder," particularly "in a war zone like Afghanistan," Hertel Decl. ¶ 21, unquestionably supports the agency's invocation of Exemption 7(F) as it raises a reasonable expectation of danger they could

face.  For that reason, summary judgment will be granted for defendant on its withholding of information under this exemption.

### D.  Exemption 3

FOIA Exemption 3 exempts from disclosure any materials that are specifically exempted from disclosure by another federal statute, provided that such statute either requires withholding "in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3); *see also Senate of Puerto Rico v. U.S. Dep't of Just.*, 823 F.2d 574, 582 (D.C. Cir. 1987).  Defendant has withheld portions of hundreds of documents and eight documents in their entirety based on three federal statutes:  1) section 7(b) of the Inspector General Act of 1978, as amended, 5 U.S.C. app. 3 § 7(b) ("IG Act"), 2) 10 U.S.C. § 130b, and 3) section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1).  *See* SIGAR *Vaughn* at 3–17.

As an initial matter, the Court finds that all three statutes are properly invoked as exempting statutes under Exemption 3.  The IG Act provides that the "Inspector General shall not, after receipt of a complaint or information from an employee, disclose the identity of the employee without consent of the employee . . . ." 5 U.S.C. app. 3 § 7(b).  This is the type of non-discretionary statutory language that Exemption 3 contemplates.  *See Braun v. USPS*, 317 F. Supp. 3d 540, 548 (D.D.C. 2018).

Similarly, 10 U.S.C. § 130b, invoked by USSOCOM, *see* Boisselle Decl. ¶ 23, explicitly states that "[t]he Secretary of Defense . . . may, notwithstanding section 552 of title 5, authorize to be withheld from disclosure to the public personally identifying information regarding . . . any member of the armed forces assigned to an overseas unit, a sensitive unit, or a routinely deployable unit."  Courts in this district have routinely held that section 130b qualifies as an Exemption 3

statute because it "establishes a particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii). *See Bloche v. Dep't of Defense*, 370 F. Supp. 3d 40, 57 n.6 (D.D.C. 2019); *see also Hall v. CIA*, 881 F. Supp. 2d 38, 66 (D.D.C. 2012).

Finally, the National Security Act, relied on by the Department of Defense and the State Department, *see* Herrington Decl. ¶¶ 4–5; Stein Decl. ¶¶ 13–15, requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). Again, this sort of non-discretionary mandate to withhold certain information complies with Exemption 3's terms. *See Morley v. CIA*, 508 F.3d 1108, 1125 (D.C. Cir. 2007) (upholding use of the National Security Act for Exemption 3 purposes).

### i. The Court need not reach the issue of SIGAR's withholding of personally identifying information under Exemption 3.

Because the Court has already addressed the redaction of information identifying interviewees and other individuals named in ROIs under Exemption 7(C), it need not consider the legality of the redaction of the same information under Exemption 3.[14] As a result, with regard to information withheld by SIGAR under the IG Act, by USSOCOM pursuant to 10 U.S.C. § 130b, and by the Department of Defense under the National Security Act, all of which appears to be duplicative of information withheld under Exemption 7(C), *see* SIGAR *Vaughn*, the Court's determination with respect Exemption 7(C) will apply; the matter will be resolved after the Court receives the necessary supplemental submissions, and both parties' motions are denied at this time.

---

14    Indeed, Exemptions 6 and 7(C) may provide more protection since the IG Act would shield the identify of SIGAR employees, but not of others who were interviewed or mentioned. *See* 5 U.S.C. app. 3 § 7(b) ("The Inspector General shall not, after receipt of a complaint or information from an *employee*, disclose the identity of the *employee* without consent of the employee[.]") (emphasis added).

> ii.   **The State Department must supplement its declaration to support its reliance on Exemption 3 to redact information on intelligence methods.**

Along with protecting intelligence sources, the National Security Act directs the Director of National Intelligence to protect intelligence methods from unauthorized disclosure. *See* 50 U.S.C. § 3024(i)(1). The D.C. Circuit has upheld redactions of such information where a supporting declaration includes an "elaborate description," that "provided the court substantial insight into the [agency's] reasons from protecting intelligence sources and methods along with other internal information." *Morley*, 508 F.3d at 1125. In *Morley*, the Court found that the detailed information was sufficient because it "satisf[ied] the [agency's] obligation to identify the 'particularized harm that could be expected to occur from production of the requested information.'" *Id.*, quoting *Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d 784, 785 (D.C. Cir. 1980).

The Court finds that the two Stein declarations adequately justify the redactions in particular documents. The supplemental Stein declaration provides a document-by-document explanation of the types of information withheld, *see e.g.*, Supp. Stein Decl. ¶ 11 ("the redacted information relates to intelligence activities and other subjects of national security interest, including the locations of personnel and operational activities."), and supplies the detail necessary for the Court to make a determination about the propriety of the agency's invocation of Exemption 3. So in that respect, the State Department's has met its burden.

But the State Department and SIGAR have overlooked an additional requirement included in the National Security Act: to show that the redacted information was withheld at the direction of the Director of National Intelligence, or someone with authority to identify and withhold

national intelligence information.  *See* 50 U.S.C. § 3024(i)(1).  And the Stein declarations do not satisfy that burden.

Although the first declaration states that Stein, as Director of the Office of Information Programs and Services, has "original classification authority and [is] authorized to classify and declassify national security information," Stein Decl. ¶ 3, it fails to explain who made the choices to redact information on the State Department's intelligence methods pursuant to Exemption 3.[15]

The  Exemption 3 section of the first Stein declaration states:

> [t]he Director of National Intelligence has, pursuant to his authority under section 102A(i)(1) of the National Security Act of 1947 . . . ordered the heads of intelligence community elements, including the Assistant Secretary for the Bureau of Intelligence and Research at the State Department, to protect national intelligence and intelligence sources, methods and activities from unauthorized disclosure.

*Id.* ¶ 14. But it fails to specify whether it was the Assistant Secretary who in fact made the redaction choices at issue.  And the State Department's *Vaughn* Index and Stein's supplemental declaration do not contain any additional information about who made the decision to withhold information pursuant to the National Security Act.

Therefore, in order for the State Department to satisfy its burden to justify these redactions under National Security Act, it is required to submit a supplemental declaration indicating who made the FOIA determinations with respect to the National Security Act in this case, and whether that person had the authority to do so.  Until the Court receives the supplemental submissions, both parties' motions will be denied without prejudice.

---

15      This stands in contrast to the declaration's detailed description of the agency's practice with respect to the documents withheld under Exemption 1.  *See* Stein Decl. ¶ 11.

### E.  Exemption 5

FOIA Exemption 5 bars disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  A document may be properly withheld under Exemption 5 only if it satisfies "two conditions:  its source must be a [g]overnment agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The Court of Appeals has interpreted Exemption 5 "to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege."  *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989) (internal quotation marks omitted).

In this case, SIGAR withheld certain materials from disclosure under the deliberative process privilege.  *See* Hubbard Decl. ¶ 44.  The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government."  *Klamath*, 532 U.S. at 8-9 (citations omitted), quoting *NLRB*, 421 U.S. at 151.  To accomplish that goal, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative."  *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006), citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

A document is predecisional if "'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'" *Judicial Watch, Inc.*, 449 F.3d at 151, quoting *Coastal States Gas Corp.*, 617 F.2d at 866.   In other words, a "'predecisional' document is one 'prepared in order to assist an agency decisionmaker in arriving at his decision.'" *Formaldehyde Inst.*, 889 F.2d at 1122, quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).   And with respect to the "deliberative" prong of the test, "the exemption protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency." *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982), citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63 (D.C. Cir. 1974).

SIGAR has invoked Exemption 5 to withhold portions of sixty-three ROIs, which it claims "contain predecisional, deliberative information that assist[s] in the development of the lessons learned reports."   Hubbard Decl. ¶ 46.   The declarant avers that the "ROIs are notes made by an interviewer; they are not a transcript.   They are deliberative because they are the thoughts of the interviewer, who is interpreting what the informant is saying," and they "are 'predecisional' because a major purpose of the interviews is to obtain information to contribute to a lessons learned report."   *Id*. ¶ 47.   He adds: "[e]ven though many of the withholdings are factual, they fall within the privilege's scope because they are intended to facilitate development of SIGAR's final position on the relevant issues in a future report," *id*. ¶ 47, and because the materials are withheld under the "consultant corollary" to Exemption 5, as the interviewees "acted as 'consultants' to SIGAR . . . and it was SIGAR who sought their advice."   *Id*. ¶ 45.

SIGAR's *Vaughn* Index describes the grounds for the withholding somewhat differently. It states that the "information withheld from th[e] ROI[s] consists of certain notes made by SIGAR

staff in the course of interviewing an informant about interagency strategy and planning, anti-corruption methods, counternarcotics activities, as well as efforts to stabilize Afghanistan." SIGAR *Vaughn* at 20.   The Index goes on to assert that "[t]hese topics inherently involve broad inter and intra-agency deliberations as any U.S. effort in Afghanistan requires coordination and planning with the Department of Defense," and it submits that the information is predecisional and deliberative because "it reflects a SIGAR employee's view of what is significant or insignificant and contains selected opinions, advice, or recommendations offered in the course of SIGAR's decision-making with respect to its writing of lessons learned reports or potential law enforcement investigations or audits." *Id*.  While the agency takes the position that all of the information in the ROIs could have been withheld under Exemption 5, Hubbard Decl. ¶ 46, the *Vaughn* Index emphasizes that the exemption is being invoked "for relatively few ROIs to protect information which SIGAR is considering using in ongoing lessons learned studies."  SIGAR *Vaughn* at 20.

Even taken together, the agency's submissions do not support its reliance on the deliberative process privilege to redact information under Exemption 5 because the showing that the material is "predecisional" is vague and indistinct from the assertion that it is "deliberative."

Hubbard says that "a major purpose of the interviews is to obtain information to contribute to a lessons learned report in which SIGAR will make findings, draw conclusions, and make recommendations," and "[a]ll of the records . . . were generated as part of a continuing process of agency decision making."  Hubbard Decl. ¶¶ 47–48.  But what decision is being made? What policy or action is SIGAR "considering?" The agency omits any reference to a "decision" and it simply repeats the phrase "decision making," relying on the deliberative nature of the communications to somehow satisfy the first prong of the test as well.

And what is "[t]hese topics inherently involve broad inter and intra-agency deliberations," SIGAR *Vaughn* at 20, even supposed to mean?  The fact that a record reflects the author's selection of information about certain *topics,* even if those topics may be the subject of some consideration in the future, does not, without more, make the record predecisional for purposes of the privilege. The statement that a Report of Interview may "reflect[] a SIGAR employee's view of what is significant or insignificant and contain[] selected opinions, advice, or recommendations," *id.*, recites principles from a traditional attorney work product analysis, but that is not the exercise we are undertaking here.  While those circumstances may bear on whether a ROI is "deliberative," that is not enough – it is a two-pronged test.

At most, the declaration and *Vaughn* Index disclose that the redacted factual information *might* be considered when formulating *potential* future agency recommendations, *might* be used in *potential* future studies within the Lessons Learned program, or *might* bear on some *potential* investigation or audit.  But they say nothing about whether the interviews themselves were conducted, or the reports were generated, in relation to any anticipated SIGAR decision or what role the reports would play in any future decision.  The Court received the documents *in camera*, but their review did not resolve the question since the agency supplied no guideposts to be applied to any specific redaction.  Under those circumstances, the showing is insufficient and defendant is not entitled to summary judgment on this issue.  *See Coastal States*, 617 F.2d at 868, citing *Vaughn v. Rosen*, 523 F.2d 1136, 1146 (D.C. Cir. 1975) ("[T]he agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process . . . . [I]f  documents are not a part of a clear "process" leading to a final decision on the issue . . . they are less likely to be  properly characterized as predecisional."); *see also id.* ("Characterizing these documents as "predecisional" simply because they play into an ongoing

audit process would be a serious warping of the meaning of the word.  No "decision" is being made or "policy" being considered . . . .")

**CONCLUSION**

For the foregoing reasons, it is the Court's ruling that:

1) The Post has standing to bring each of the claims in its complaint;

2) The Post was not required to exhaust administrative remedies before bringing this suit;

3) The Post's claim as to the timeliness of defendants' production is denied as moot;

4) Summary judgment will be granted for SIGAR with respect to the adequacy of its search for responsive records;

5) Both parties' motions with respect to Exemption 1 will be denied without prejudice, and the issue will be remanded to the State Department for a more fulsome explanation of the documents withheld under Exemption 1 and the national security concerns they implicate;

6) Both parties' motions with respect to SIGAR's withholding of personally identifying information of interviewees and third parties under Exemption 7(C) will be denied without prejudice, and SIGAR must supplement the record with information about the each of the protected individuals' statuses as a private citizen and whether they are properly covered by the Exemption; in addition, both parties' motions will be denied without prejudice until SIGAR has had the opportunity to provide additional information to support its reliance on Exemption 6 and 7(C) to withhold interview codes, the location of interviews, and audio recordings;

7) Summary judgment will be granted in favor of SIGAR with respect to its reliance on Exemptions 7(A), 7(E), and 7(F); and

8) The issue of the State Department's reliance on Exemption 3 to withhold documents pursuant to the National Security Act will be remanded to the agency for more details on who at the agency has the authority to invoke the National Security Act, and who was involved in making the redactions in this case.  Both parties' motions as to this issue will be denied without prejudice until the Court receives the supplemental information.

9) Defendant's motion for summary judgment with respect to Exemption 5 and the deliberative process privilege and plaintiff's motion will be denied without prejudice pending the receipt of any supplemental information in accordance with this opinion.

A separate Order will issue.


AMY BERMAN JACKSON
United States District Judge


DATE: September 15, 2020