**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WP COMPANY LLC** )<br>**d/b/a THE WASHINGTON POST**, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>**SPECIAL INSPECTOR GENERAL FOR** )<br>**AFGHANISTAN RECONSTRUCTION**, )<br> )<br>Defendant. )<br> ) | Civil Action No. 1:18-cv-2622<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION**
**TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Matthew E. Kelley (#1018126)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
kelleym@ballardspahr.com

*Counsel for Plaintiff WP Company LLC,*
*d/b/a The Washington Post*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND AND PROCEDURAL HISTORY ..........................................................2

    SIGAR's Lessons Learned Program ......................................................................2

    The *Post*'s FOIA Request ......................................................................................2

    The First Round of Litigation ................................................................................3

    The *Post*'s Report "The Afghanistan Papers" .....................................................3

    The Court's Memorandum Opinion and Order ......................................................5

    Subsequent Proceedings.........................................................................................7

ARGUMENT ......................................................................................................................8

I.      STANDARD OF REVIEW .....................................................................................8

II.    THE PUBLIC IS ENTITLED TO THE WITHHELD INFORMATION ..........................8

    A.    SIGAR Has Not Justified Its Redactions Under Exemptions 6 and 7(C) .........................................................................................................8

        1.    SIGAR misrepresents the conditions for "on the record" interviews ..................................................................................9

        2.    SIGAR misrepresents the status of numerous public officials .................12

        3.    SIGAR misrepresents the privacy harm in identifying interviewees and third parties .................................................15

        4.    SIGAR misrepresents the public interest in identifying interviewees and third parties .................................................17

    B.    SIGAR Has Not Justified Its Redactions Under Exemption; 7(D).....................19

    C.    SIGAR Has Not Met Its Burden to Justify Continued Withholdings Under Exemption 5 ..........................................................................................20

        1.    SIGAR's Belated Invocation of the Presidential Communications Privilege Is Improper and Unavailing .........................22

i

         a.     SIGAR Waived Any Presidential Communications
Privilege Claim .............................................................................23

         b.     Even If It Were Not Waived, the Presidential
Communications Privilege Does Not Apply..................................24

         c.     SIGAR Has Not Shown Foreseeable Harm Regarding
the Presidential Communications Privilege ...................................26

    2.     The Material Withheld Under Exemption 5 Is Not Protected
By the Deliberative Process Privilege...........................................26

         a.     The Unprivileged Material SIGAR Had Improperly
Withheld Under Exemption 5 Shows that SIGAR
Invalidly Relies on This Exemption .............................................27

         b.     SIGAR Has Not Shown the ROIs Are Deliberative ....................28

         c.     The Interviewees Are Not Consultants ..........................................30

         d.     SIGAR Has Not Shown Foreseeable Harm To The
Deliberative Process......................................................................31

D.     SIGAR Has Not Justified Its Redactions Under Exemption 3 .............................32

    1.     IG Act.............................................................................................33

    2.     10 U.S.C. § 130b and the National Security Act .......................36

E.     SIGAR Has Not Justified Its Redactions Under Exemption 1 .............................36

F.     SIGAR Continues To Improperly Withhold Information in the Public
Domain.............................................................................................................39

CONCLUSION.....................................................................................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*100Reporters LLC v. Dep't of Justice*,
   248 F. Supp. 3d 115 (D.D.C. 2017) ...............................................................29, 32

*Am. Oversight v. Dep't of Health & Human Servs.*,
   380 F. Supp. 3d 45 (D.D.C. 2019) .......................................................................31

*August v. FBI*,
   328 F.3d 697 (D.C. Cir. 2003) ............................................................................23

*BuzzFeed Inc. v. Dep't of Educ.*,
   2019 U.S. Dist. LEXIS 132321 (D.D.C. Aug. 7, 2019) ......................................15

*Campbell v. Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998) ..............................................................................37

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ...............................................................21, 28, 29

*Cottone v. Reno*,
   193 F.3d 550 (D.C. Cir. 1999) ...............................................................36, 39, 40

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) .........................................................21, 22, 26

*Dep't of Interior v. Klamath Water Users Protective Ass'n*,
   532 U.S. 1 (2001) .....................................................................................21, 31

*Dep't of Justice v. Landano*,
   508 U.S. 165 (1993) .............................................................................................19

*Dep't of Justice v. Reporters Comm. for Freedom of Press*,
   489 U.S. 749 (1989) ................................................................................1, 17, 18

*Evans v. Fed. Bureau of Prisons*,
   951 F.3d 578 (D.C. Cir. 2020) ..............................................................................8

*Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*,
   762 F. Supp. 2d 123 (D.D.C. 2011) ....................................................................30

*Griffin v. Oceanic Contractors*,
   458 U.S. 564 (1982) .............................................................................................35

*Hardy v. ATF*,
   243 F. Supp. 3d 155 (D.D.C. 2017) ..............................................................29, 30

*Iglesias v. USAID*,
   2018 U.S. Dist. LEXIS 175806 (D.D.C. Oct. 12, 2018) .......................................35

*Judicial Watch, Inc. v. Dep't of Commerce*,
   375 F. Supp. 3d 93 (D.D.C. 2019) .......................................21

*Judicial Watch, Inc. v. Dep't of Def.*,
   913 F.3d 1106 (D.C. Cir. 2019) .......................................21

*Judicial Watch, Inc. v. Dep't of Justice*,
   365 F.3d 1108 (D.C. Cir. 2004) .......................................22, 25

*Leopold v. Dep't of Justice*,
   2020 U.S. Dist. LEXIS 160707 (D.D.C. Sept. 3, 2020) .......................................25

*Loving v. Dep't of Def.*,
   550 F.3d 32 (D.C. Cir. 2008) .......................................21

*Maydak v. Dep't of Justice*,
   218 F.3d 760 (D.C. Cir. 2000) .......................................23, 24

*Mapother v. Department of* Justice,
   3 F.3d 1533 (D.C. Cir. 1993) .......................................30

*McKinley v. Bd. of Governors of the Fed. Reserve Sys.*,
   647 F.3d 331 (D.C. Cir. 2011) .......................................30

*McMichael v. Dep't of Def.*,
   910 F. Supp. 2d 47 (D.D.C. 2012) .......................................16, 17

*Memphis Publ'g Co. v. FBI*,
   879 F. Supp. 2d 1 (D.D.C. 2012) .......................................43

*Nat'l Sec. Counselors v. CIA*,
   320 F. Supp. 3d 200 (D.D.C. 2018) .......................................33

*Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*,
   849 F. Supp. 2d 13 (D.D.C. 2012) .......................................30

*Nation Magazine v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) .......................................15

*Playboy Enters. Inc. v. Dep't of Justice*,
   677 F.2d 931 (D.C. Cir. 1982) .......................................29

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) .......................................39

*Ryan v. Dep't of Justice,*
    617 F.2d 781 (D.C. Cir. 1980) ............................................................... 23

*Schrecker v. Dep't of Justice,*
    349 F.3d 657 (D.C. Cir. 2003) ............................................................... 17

*\*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) .......................................................... 22, 25

*\*Stern v. FBI,*
    737 F.2d 84 (D.C. Cir. 1984) ............................................................ 12, 16

*Stonehill v. IRS,*
    558 F.3d 534 (D.C. Cir. 2009) ............................................................... 23

*United States v. Voorhees,*
    79 M.J. 5 (C.A.A.F. 2019) ..................................................................... 13

*\*Wolf v. CIA,*
    473 F.3d 370 (D.C. Cir. 2007) ................................................... 37, 39, 43

*WP Co. LLC v. Small Bus. Admin.,*
    2020 U.S. Dist. LEXIS 206836 (D.D.C. Nov. 5, 2020) ..................... 12, 18

## Statutes & Other Authorities

162 Cong. Rec. H3714-01 (2016) ................................................................ 21

5 U.S.C. App. 3 § 7(a) ........................................................................... 33, 34

*\*5 U.S.C. § 552 ................................................................................. passim*

*\*10 U.S.C. § 130b ................................................................................ 33, 36*

*\*Inspector General Act of 1978 ..................................................... 2, 33, 34, 35*

National Security Act ....................................................................... 6, 33, 36

## PRELIMINARY STATEMENT

John Sopko, the head of Defendant Special Inspector General for Afghanistan Reconstruction ("SIGAR"), testified to Congress last year that America's involvement in Afghanistan suffers from "mendacity and hubris."  IG Sopko observed that "we have created an incentive to almost require . . . for people to lie" about the conditions in Afghanistan, and that the "disconnect" between what the military was saying and "what was [truly] going on" led SIGAR to launch its Lessons Learned Project and conduct the interviews that are now at the heart of this Freedom of Information Act ("FOIA") lawsuit brought by *The Washington Post* ("the *Post*").

Mendacity and hubris are also what bring this case back before this Court for a second round of summary judgment briefing.  Hubris in that SIGAR rebuffed the Court's suggestion (and the *Post*'s invitation) to mediate the issues that remain in dispute following the Court's September 2020 Memorandum Opinion ("Mem. Op.") (Dkt. 28).  *See* Joint Status Report Regarding Mediation, Nov. 20, 2020, at 3 (Dkt. 31).  And mendacity in that the record reveals how thoroughly SIGAR has mischaracterized the materials of vital public importance it continues to keep secret.

The *Post* again asks for the Court's help in ensuring that this agency – whose mission is to bring greater public accountability to this bloody and costly chapter of U.S. history – fulfills its obligations under FOIA to inform us all of "what the government [has been] up to" in Afghanistan for the past two decades*.  Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 780 (1989) (citation omitted).

1

## BACKGROUND AND PROCEDURAL HISTORY

**SIGAR's Lessons Learned Program**

Congress created SIGAR in 2008 to provide independent, objective oversight of Afghanistan reconstruction.  Mem. Op. at 2.  One of the ways that SIGAR carries out this mission is through its Lessons Learned Program ("LLP"), which "aims to extract lessons from the reconstruction experience and makes recommendations to Congress and federal agencies on ways to improve the reconstruction efforts."  *Id.*  LLP staff have accordingly "conduct[ed] interviews with hundreds of individuals with direct and indirect knowledge of U.S. reconstruction programs."  *Id.* (internal marks omitted).  The product of these efforts are the "Lessons Learned Reports," which "focus on key aspects of the reconstruction effort and document what the U.S. government sought to accomplish, assess what it achieved, and evaluate the degree to which these efforts helped the United States reach its strategic goals in Afghanistan."  *About SIGAR*, https://www.sigar.mil/about/ (under "Lessons Learned Program").

**The *Post*'s FOIA Request**

On March 23, 2017, *Post* reporter Craig Whitlock filed a request with SIGAR under the Freedom of Information Act, 5 U.S.C. § 552, for the "full, unedited transcripts and complete audio recordings of __*all*__ interviews conducted for the Lessons Learned program, regardless of whether they were labeled as 'on the record,' or if the interviewee was granted anonymity, or if they were cited in a particular report or not."  Mem. Op. at 2-3.

Nearly a year later, SIGAR's General Counsel informed the *Post* that the LLP "had conducted 410 interviews to date, and that the majority (374) had been completed without audio recordings or transcripts."  *Id.* at 3.  The General Counsel also represented to the *Post* that, based on its interpretation of the Inspector General Act of 1978, SIGAR believes it is prohibited "from

2

disclosing the identity of a source who wishes to remain anonymous." *Id.* at 3-4.  There followed "a series of communications between SIGAR and Whitlock, and between the agency and James McLaughlin, a Deputy General Counsel at the Post, in which the Post repeatedly voiced concerns about the completeness and the pace of the production." *Id.* at 4.

### The First Round of Litigation

The *Post* filed this lawsuit on November 14, 2018.  SIGAR answered on December 17, 2018, asserting that it had properly withheld information and records exempt from disclosure under FOIA.  *See* Answer (Dkt. 9).

After a delay due to a government shutdown, *see* Dkt. 11, this Court ordered SIGAR to make rolling productions of the remaining records with the goal of completing production by May 15, 2019.  *See* Minute Order of Feb. 12, 2019.  When that deadline arrived, SIGAR abruptly stated that it had not completed its consultations with other agencies and needed more time to finish producing the requested records.  *See* Def.'s Status Report, May 15, 2019 (Dkt. 14).

On June 17, 2019, SIGAR represented to the Court that its production was finally complete.  *See* Def.'s Status Report (Dkt. 15).  Pursuant to the briefing schedule set by the Court, SIGAR filed its motion for summary judgment on August 16, 2019, and the *Post* submitted its cross-motion on September 6, 2019.  Mem. Op. at 4-5.  Briefing closed on September 27, 2019. *See* Dkt. 25.

### The *Post*'s Report "The Afghanistan Papers"

On December 9, 2019, the *Post* published a six-part series titled "The Afghanistan Papers: A Secret History of the War."  *Post's* Statement of Undisputed Material Facts ("SUMF") ¶ 1.  Drawing largely on the interview records produced by SIGAR, The Afghanistan Papers helped to "reveal a secret, unvarnished history of the conflict and offer[ed] new insights into how three presidential administrations have failed for nearly two decades to deliver on their promises

to end the war." *Id.* at ¶ 2.  The *Post* identified four themes throughout the records: (1) Year after year, U.S. officials failed to tell the public the truth about the war in Afghanistan; (2) U.S. and allied officials admitted the mission had no clear strategy and poorly defined objectives; (3) many years into the war, the United States still did not understand Afghanistan; and (4) the United States wasted vast sums of money trying to remake Afghanistan and bred corruption in the process.  *See* Craig Whitlock et al., *The Afghanistan Papers*, WASH. POST (Dec. 9, 2019), https://www.washingtonpost.com/graphics/2019/investigations/afghanistan-papers/documents-database/.  The *Post* also published 422 of these interview records as produced by SIGAR so that members of the public could explore and evaluate the source material for themselves.  *Id.*

As the *Post* reported, the records SIGAR produced "identified 62 interviewees by name," and the *Post* "independently identified 33 other people who were interviewed, including several former ambassadors, generals and White House officials."  Craig Whitlock et al., *Responses from people featured in The Afghanistan Papers*, WASH. POST (Dec. 9, 2019) ("Responses article"), https://www.washingtonpost.com/investigations/responses-from-people-featured-in-the-afghanistan-papers/2019/12/08/086864aa-0bed-11ea-97ac-a7ccc8dd1ebc_story.html.  More than a dozen of these Lessons Learned interviewees provided additional comments to the *Post*. *Id.*

The Afghanistan Papers grabbed the attention of the press, the public, the military, and the government.  SUMF ¶¶ 2-10; *see also, e.g.*, *The Washington Post's "Afghanistan Papers" and U.S. Policy: Main Points & Possible Questions for Congress*, CONGRESSIONAL RESEARCH SERVICE (Jan. 28, 2020), https://fas.org/sgp/crs/misc/R46197.pdf.  "Senator Tom Udall spoke on the Senate floor about the Papers" and "Senator Kirsten Gillibrand called for Senate hearings to investigate 'these deeply concerning revelations about the Afghan war.'"  *Id.* at 11.  "Top U.S.

defense officials," on the other hand, "largely defended the U.S. conduct of the war, arguing that the Papers did not constitute evidence that former officials had lied to the American public, and that the Papers, as part of a Lessons Learned project, were structured to invite criticism, in hindsight, of the war effort." *Id.*

IG Sopko himself sent the *Post* a letter to the editor, "disputing some of the Post's characterizations" but acknowledging that "the Afghanistan Papers is an important contribution to public discourse about the war in Afghanistan." *Id.* at 12 & n.16.  The month after publication of The Afghanistan Papers, IG Sopko "testified in front of the House Foreign Affairs Committee that U.S. policy in Afghanistan has been characterized by 'institutional hubris and mendacity' and that 'We have incentivized lying to Congress . . . the whole incentive is to show success and to ignore failure and when there's too much failure, classify it or don't report it.'" *Id.* at 12; *see also* SUMF ¶ 10.

### The Court's Memorandum Opinion and Order

On June 2, 2020, the Court ordered SIGAR to provide copies of the records for *in camera* review that had been withheld under Exemption 5.  Minute Order of June 2, 2020.  SIGAR submitted those materials to the Court on June 8, 2020.  *See* Dkt. 26.

On September 15, 2020, the Court issued a Memorandum Opinion and Order on the cross-motions for summary judgment.  Order (Dkt. 27), Mem. Op. (Dkt. 28).  The Court agreed with the *Post* that it had standing to bring suit.  Mem. Op. at 6-8, 10-13.  The Court, however, denied as moot the *Post*'s claim as to the timeliness of SIGAR's production, *id.* at 13-14, and granted summary judgment for SIGAR as to the adequacy of its search, *id.* at 14-15.

On the merits, the Court granted summary judgment for SIGAR as to Exemptions 7(A), 7(E), and 7(F), and it denied without prejudice the parties' cross-motions with respect to

Exemptions 1, 3, 5, 6, 7(C), and 7(D).  *Id.* at 15-40.  As to those exemptions, the Court directed the government to supplement its arguments and proofs in the following ways:

First, to justify withholdings under Exemption 1, the Court instructed the State Department to provide "a more fulsome explanation of how the redacted information could logically be expected to result in a threat to national security."  Mem. Op. at 19.

Second, to justify withholdings under Exemption 7(C), the Court instructed SIGAR to "supplement its declaration indicating whether each individual whose identity is being protected could be properly characterized as a 'private citizen' at the time of the interview and/or the events described during the interview, and whether the interviewee or individual named falls within the proper scope of the exemptions."  *Id.* at 26.  "[A]s to the unique interviewee codes, the interview locations, and the audio recordings" that have been withheld, the Court ordered SIGAR to "either supplement its pleadings with additional information explaining how those pieces of data would tend to identify interviewees, or provide the data, including all reasonably segregable portions of the audio recordings, to the *Post*."  *Id.* at 28.

Third, to justify withholdings under Exemption 3 as related to the National Security Act, the Court directed the State Department to "submit a supplemental declaration indicating who made the FOIA determinations with respect to the National Security Act in this case, and whether that person had the authority to do so."  *Id.* at 35.

Fourth, to justify withholdings under Exemption 5, the Court ordered SIGAR to submit sufficient "supplemental information" to "support its reliance on the deliberative process privilege."  *Id.* at 38-40.

The Court also concluded that because "individuals who submitted to interviews 'on the record' . . . chose to be interviewed without any privacy protection," to the extent "SIGAR has

redacted or withheld information that an interviewee has given permission to keep on the record, it must produce that information" to the *Post*.  *Id.* at 24 n.10.

**Subsequent Proceedings**

On September 15, 2020, the Court ordered the parties to submit a proposed schedule for further proceedings.  Minute Order of Sept. 15, 2020.  On September 24, 2020, after the parties had submitted competing proposals, the Court ordered SIGAR by October 30, 2020 to re-review the withheld materials, produce records for which it determined additional information could be disclosed, and identify and justify any continued withholdings.  Minute Order of Sept. 24, 2020.

On October 30, 2020, SIGAR produced certain additional information to the *Post*.  The parties subsequently agreed to and proposed a summary judgment briefing schedule on the remaining issues in this case.  *See* Joint Status Report, Nov. 10, 2020 (Dkt. 30).  The Court adopted that schedule but also inquired whether the parties would be amenable to mediation to resolve the remaining disputes amicably.  *See* Minute Order of Nov. 12, 2020.

On November 17, 2020, SIGAR informed the *Post* that it would not agree to mediation. *See* Joint Status Report, Nov. 20, 2020 (Dkt. 31) at 1-2.  SIGAR said that it would never agree to disclose the identities of interviewees who had spoken "on the record," not even the names of high-ranking government officials identified in their interview reports.  *Id.* at 4-5.  SIGAR also expressed concern that Magistrate Judges might lack the security clearances to review and discuss the information SIGAR is withholding under Exemptions 1 and 3.  *Id.* at 2.

SIGAR filed its renewed motion for summary judgment on December 15, 2020.  *See* Dkt. 32 ("SIGAR Second MSJ").  The *Post* now timely files this renewed cross-motion and opposition.

## ARGUMENT

### I.  STANDARD OF REVIEW

As the D.C. Circuit recently emphasized, "FOIA favors disclosure, not concealment." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 586 (D.C. Cir. 2020).  To withhold information from the public, therefore, "the government bears the burden of proving the applicability of [a FOIA] exemption."  *Id.*  An agency can carry this burden through affidavits and declarations, but only "when they are relatively detailed and non-conclusory, and not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Mem. Op. at 6 (citations and internal marks omitted).

### II.  THE PUBLIC IS ENTITLED TO THE WITHHELD INFORMATION

Even with a second chance to do so, SIGAR utterly fails to carry its burden to justify its withholding of portions of these public records.  Its declarations are far too vague, and they are repeatedly contradicted by record evidence – including SIGAR's own public reports.  The Court should deny SIGAR's renewed summary judgment motion, and rather than give SIGAR a third bite at the apple, the Court should grant the *Post*'s renewed cross-motion in full.

#### A.  SIGAR Has Not Justified Its Redactions Under Exemptions 6[1] And 7(C)

After determining, in evaluating SIGAR's Exemption 7(C) claims, that the agency compiled information for law enforcement purposes, *see* Mem. Op. at 21-22, and that the interviewees and third parties referenced had at least a minimal privacy interest, *see id.* at 22-25, the Court recognized that it could not conduct the necessary balancing test.  The Court

---

[1] SIGAR cites Exemption 6 along with Exemption 7(C), as they both balance the public interest in disclosure against the privacy interest in withholding, but because "the threshold of harm" is lower for Exemption 7(C) than for Exemption 6, failure to satisfy Exemption 7(C) necessarily amounts to failure to justify withholding under Exemption 6 as well.  *See* Mem. Op. at 20.

determined that SIGAR had not provided sufficient information to weigh the public interest in disclosure against the privacy interest in withholding information, without knowing (1) whether the individuals were private citizens or public employees; and (2) whether those public employees were high ranking or low ranking.  *Id.* at 26-27.  The Court thus ordered SIGAR to provide that information.  *Id.*  The Court also ordered that SIGAR "must produce" the names and other identifying information of interviewees "who submitted to interviews 'on the record,'" because those individuals "chose to be interviewed without any privacy protection," *id.* at 24 n.10.

SIGAR has refused to follow either of these clear instructions.  The agency refuses to identify "on the record" interviewees, and its justifications are riddled with misstatements.  In this respect SIGAR has completely failed to justify its withholdings under Exemption 7(C).

### 1.  SIGAR misrepresents the conditions for "on the record" interviews.

This Court could not have been clearer in telling SIGAR that it "must" disclose the names of all Lessons Learned interviewees who spoke with the agency on the record because they "chose to be interviewed without any privacy protection."  *Id.* at 24 n.10.[2]  SIGAR's reasons for refusing to comply do not stand up to scrutiny.

---

[2] The written interview records marked as "on the record" or memorializing that agreement between interviewer and subject are: SIGAR-(b)(1)-00062-00067, SIGAR-(b)(1)-00093-00102, SIGAR-LL-05-00069, SIGAR-LL-05-00073, SIGAR-LL-05-00081, SIGAR-LL-05-00085, SIGAR-LL-05-00090, SIGAR-LL-05-00094, SIGAR-LL-05-00097, SIGAR-LL-05-00105, SIGAR-LL-05-00108, SIGAR-LL-05-00112, SIGAR-LL-05-00121, SIGAR-LL-05-00125, SIGAR-LL-05-00183, SIGAR-LL-05-00190, SIGAR-LL-07-00017, SIGAR-LL-07-00025, SIGAR-LL-07-00030, SIGAR-LL-07-00035, SIGAR-LL-07-00078, SIGAR-LL-07-00140, and SIGAR-LL-07-00193, along with audio recordings associated with SIGAR-(b)(1)-00105-00116, SIGAR-LL-Misc-00073-00132, SIGAR-(b)(1)-00062-00067, SIGAR-(b)(1)-00093-00102, SIGAR-LL-Misc-00001-00072, and SIGAR-LL-Misc-00133-00184.

SIGAR's main rationale for ignoring the Court's instruction is its claim of "some confusion regarding ROIs marked 'on the record'" because an unknown number of interviewees supposedly "understood 'on the record' to mean that they wanted the *information* they provided to SIGAR to be used in the lessons learned studies and reports, but their identities to remain confidential."  *See* Fourth Hubbard Decl. ¶ 41 (Dkt. 32-2) (emphasis in original).  The record evidence, however, contradicts that assertion – to the contrary, SIGAR's interviewers explained to interviewees the precise terms under which those interviews would be conducted.  One interview, for example, began as follows:

> SIGAR interviewer:  **So generally how we're handling these interviews is, we try and do them, when we can, on the record.** It's better for us. But we kind of use the same journalistic rules as taught at *The Washington Post*. **On the record means we're going to attribute it to you.** On background means, you will be some official – you can decide what you want to be, former advisor to the U.S. military, something like that. Deep background – we make no association with your organization or your attributes whatsoever. And then off the record is of course, we turn that thing off and we don't use that information at all.

*See, e.g.*, Third Tobin Decl., Ex. 2 (audio recording SIGAR-LL-01-00101, at 00:13-49) (emphasis added).  The recorded recitation of SIGAR's interviews, and the interviewer's explanation – "On the record means we're going to attribute it to you" – could not be clearer. Interviewees were expressly told that "on the record" meant the information they provided would be attributed to them.

SIGAR further claims that interviewees expressed a preference to remain unidentified in ROIs marked "On the record, check back for quotes," which purportedly meant that "SIGAR could use the information provided by the [interviewee], but could not identify the [interviewee] without first obtaining permission."  Suppl. Hubbard Decl. ¶ 17 (Dkt. 23-1) (cited at Fourth Hubbard Decl. ¶ 41).  Record evidence, however, clearly contradicts that claim as well.  The

transcript of Ambassador Nicholas Burns' on the record interview, for example, begins as follows:

> AMBASSADOR BURNS: I'm happy to speak on the record, but if we could agree that if you're going to use a quote from me, could you run it by me?
>
> [SIGAR interviewer]: Sure, absolutely.
>
> AMBASSADOR BURNS: Because you know, obviously context is important, and I want to make sure I'm saying exactly what I mean.  So, if the agreement could be, you can record this, I'm on the record, but that you won't use an on the record quote without sending it to me, I'll get right back to you, whenever you need that.
>
> [SIGAR interviewer]: Absolutely. That's perfectly fair.

*See* Third Tobin Decl., Ex. 3 at SIGAR-LL-Misc-00002.  This exchange shows that SIGAR did not need – and has no basis to tell this Court that it needed – additional "permission" to identify Ambassador Burns as an interviewee.  Instead, SIGAR agreed only to engage in a practice commonly known as "quote approval," in which Ambassador Burns could review a potential quote for accuracy prior to its publication in a Lessons Learned report.  *See, e.g.*, Erik Wemple, *New York Times bans quote approval, kind of*, WASH. POST (Sept. 20, 2012), https://www.washingtonpost.com/blogs/erik-wemple/post/new-york-times-bans-quote-approval-kind-of/2012/09/20/57586992-035e-11e2-8102-ebee9c66e190_blog.html.[3]

SIGAR also continues to assert that interviewees believed they could invoke "on the record" status a la carte, in that they supposedly "consented to a quote being attributed to [them], but did not consent to the entirety of an interview being attributed to [them]."  Fourth Hubbard

---

[3] The *Post*'s Policies and Standards observe that "[s]ometimes, a source will agree to be interviewed only if we promise to read quotations back to the source before publication. We should not allow sources to change what was said in an original interview, although accuracy or the risk of losing an on-the-record quote from a crucial source may sometimes require it. A better and more acceptable alternative is to permit a source to add to a quotation and then explain that sequence to readers."  *See Policies and Standards*, WASH. POST (Jan. 1, 2016), https://www.washingtonpost.com/news/ask-the-post/wp/2016/01/01/policies-and-standards/.

Decl. ¶ 41.  Another Court in this District, in a very recent FOIA decision in favor of the *Post*

and other news organizations, rejected another agency's identical assertion that, despite

explicitly informing people who provided information to the government that the data would be

made public, privacy interests should prevail.  *WP Co. LLC v. Small Bus. Admin.*, 2020 U.S.

Dist. LEXIS 206836, at *59-60 (D.D.C. Nov. 5, 2020).  There, the court held that the public's

interest in obtaining information about the small-business loan programs for COVID-19 relief far

outweighed the weak privacy interests of the loan recipients, even those that were individuals or

sole proprietorships, in part because the recipients were on notice that the data would be public.

*Id.*

   This Court has unambiguously instructed SIGAR to identify on-the-record interviewees.

SIGAR's post hoc rationale for failing to do so, which flies in the face of the explicit record its

interviewers made, should be rejected.  SIGAR should be instructed, without delay, to provide

the public with the information the Court has ordered.

### 2.  SIGAR misrepresents the status of numerous public officials.

   The Court also has recognized that "high ranking public officials" who are interviewees

or third parties referred to in the interview records may fare differently under the Exemption

7(C) analysis than low-ranking officials or private citizens.  Mem. Op. at 26.  Their status affects

both sides of the balancing test: high-ranking government officials have diminished privacy

interests, and the public's interest in the identity of a government official rises with the "level of

responsibility" that person holds.  *See Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984).  The Court

therefore ordered SIGAR to provide supplemental information as to the status of each individual

whose identity the agency seeks to withhold under Exemption 7(C).  Mem. Op. at 26-27.

But SIGAR's supplemental proofs, in response to the Court's order, are replete with

misrepresentations.  For example:

- SIGAR labelled **Col. Christopher Kolenda** as a "low ranking government
  employee."  *See* SIGAR's Third *Vaughn*, Dkt. 32-3 at 147 (SIGAR-LL-03-00154-
  00156).  In one of its own Lessons Learned reports, however, SIGAR noted he
  was a "*former Senior Advisor on Afghanistan and Pakistan to the Under
  Secretary of Defense for Policy*."  September 2017 Report at 259 (emphasis
  added).  Col. Kolenda's public biography elaborates that he "served as the Senior
  Advisor on Afghanistan and Pakistan to Under Secretary of Defense Michèle
  Flournoy, and three [four-star] Generals in Afghanistan," he "was hand-selected
  by the Under Secretary of Defense for Policy to develop a new U.S. strategy for
  the conflict and was then ordered back to Afghanistan where he drafted the
  groundbreaking McChrystal assessment, counterinsurgency guidance, and
  military strategy," he has provided advice that "has been adopted by three
  Secretaries of Defense and the President of the United States," and he "was
  selected to be the Secretary of Defense's representative in exploratory talks with
  the Taliban from 2010-2013."  *See Christopher D. Kolenda*, CNAS,
  https://www.cnas.org/people/christopher-d-kolenda.[4]

- SIGAR labelled **John Wood** as a "low-level government employee."  *See*
  SIGAR's Third *Vaughn*, Dkt. 32-3 at 152 (SIGAR-LL-04-00005-00006).  But
  SIGAR itself noted that he was the former "*Senior Director for Afghanistan*" on
  the National Security Council.  June 2018 Report n.149 (emphasis added).
  According to his public biography, Wood held that NSC position "from 2007-
  2009 under both the Bush and Obama administrations," and he "served 28 years
  in the United States Army as an armor officer, retiring as a colonel."  *See
  Afghanistan's Terrorist Insurgencies*, Middle East Inst.,
  https://mei.edu/events/afghanistans-terrorist-insurgencies (under "Panelists
  Biographies").

- SIGAR labelled **Paul Miller** as a "low ranking government employee at the time
  of the events discussed."  *See* SIGAR's Third *Vaughn*, Dkt. 32-3 at 13-14
  (SIGAR-(b)(1)-00132-00135).  According to his public biography, however,
  Miller "served as *Director for Afghanistan and Pakistan on the National Security
  Council staff*."  *See Paul D. Miller*, Georgetown Univ.,

---

[4] SIGAR also identifies two other Army colonels as "low ranking."  *See* SIGAR's Fifth *Vaughn*
Index, Dkt. 32-3 at 259 (**Col. Bradley Moses**, SIGAR-LL-07-00078-00080), 285 (**Col. Dennis
Cahill**, SIGAR-LL-07-00197-00199).  According to the Army, however, a colonel typically
"commands brigade-sized units (1,500 to 3,200 Soldiers)" or is "the chief of divisional-level
staff agencies."  *See* U.S. Army Ranks, https://www.army.mil/ranks/.  Colonels are therefore
high-ranking, not low-ranking.  *Cf. United States v. Voorhees*, 79 M.J. 5, 13 (C.A.A.F. 2019)
(characterizing a jury "comprised of colonels and lieutenant colonels" as one made up of "senior
officers"), *cert. denied*, 2020 U.S. LEXIS 1988 (U.S. Mar. 30, 2020).

https://gufaculty360.georgetown.edu/s/contact/00336000015aqRIAAY/paul-miller (emphasis added).

- SIGAR labelled **Sarah Chayes** as a "low ranking government employee at the time of the events discussed." *See* SIGAR's Third *Vaughn*, Dkt. 32-3 at 106-07 (SIGAR-LL-03-00001-00006).  SIGAR's own report notes, however, that she was a former special assistant to NATO's commander in Afghanistan, General Stanley McChrystal. September 2016 Report at 34 & n.218 (emphasis added).  According to her public biography, Chayes also "served as special assistant to the top U.S. military officer, Chairman of the Joint Chiefs of Staff Admiral Mike Mullen," in which capacity "[s]he focused on governance issues, participating in cabinet-level decision-making on Afghanistan, Pakistan, and the Arab Spring, and traveling with Mullen frequently to these regions," and which followed "her work as special adviser to two commanders of the international troops in Afghanistan." *See Sarah Chayes*, Carnegie Endowment for Int'l Peace, https://carnegieendowment.org/experts/712.

- SIGAR labelled **Barnett Rubin** as "a low ranking government employee at the time of the events discussed."  *See* SIGAR's Third *Vaughn*, Dkt. 32-3 at 275 (SIGAR-LL-07-00151-00154).  SIGAR itself, however, noted that he was the senior adviser to the State Department's Special Representative for Afghanistan and Pakistan.  May 2018 Report at 156 & n.1014.  According to his public biography, Rubin held that post from 2009 to 2013, and before that he "served as special advisor to the UN Special Representative of the Secretary General for Afghanistan, during the negotiations that produced the Bonn Agreement," after which he "advised the United Nations Assistance Mission in Afghanistan on the drafting of the constitution of Afghanistan, the Afghanistan Compact, and the Afghanistan National Development Strategy."  *See Barnett Rubin*, NYU Ctr. on Int'l Cooperation, https://cic.nyu.edu/people/barnett-rubin.[5]

SIGAR's representations of the seniority of its interviewees is a wholly unreliable effort to avoid this Court's conclusion that the public interest in senior officials' interviews is great, while the privacy interest of these officials is minimal.  Its representations about the prominence of third parties whose names are mentioned in the reports are suspect as well.  SIGAR's declaration in this regard, and *Vaughn* index, are thus in bad faith and should be given no weight.

---

[5] Indeed, SIGAR considered Rubin such an important figure that the agency interviewed him at least four times, as Rubin himself confirmed to the *Post* last year.  *See* Responses article.

### 3. SIGAR misrepresents the privacy harm in identifying interviewees and third parties.

On the privacy interest side of the Exemption 7(C) balancing test, SIGAR claims that disclosure of interviewees' and third parties' identities will lead to a parade of horribles, most notably the risk of "retaliation" or "reprisal."  *See* Fourth Hubbard Decl. ¶¶ 12, 18, 22, 27; SIGAR Second MSJ at 19 (citing Mem. Op. at 23-25 & n.8).  The problem for SIGAR is that the past year has shown these alleged risks were greatly exaggerated.[6]

As discussed above, the *Post* published its The Afghanistan Papers series in December 2019.  The *Post* reported that "documents disclosed by SIGAR identified 62 interviewees by name," and that "[t]hrough additional reporting, The Post independently identified 33 other people who were interviewed, including several former ambassadors, generals and White House officials."  Responses article (quoting interviewees independently identified by the *Post*, including Haass, Chayes, and Rubin).[7]  Another interviewee subsequently self-identified in another publication.  *See* Paul Miller, *What Really Went Wrong in Afghanistan*, The Dispatch (Jan. 29, 2020), https://thedispatch.com/p/what-really-went-wrong-in-afghanistan ("I also welcome the greater transparency brought by the publication of SIGAR's interviews.")  Yet

---

[6] SIGAR's inconsistency in redacting third party names further reveals that the alleged risks of disclosure are exaggerated, as the agency has released many such names to no apparent harm. *See, e.g.*, Third Tobin Decl., Ex. 5 (SIGAR-LL-05-00169, redacting no third party names); *see also BuzzFeed Inc. v. Dep't of Educ.,* 2019 U.S. Dist. LEXIS 132321, at *2 (D.D.C. Aug. 7, 2019) (denying government's summary judgment motion where *in camera* review revealed that its "approach to redacting the [records] appears to be inconsistent" and that certain redactions "are significantly overbroad").

[7] SIGAR cannot possibly justify continuing to withhold the names of interviewees who have voluntarily spoken to the *Post* or otherwise publicly commented about their interviews.  *See Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) (as former presidential candidate Ross Perot has made public statements about his offers to help federal authorities in hostage rescues and drug interdiction, redacting his name from records "that involve the subject matter of those disclosures . . . would not serve any useful purpose in protecting his privacy").

SIGAR has not identified <u>any</u> retaliation that <u>any</u> of its interviewees have faced since the *Post*'s series was published.  Rather, SIGAR says only that some number of still-unnamed interviewees have expressed generalized concerns about the possibility that they might still be identified.  *See* Fourth Hubbard Decl. ¶ 16.

Indeed, SIGAR IG Sopko himself testified before the U.S. House of Representatives Committee on Foreign Affairs the month after the *Post* published the Afghanistan Papers series. When asked whether Lessons Learned interviewees have faced retaliation, he candidly replied that SIGAR "know[s] of no retaliation" and suggested that interviewees might seek anonymity merely to "bad mouth[] their old boss."  *See* SUMF ¶ 11; Third Tobin Decl., Ex. 4 (hearing transcript) at 11.

Without any evidence of actual harms SIGAR resorts in this Court to hypotheticals. SIGAR even turns the Court's concern about the nondisclosure of high-ranking officials' identities on its head.  According to SIGAR, "high-ranking government employees" potentially face a "*greater* risk of retaliation or reprisal" than their low-ranking colleagues because "[h]igh-ranking government employees, especially political appointees, can easily be removed from their positions and essentially black-listed, and can suffer substantial reputational harm."  Fourth Hubbard Decl. ¶ 12 (emphasis added).  With this sophistry, SIGAR seeks to overturn decades of FOIA doctrine under which the higher rank a federal employee attains, the lower privacy interest that employee enjoys.[8]  *See, e.g.*, *Stern*, 737 F.2d at 92; *McMichael v. Dep't of Def.*, 910 F. Supp. 2d 47, 53 (D.D.C. 2012) (subject's "status as a federal employee with leadership responsibilities

---

[8] SIGAR's backwards logic fails even more spectacularly for interviewees who were high-ranking at the time of the interview or the events in question, but who are now private citizens, as they no longer face any conceivable risk of such retaliation from the disclosure of their names.

diminishes his privacy interest" in Exemption 7(C) context).  The Court should reject SIGAR's

attempt to flip this aspect of FOIA on its head.[9]

### 4. SIGAR misrepresents the public interest in identifying interviewees and third parties.

SIGAR further claims that the *Post* has "failed to establish how disclosing the limited

remaining information – the individuals' names and identifying information – would bear upon

SIGAR's 'performance of its statutory duties' or 'contribute significantly to public

understanding of the operations or activities of the government' in Afghanistan."  SIGAR

Second MSJ at 22 (quoting *Reporters Comm.*, 489 U.S. at 773, 775).  To the contrary, the *Post*

has done just that – and SIGAR has simply failed to challenge the *Post*'s argument in any

meaningful way.

As the *Post* previously explained, it is impossible to meaningfully "understand the facts"

in the interviews <u>without</u> knowing the identities of the interviewees and the persons they

discussed.  For example:

- SIGAR produced an interview of a "senior U.S. official" who explained why Defense Secretary Robert Gates fired Army Gen. David McKiernan, the commander of U.S. and NATO forces in Afghanistan from 2008 to 2009.  *See* Second Tobin Decl., Ex. 4. at SIGAR-LL-07-00212.  According to this interviewee, Gen. McKiernan was fired because he minimized or failed to take responsibility for civilian casualties caused by U.S. forces. *Id.*

---

[9] Finally, SIGAR appears to be asserting Exemption 7(C) as to at least one deceased individual: Ambassador Richard Holbrooke, who died in December 2010.  *Compare* SIGAR's Third *Vaughn*, Dkt. 32-3 at 62-63 (withholding information in SIGAR-LL-01-0122 about a "[t]hird party referenced by the [interviewee who] appears to have been a government employee, high ranking"), *with* SIGAR's Exemption 5 *Vaughn*, Dkt. 32-4 at 4-5 (noting that Holbrooke was one of the third parties referenced in SIGAR-LL-01-0122).  Because the D.C. Circuit has recognized that "the privacy interest in nondisclosure of identifying information may be diminished where the individual is deceased," *Schrecker v. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003), SIGAR must articulate some particularly persuasive rationale for withholding this information if in fact it pertains to the late ambassador, and SIGAR must do the same for any other information it seeks to withhold about other deceased individuals.

Gen. McKiernan was the first U.S. war commander since the Korean War to be relieved of command.  But former Secretary Gates and other senior Pentagon officials have never provided a clear explanation for his removal.  For the public to know how much credence to give this interviewee's account, the public must know <u>who</u> provided that account, including to determine whether the interviewee was even in a position to know why Gen. McKiernan was fired.

- SIGAR produced the 2014 interview of an anonymous individual who is sharply critical of the war, referring to Afghanistan as "a sinking ship."  Second Tobin Decl., Ex. 5 at SIGAR-LL-01-00040.  According to this interviewee, the U.S. ignored warning signs as far back as 2005, stating: "The turning point came at the end of 2005—beginning of 2006 when we finally woke up to the fact that there was an insurgency that could actually make us fail. The first IEDs and suicide bombers struck, there were the riots. There were fears of a Tet Offensive in Kandahar.  BUT, our strategy, militarily, remained the same. Our military strategy didn't really change until 2009."  *Id.* at SIGAR-LL-01-00043-44.

  Without knowing <u>who</u> this interviewee is, it is effectively impossible for the public to know whether or how much to credit the interviewee's perspective.

- SIGAR produced the 2015 interview of an individual in Brussels who discussed the NATO coalition's efforts in Afghanistan.  Second Tobin Decl., Ex. 6 at SIGAR-LL-01-00070.  According to this interviewee, "There was no center. There was no sense of common purpose. . . . There was an illusion that the Afghan government was generally becoming more competent.  But, in reality, strategy wasn't treated urgently.  Issues became urgent, but not the strategy."  *Id.* at SIGAR-LL-01-00071.

  Without knowing the interviewee's identity, the public cannot possibly know how much weight to give to this criticism of the war effort.  Indeed, as it now stands the public does not even know if this interviewee ever served in Afghanistan.

As these examples illustrate, SIGAR errs in claiming that further disclosures would not advance a public interest cognizable under FOIA.  As the *Small Business Administration* court held, "the fact that the public already knows <u>some</u> information about [the relevant government program] does not preclude the existence of a 'great public interest' that would be served by releasing <u>more</u> information."  2020 U.S. Dist. LEXIS 206836, at *56 (emphasis in original) (citation omitted).  Indeed, learning these and other interviewees' identities – and the identities of the officials the interviewees discussed – will advance the fundamental goal of FOIA: informing the public about "what their government is up to."  *Reporters Comm.*, 489 U.S. at 773.  Because

that public interest clearly outweighs the minimal privacy interests discussed above, SIGAR cannot justify its withholdings under Exemption 7(C).

### B.  SIGAR Has Not Justified Its Redactions Under Exemption 7(D)

Finally, SIGAR urges the Court to "avoid addressing some of the balancing tests" required by those exemptions and instead to approve its withholdings under Exemption 7(D). SIGAR Second MSJ at 15.  But as SIGAR concedes, Exemption 7(D) applies only when the agency can demonstrate "that a source has provided information under either an express or implied promise of confidentiality."  *Id.* at 16; *accord Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993).  SIGAR thus cannot justify its withholding under Exemption 7(D), either, because it has failed to demonstrate that it extended a sufficient promise of confidentiality to any of its Lessons Learned interviewees, let alone "all" of them, as SIGAR's declarant now opportunistically claims.  *See* Fourth Hubbard Decl. ¶ 42.

As the Supreme Court explained in *Landano*, for a promise of confidentiality to suffice for Exemption 7(D), the source must have "furnished information with the understanding that the [agency] would not divulge [it] except to the extent the [agency] thought necessary for law enforcement purposes."  508 U.S. at 174.  SIGAR has not shown that any interviewees participated in the Lessons Learned Project with such an understanding, nor could it possibly do so: the record reflects that interviews were conducted under *journalistic* ground rules – *i.e.*, a discussion between a reporter and a source, not an informant speaking to a law enforcement officer.  *See* Third Tobin Decl., Ex. 2 (audio recording SIGAR-LL-01-00101, at 00:13-49).

Indeed, the record reflects that the Lessons Learned Project simply did not operate with the type of confidentiality that Exemption 7(D) contemplates.  For example, as the *Post* previously noted, SIGAR produced an interview record dated April 11, 2018, where the

interviewee's name is redacted under Exemption 7(D), but from context it is clear that the interviewee is David Mansfield, who – as SIGAR disclosed – gave an interview on that date. *See* June 2018 Report at nn.148, 182, 185, 280, 291, 604, 606, 609, 610, 611, 629, 781, 863, 906, & 933.  Mansfield looks nothing like a confidential source: he was a co-author of that Report; his name appears more than 100 times in the Report; and numerous photographs in the Report are credited to him.  *Id.*  Withholding his name under Exemption 7(D) is completely frivolous.

Likewise, SIGAR claimed Exemption 7(D) to redact the name of an interviewee who was clearly former U.S. Ambassador to Afghanistan Ronald Neumann.  *Compare* June 2018 Report at 97 & n.670, *with* Second Tobin Decl., Ex. 3 at SIGAR-LL-04-00010.  For one, SIGAR also disclosed that Neumann sat for a separate interview on a different date.  *See* Second Tobin Decl., Ex. 7 at SIGAR-LL-05-00047.  For another, Neumann sat on a public panel alongside IG Sopko to mark the release of SIGAR's June 2018 Lessons Learned report.[10]  It would stretch Exemption 7(D) past the breaking point to treat one of the public faces of the entire Lessons Learns Project as one of its "confidential informants."

Because SIGAR has failed to show that it extended a legally sufficient promise of confidentiality to the interviewees, it cannot justify any of its Exemption 7(D) withholdings.

### C.  SIGAR Has Not Met Its Burden to Justify Continued Withholdings Under Exemption 5

FOIA's Exemption 5 allows an agency to withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  Exemption 5 thus incorporates privileges applicable in civil discovery, including the deliberative process privilege and the presidential

---

[10] *Counternarcotics: Lessons from the U.S. Experience in Afghanistan*, NEW AMERICA, https://www.newamerica.org/international-security/events/counternarcotics-lessons-us-experience-afghanistan/.

communications privilege. *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008). The deliberative process privilege narrowly shields materials that are both "predecisional" and "deliberative," meaning that they must have been "generated before the adoption of an agency policy" and "reflect[] the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The presidential communications privilege applies only to communications among the President or his close advisors in aid of a decision to be made by the President. *Judicial Watch, Inc. v. Dep't of Def.*, 913 F.3d 1106, 1113-14 (D.C. Cir. 2019). Courts must give Exemption 5 a narrow scope, keeping in mind "the basic policy that disclosure, not secrecy, is the dominant objective of" FOIA. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7-8 (2001) (citation omitted).

As is the case with other discretionary FOIA exemptions, an agency invoking Exemption 5 has the burden under 5 U.S.C. § 552(a)(8)(A)(i) to show disclosure of the records would cause foreseeable harm. In adding this provision to FOIA in 2016, "Congress was especially concerned about agencies' reliance on Exemption 5 and the deliberative process privilege." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 104 (D.D.C. 2019) (denying the government's withholdings for failing to meet the increased burden under Exemption 5). This was "based on the recognition that 'from the beginning, agencies have taken advantage of these exemptions to withhold any information that might technically fit.'" *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) (quoting 162 Cong. Rec. H3714-01, H3717162 (2016) (noting that although some agencies "have made an effort to comply with the letter of the law, very few have complied with the spirit of the law")).

To meet its burden to show foreseeable harm, the government "must identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from

disclosure of the withheld materials and connect the harms in a meaningful way to the information withheld." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 105 (internal marks and citations omitted). The government must "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld," and "general explanations" and "boiler plate language" will not suffice. *Id.* at 106 (citations omitted).

In its second motion for summary judgment, SIGAR asserts Exemption 5, citing for the first time in more than two years of litigation, the presidential communications privilege as to seven ROIs. SIGAR Second MSJ at 32-43. SIGAR also continues to cite the deliberative process privilege as to portions of 11 ROIs. None of these assertions has merit and the withheld materials therefore should be released in full.

### 1. SIGAR's Belated Invocation of the Presidential Communications Privilege Is Improper and Unavailing

When properly invoked, the presidential communications privilege protects the contents of communications directly involving the president or that top White House "advisers and their staff author or solicit and receive in the course of performing their function of advising the President on official government matters." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). That privilege is not absolute, however, and "should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *Id.*; *see also Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1116 (D.C. Cir. 2004) (same, in context of FOIA litigation).

The presidential communications privilege does not apply here because SIGAR failed to invoke it in its initial summary judgment motion. Moreover, even if SIGAR had not waived the

privilege, it has not met its burden to show either that the withheld material is privileged or that release of the records would cause any harm the privilege is meant to prevent.

### a.   SIGAR Waived Any Presidential Communications Privilege Claim

The D.C. Circuit has consistently and emphatically warned the Government that to avoid waiver, it must claim <u>every</u> basis for withholding records under FOIA in its initial motion for summary judgment.  *Maydak v. Dep't of Justice*, 218 F.3d 760, 764-65 (D.C. Cir. 2000) ("We have plainly and repeatedly told the government that, as a general rule, it must assert all exemptions *at the same time*, in the original district court proceedings." (emphasis added) (collecting cases)); *see also, e.g.*, *August v. FBI*, 328 F.3d 697, 698 (D.C. Cir. 2003) ("[T]he Government generally waives any FOIA exemption it fails to raise at the initial proceedings before the district court . . . .")  This rule is grounded in basic fairness and serves

> two policy goals: (1) the interest in judicial finality and economy, which has special force in the FOIA context, because the statutory goals – efficient, prompt, and full disclosure of information – can be frustrated by agency actions that operate to delay the ultimate resolution of the disclosure request, and (2) preventing the government from playing cat and mouse by withholding its most powerful cannon until after the district court has decided the case and then springing it on surprised opponents and the judge.

*Stonehill v. IRS*, 558 F.3d 534, 538 (D.C. Cir. 2009) (internal marks and citations omitted). The D.C. Circuit has specifically instructed lower courts to reject the tactic SIGAR attempts here and not "permit[] the Government to raise its FOIA exemption claims one at a time, at different stages of a district court proceeding."  *Ryan v. Dep't of Justice*, 617 F.2d 781, 792 (D.C. Cir. 1980).

There are only two narrow exceptions to the waiver rule "for unusual situations, largely beyond the government's control:" first, "extraordinary circumstances where, from pure human error, the government failed to invoke the correct exemption," and second, "where a substantial change in the factual context of the case or an interim development in the applicable law forces

the government to invoke an exemption after the original district court proceedings have concluded." *Maydak*, 218 F.3d at 767.  SIGAR argues neither circumstance here.  Therefore, SIGAR has waived any reliance on the presidential communications privilege, and it cannot continue to withhold any material on that basis.

### b.  Even If It Were Not Waived, the Presidential Communications Privilege Does Not Apply

For two reasons, SIGAR's briefing, declaration and *Vaughn* index fail to establish the presidential communications privilege protects the withheld information, even if that privilege had not been waived.

First, the government's submissions are too vague to allow the Court and the *Post* to assess the validity of the claim of privilege.  For example, the Fourth Hubbard Declaration asserts that the withheld materials disclose the content of communications "between or involving high-level government officials on matters of presidential decision-making," and lists a number of advisers to Presidents George W. Bush and Barack Obama "involved" in the communications. Fourth Hubbard Decl. ¶ 67.  But neither the declaration nor the Exemption 5 *Vaughn* index (Dkt. 32-4) explains what these officials' "involvement" entailed, nor does the Government state which advisers were involved in which communications.[11]

Second, the Exemption 5 *Vaughn* index asserts the privilege over information that is self-evidently <u>not</u> the content of any presidential communication, such as "how information was communicated to the President through close advisors," "specific topics of meetings of close

---

[11] Here, too, the Government's explanations are inconsistent.  Although the Exemption 5 *Vaughn* index states that some of the withheld information "reveals policy discussions and decisions involving the president, vice-president, and close advisors to the president" and "reveals policy arguments directly involving the vice-president," the Fourth Hubbard Declaration's list of officials and advisers "involved" with the withheld material do not include any vice-president. *Compare* Exemption 5 *Vaughn* at 3 *with* Fourth Hubbard Decl. ¶ 67.

advisors to the president," and "details about how close advisors made policy recommendations to the president." Exemption 5 *Vaughn* at 1, 2, 4.

Third, SIGAR claims privilege for communications with president-elect Obama and/or his advisers during the transition period before he became President. SIGAR Second MSJ at 43; Fourth Hubbard Decl. ¶¶ 69-71; Exemption 5 *Vaughn* at 4. The Government cites no binding authority indicating that the privilege applies to presidents-elect, and the *Post* is unaware of any.[12]

The presidential communications privilege should not extend to the president-elect and close advisers on the transition team. The privilege is meant to protect <u>presidential</u> decision-making, and this nation has but one president at a time. Extending the privilege beyond the sitting President is unwarranted under the case law. The D.C. Circuit has repeatedly emphasized the need for the privilege to be narrowly drawn to avoid the "significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President." *In re Sealed Case*, 121 F.3d at 752. For example, in *Judicial Watch, Inc. v. Department of Justice*, the D.C. Circuit expressly rejected an invitation to extend the privilege to officials in the executive branch overall whom the Government claimed acted as advisors to the president or documents that never made it to the White House. 365 F.3d at 1116-17. The D.C. Circuit held that any interest in protecting communications involving or advice given by government officials would be adequately protected by the deliberative process privilege, *id.* – a

---

[12] In the one case SIGAR cites, SIGAR Second MSJ at 43, in which the undersigned counsel represent a FOIA plaintiff, the parties did not litigate and Judge Walton did not address the issue of the privilege's applicability during the transition period. *Leopold v. Dep't of Justice*, 2020 U.S. Dist. LEXIS 160707, at *25-27 (D.D.C. Sept. 3, 2020).

conclusion buttressed here by the fact that SIGAR asserts both privileges apply to the same transition-related materials.  *See* Fourth Hubbard Decl. ¶ 62; Exemption 5 *Vaughn* at 1-4.

### c.   SIGAR Has Not Shown Foreseeable Harm Regarding the Presidential Communications Privilege

SIGAR also has failed to meet its "independent and meaningful burden" to show that disclosure of the withheld materials would cause harm that the presidential communications privilege is meant to prevent.  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (citation omitted).  The Government's declarant makes precisely the "boilerplate statements and generic and nebulous articulations of harm" that are patently insufficient to show foreseeable harm.  *Id.* (citation omitted).[13]  Accordingly, the materials withheld pursuant to claims of the presidential communications privilege should be released.

### 2.   The Material Withheld Under Exemption 5 Is Not Protected By the Deliberative Process Privilege

In its Memorandum Opinion, this Court held that SIGAR had not shown that the records it withheld under the deliberative process privilege were the kind of predecisional and deliberative materials protected by the privilege.  Mem. Op. at 36-40.  SIGAR has failed to make that showing in this round of briefing as well.  To the contrary, the materials SIGAR previously withheld under Exemption 5, and has now released, show many of those redactions were improper in the first place.  Further, the Government's new submissions to the Court still do not show that the withheld materials are deliberative, that the interviewees were "consultants," or that foreseeable harm would result from disclosure.

---

[13] "The disclosure of such communications . . . burdens the ability of the President and his advisors to engage in a confidential and frank decision-making process and chills or inhibits their ability to have candid discussions. . . ."; "Disclosure [of communications made during the presidential transition] would undermine the President-elect's ability to engage in confidential discussions on matters that will be subject to presidential decision-making post-inauguration." Fourth Hubbard Decl. ¶¶ 73, 74.

### a. The Unprivileged Material SIGAR Had Improperly Withheld Under Exemption 5 Shows that SIGAR Invalidly Relies on This Exemption

SIGAR makes much of the fact that, since its first summary judgment briefing, it has withdrawn Exemption 5 withholdings from 39 ROIs.[14]  Second SIGAR MSJ at 7, 32.  Those releases, however, indicate SIGAR has abused the exemption throughout these proceedings. Many show that SIGAR claims Exemption 5 simply to hide information that reflects poorly on the U.S. government, for example, SIGAR's initial withholding of this passage from a report of an interview with a U.S. military member:

> There were instances where Special Forces killed the wrong people. The [U.S. Army] Rangers 'owned the night' and would raid houses. One time a neighbor heard the footsteps of the Rangers on the roof. The family was of an Afghan COL's and the wife taught at a girl's school. A firefight occurred and killed them both. We killed our allies.

Third Tobin Decl. Ex. 6 (revised redactions of SIGAR-LL-05-00069).  Similarly, SIGAR initially hid from the public this account of a program to help the Afghan government set up an elite counternarcotics force:

> [Private security contractor] Blackwater meant to do training but no one showed. So went to variety of warlords and asked them to send people - Hazrat Ali sent 70 year old deaf in one ear and blind in one eye. But [B]lackwater had to deliver trained people no matter what. Ended up with Fahim's people, Daud's people etc. Lot of nepotism. It was a good little training program but there is only so much you can do polish a turd. In one operation they had guns and no bullets.

*Id.* Ex. 7 (revised redactions of SIGAR-LL-04-00102).

Other recently released material initially withheld under Exemption 5 makes clear that the claims had no basis whatsoever.  For example, in one document, SIGAR withheld the fact that a series of meetings had occurred "at the NSC [National Security Council]," *id.* Ex. 8 (revised redactions of SIGAR-(b)(1)-00074), a fact that has no deliberative content at all.  In

---

[14] SIGAR in fact has not released any information from a dozen of those 39 ROIs, continuing to rely on other exemptions to withhold them.

another, SIGAR redacted the unsurprising statement that officials discussed what to do about the

Kajaki Dam, a hydroelectric facility in Afghanistan that had been the target of insurgents.  *Id.*

Ex. 9 (revised redactions of SIGAR-LL-05-00183).  The decision to include in an ROI the fact

that U.S. officials debated what to do regarding a major public infrastructure project does not

disclose anything about SIGAR's deliberative process.

These past redactions make clear that SIGAR has withheld, and will continue to

withhold, information with no valid Exemption 5 purpose.  For this reason, as well as the invalid

boilerplate assertions SIGAR makes, the Court should reject the remaining Exemption 5 claims.

### b.  SIGAR Has Not Shown the ROIs Are Deliberative

To justify withholding information under the deliberative process privilege, SIGAR must

establish "what deliberative process is involved, and the role played by the documents in issue in

the course of that process."  *Coastal States*, 617 F.2d at 868.  SIGAR has failed in its second

attempt to do so.

This Court directly asked: "what decision is being made?"  Mem. Op. at 38.  Rather than

answer that question, SIGAR responds that the interviews were conducted in preparation – not

for a governmental policy decision – but for SIGAR's production of the Lessons Learned

reports, primarily for an unfinished report on strategy and planning.  Fourth Hubbard Decl.

¶¶ 57-58.  That painting of the purpose for the reports does not "reflect[] the give-and-take of the

consultative process" that Exemption 5 requires of SIGAR.  *Coastal States*, 617 F.2d at 866.

Indeed, even under Mr. Hubbard's explanation, the ROIs are not deliberative at all.  No

interviewee, according to all of the Government's submissions, analyzed, suggested or

recommended what SIGAR should or should not include in any report – the interviews simply

were not pre-deliberative communications about what the Lessons Learned reports should

contain.  At best, according to Mr. Hubbard, SIGAR staff sifted through the ROIs' contents and made those decisions themselves.  Settled Exemption 5 law holds that "the mere consideration of a document does not bring it within the privilege if it does not 'reflect[] the give-and-take of the consultative process.'"  *100Reporters LLC v. Dep't of Justice*, 248 F. Supp. 3d 115, 153 (D.D.C. 2017) (quoting *Coastal States*, 617 F.2d at 866).  As the D.C. Circuit observed in *Coastal States*, "characterizing . . . documents as 'predecisional' simply because they play into an ongoing audit process would be a serious warping of the meaning of the word."  617 F.2d at 868.

SIGAR also makes the misguided argument that the withheld material can be protected because it is a summary of the interviewee's statements and "thus reflects the interviewer's interpretation of those statements, as well as the interviewer's personal judgment regarding what information provided by the informant is important and should be reported to others within SIGAR."  Fourth Hubbard Decl. ¶ 59.  Although in some unusual circumstances factual material may be withheld if it would reveal the decision-making process, "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material," so the general rule is that "compilations of facts, devoid of any conclusions, recommendations, opinions or advice" cannot be withheld.  *Playboy Enters. Inc. v. Dep't of Justice*, 677 F.2d 931, 935-36 (D.C. Cir. 1982).  The deliberative process privilege applies only in cases where "if disclosed, the factual information would reveal something *about the agency's deliberative process*, or if the factual information is inextricably intertwined with the deliberative sections of documents."  *Hardy v. ATF*, 243 F. Supp. 3d 155, 165 (D.D.C. 2017) (emphasis added) (internal marks and citations omitted).

Contrary to SIGAR's implications, SIGAR Second MSJ at 37, courts in this Circuit have held that the government may not withhold under Exemption 5 factual compilations such as

narrative accounts of witness interviews even if the agency compiled the facts as part of its process to determine whether to file criminal charges or impose administrative sanctions.  *See, e.g.*, *Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 849 F. Supp. 2d 13, 38 (D.D.C. 2012) ("handwritten notes describing a meeting, phone call, or interview" by HHS Office of Inspector General agents were not deliberative); *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 137 (D.D.C. 2011) (staffer's meeting notes "detailing what each of the participants said" were not deliberative).

The cases SIGAR cites do not support its withholding of the material at issue.  For example, unlike the ROIs involved here, the records at issue in *Mapother v. Department of Justice* were factual analyses written by staff directed by a supervisor "to cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and to identify the significant issues they encountered along the way," tasks that obviously required policy-oriented judgments.  3 F.3d 1533, 1538-39 (D.C. Cir. 1993).  In *Hardy*, not only did the investigators' notes reveal their investigative strategy, but the court also noted that "[t]he 'limited exception to the general principle that purely factual material may not be withheld under Exemption 5 may not be read so broadly . . . as to swallow the rule.'"  243 F. Supp. 3d at 168 (citation omitted).

Because the deliberative process privilege does not protect the material being withheld pursuant to Exemption 5, all of those redactions should be lifted and the information produced.

### c.  The Interviewees Are Not Consultants

SIGAR also persists in rewriting the history of its work by portraying the interviewees as *de facto* government "consultants," Second SIGAR MSJ at 38-39, misapplying the "consultant corollary" under Exemption 5.  *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 336 (D.C. Cir. 2011).  That corollary applies only where outside consultants effectively

operate as agency employees, such that "the records submitted by outside consultants played essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done." *Klamath*, 532 U.S. at 10-11. That is not the case here.

The interview subjects were not "consultants" because SIGAR solicited only <u>information</u> from them, not "advice and recommendations" on what content to include or recommendations to make in its reports, as SIGAR suggests. SIGAR Second MSJ at 38. They did not "stand in the shoes of fellow agency employees" in participating in SIGAR decision-making. *Am. Oversight v. Dep't of Health & Human Servs.*, 380 F. Supp. 3d 45, 54-55 (D.D.C. 2019).

SIGAR also contends that the interviewees were "consultants" because they were not sharing information to pursue their own interests or to obtain a government benefit. SIGAR Second MSJ at 39. While lacking a stake in the outcome is one indication in analyzing a consultant-corollary claim, SIGAR does not cite any authority for the proposition that the lack of an independent agenda is in itself dispositive. Moreover, common sense counsels that the people SIGAR interviewed most likely acted, at least in part, out of self-interest, whether to promote a particular ideology or policy position, minimize personal responsibility for failures, or simply to say "I told you so" about some of the many mistakes our nation made in Afghanistan.

Put simply, the people SIGAR interviewed were sources of information, not consultants. The consultant corollary therefore does not apply.

### d.  SIGAR Has Not Shown Foreseeable Harm To The Deliberative Process

As with its invocation of the presidential communications privilege, SIGAR's reliance on the deliberative process privilege fails because the Government has not shown that disclosing the withheld material would cause harm. In fact, SIGAR does not even attempt to argue that disclosure <u>would</u> harm the deliberative process, as the law requires; it merely speculates that

disclosure <u>could</u> cause such harm.  *See* Fourth Hubbard Decl. ¶ 60 (stating that release of the withheld information "could chill the full and frank discussion necessary for SIGAR to carry out its investigative and policy-recommending mandate" and "could cause public confusion by providing the public with potentially inaccurate information").  That failure alone is sufficient to reject the withholdings under the deliberative process privilege.

SIGAR's arguments would fare no better if it were to substitute "would" for "could." The deliberative process privilege is meant to avoid the discouragement of candid internal discussions within SIGAR.  *See 100Reporters*, 248 F. Supp. 3d at 150.  But SIGAR never explains how disclosing this material could possibly cause any of its employees to conduct any interview or draft any ROI differently.  Nor does SIGAR provide any plausible explanation for how the release of the raw material from various witness interviews would "cause public confusion about" any unverified facts stated by interviewees and SIGAR's actual conclusions; the public certainly is sensible enough to understand the difference between what an interviewee told SIGAR and what SIGAR concluded was either accurate or relevant.

The material SIGAR is withholding pursuant to the deliberative process privilege should be released for the additional reason that SIGAR has not shown, as required, that harm would result from that disclosure.

### D.  SIGAR Has Not Justified Its Redactions Under Exemption 3

SIGAR has not justified the vast majority of its withholdings under Exemption 3, which "exempts from disclosure any materials that are specifically exempted from disclosure by another federal statute, provided that such statute either requires withholding 'in such a manner

as to leave no discretion on the issue' or 'establishes particular criteria for withholding or refers to particular types of matters to be withheld.'"  Mem. Op. at 32 (quoting 5 U.S.C. § 552(b)(3)).

To withhold records under Exemption 3, an agency must: (1) identify a valid exempting statute that would prohibit disclosure and (2) demonstrate that the law applies to the records at issue.  *Nat'l Sec. Counselors v. CIA*, 320 F. Supp. 3d 200, 214-15 (D.D.C. 2018).  This Court has concluded the three statutes at issue – Section 7(b) of the Inspector General Act, 5 U.S.C. App. 3 § 7(b) (the "IG Act"), 10 U.S.C. § 130b, and Section 102A(i)(1) of the National Security Act, 50 U.S.C. § 3024(i)(1), qualify as withholding statutes.  Mem. Op. at 32.  But SIGAR has failed to demonstrate that the IG Act encompasses any of the redacted information, and SIGAR has improperly withheld, under 10 U.S.C. § 130b and the National Security Act, information that must be released pursuant to the public domain doctrine.

### 1.  IG Act

The IG Act provides that an Inspector General "may receive and investigate complaints or information from an employee of the establishment concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety." 5 U.S.C. App. 3 § 7(a).  The IG Act further provides that an Inspector General "shall not, after receipt of a complaint or information from an employee, disclose the identity of the employee without the consent of the employee, unless the Inspector General determines such disclosure is unavoidable during the course of the investigation."  *Id.* § 7(b).  For two independent reasons, SIGAR has failed to show that its withholdings fall within the scope of this provision.

First, the IG Act does not mandate confidentiality for all communications with an Inspector General, but only for those submissions of "complaints or information" that concern

specific issues, namely "the possible existence of an activity constituting a violation of law,
rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial
and specific danger to the public health and safety." *Id.* § 7(a).  SIGAR, however, simply
ignores this restriction, treating all of its interviewees as if they were confidential whistleblowers
and asserting that the IG Act applies to <u>any</u> transmission to SIGAR of <u>any</u> "information" of <u>any</u>
kind.  *See* Fourth Hubbard Decl. ¶ 51 ("I conclude that SIGAR is statutorily prohibited from
disclosing the identity of a federal government employee who provides information to SIGAR,
without first obtaining the consent of that employee.").  Likewise, when quoting the IG Act,
Hubbard simply covers up its subject-matter limits with an ellipsis.  *Compare* 5 U.S.C. App. 3
§ 7(a) ("The Inspector General may receive and investigate complaints or information from an
employee of the establishment concerning the possible existence of an activity constituting a
violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of
authority or a substantial and specific danger to the public health and safety."), *with* Fourth
Hubbard Decl. ¶ 49 ("Section 7(a) states: 'The Inspector General may receive and investigate
complaints or information from an employee of the *establishment* . . . .'" (SIGAR's emphasis)).
Because SIGAR has not even attempted to show that its withholdings under the IG Act are
limited to only those instances where interviewees provided the specific types of "complaints or
information" set out in the IG Act, the agency has not carried its burden to justify those
withholdings under Exemption 3.

Second, the Court already has agreed with the *Post* that the IG Act provides
confidentiality only for whistleblowers who are "employee[s] of the establishment" within which
that particular Inspector General is situated.  5 U.S.C. App. 3 § 7(a); Mem. Op. at 33 n.14 (Court
notes IG Act can "shield the identi[t]y of *SIGAR employees*, but *not* of others who were

interviewed or mentioned." (emphasis added)).  SIGAR, however, ignores this clear statement

from the Court and claims instead that because SIGAR "is not established within any agency," it

must be able to apply the IG Act's protections to <u>all</u> "U.S. Government employees" from any

agency mentioned in the IG Act.  SIGAR Second MSJ at 11.  SIGAR's reading of the IG Act

thus not only conflicts with this Court's correct interpretation of the word "establishment" in the

statute, it also would produce the type of "absurd results [that] are to be avoided if alternative

interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic

Contractors*, 458 U.S. 564, 575 (1982).

SIGAR erroneously cites *Iglesias v. USAID* for the narrow proposition that the IG Act's

statutory purpose "plainly has some force irrespective of whether the source is an 'employee'

under section 7(b)."  SIGAR Second MSJ at 11 (quoting 2018 U.S. Dist. LEXIS 175806, at *22

(D.D.C. Oct. 12, 2018), *aff'd*, 824 F. App'x 1 (D.C. Cir. 2020) (per curiam)).  But in that case,

the court was addressing whether the IG Act distinguishes between employees of an agency and

employees of <u>that agency's</u> Office of Inspector General.  *Iglesias*, 2018 U.S. Dist. LEXIS

175806, at *19-20.  The decision clearly does not hold, as SIGAR argues, that <u>any</u> federal

government employee who provides <u>any</u> information to SIGAR should be treated as a

confidential whistleblower under the IG Act.

SIGAR has not shown that these withholdings are limited only to SIGAR employees who

are making complaints or providing information about the possible violations of laws, rules, or

regulations; waste, fraud, or abuse; or a substantial and specific danger to public health and

safety.  The agency therefore has failed to justify its Exemption 3 withholdings with respect to

the IG Act.

### 2.   10 U.S.C. § 130b and the National Security Act

SIGAR's Exemption 3 claims under 10 U.S.C. § 130b and the National Security Act

likewise fail for information that the agency previously has disclosed.  As discussed elsewhere in

this brief, *see infra* at 38-42, information that may otherwise be exempt from disclosure under

FOIA loses its protection when it is disclosed in a public record.  *Cottone v. Reno*, 193 F.3d 550,

554 (D.C. Cir. 1999).  Here, SIGAR continues to withhold under 10 U.S.C. § 130b the name of

an interviewee it published in its public reports: Col. Bradley Moses.  *Compare* Tobin Decl., Ex.

12 at SIGAR-LL-07-00078, *with* May 2018 Report at 115 & n.772 (quoting Col. Moses).

Likewise, Ambassador Richard Haass has expressly acknowledged that he was a Lessons

Learned interviewee, but SIGAR improperly continues to redact his name under the National

Security Act.  *Compare* Third Tobin Decl., Ex. 1 at SIGAR-(b)(1)-00062, *with* Responses article

(providing an additional comment from Haass to the *Post*).  SIGAR cannot withhold under

Exemption 3 – or any other exemption – this material as it already has been subject to prior

disclosure.

### E.  SIGAR Has Not Justified Its Redactions Under Exemption 1

The Court required the Government to justify its claim that the allegedly classified

material, if released, would harm national security.  Mem. Op. at 18-19.  This Court held that the

Government's submissions supporting its Exemption 1 claim were too "vague and conclusory"

to adequately explain why "the information withheld could reasonably be expected to result in a

specific level of damage to national security."  *Id.* at 18.  The Court directed the Government to

provide "a more fulsome explanation of how the redacted information could logically be

expected to result in a threat to national security."  *Id.* at 19.  As this Court noted, while courts

defer to the Executive Branch on these national security matters, "deference is not equivalent to

acquiescence." *Id.* at 16 (quoting *Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998)).

The supplemental *Vaughn* index SIGAR now supplies,[15] while more detailed, still fails to provide a "logical" and "plausible" rationale for all of the Exemption 1 withholdings. *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). This is particularly true of ROIs for on-the-record interviews with high-ranking officials. Take for example: General David Richards of the United Kingdom, a former commander of the ISAF; General Edward Reeder, the former head of the U.S. Army Special Forces Command; and Ambassador Richard Boucher, former Assistant Secretary of State for South and Central Asian Affairs. *See* Exemption 1 *Vaughn* at 2-6. The Government claims large swaths of these ROIs contain classified information. *Id.*

The context surrounding many of the redactions, however, makes clear that the Government's explanations are not logical or plausible. For example, the redactions in General Richards' ROI reference Operation Medusa, in which the Canadian military attempted to clear insurgents from and help rebuild an area in southern Afghanistan:

> After a difficult 24 hours of wrangling and arm-twisting, supported mainly by US and Afghan forces, the Canadians re-launched their attack. The Taliban initially put more reserves into Panjwai where we killed or injured them - tens if not hundreds. The area was liberated. We thoroughly defeated the Taliban, but the follow up was sadly less impressive. I listened to overoptimistic plans to flood the area with support after clearing was finished. (b)(1) - 1.4(D) ████████████████████████████ They were embarrassed that they couldn't do more. They wanted to build a road from the Ring Road to Panjwai as part of the stabilization effort, so I was always asking how the road was coming. It took months to build the road. I was told the road would be built within four weeks, but it took six months. They rebuilt housing that had been destroyed. Most civilians had gotten out beforehand so it was a free-fire zone. Panjwai residents wanted to believe what we had promised, but they had been told all along that aid was coming, but it never came, so the Taliban slowly came back in to exploit it.

---

[15] *See generally* Dep't of State Supp. *Vaughn* Index ("Exemption 1 *Vaughn*"), Dkt. 32-5.

SIGAR-(b)(1)-00181.  From the context, the redacted material obviously is a reference to the

Canadians; a SIGAR report cites General Richards' interview for the fact that as a result of the

operation, "[t]he Taliban were eventually cleared from the area, but the Canadian-led

development assistance that followed the clearing operation was delayed and underwhelming."

May 2018 Report at 18.  It is not plausible that this material represents information the U.K.

government provided to the U.S. government in confidence, the primary justification for

withholding material from the Richards ROI.  Exemption 1 *Vaughn* at 2-3.  It also is not credible

to suggest that any information General Richards provided to U.S. government historians in an

on-the-record interview meant for inclusion in public reports included secrets the U.K.

government expected the U.S. government to keep.

Some redactions of individuals' names also are difficult to reconcile as required to

protect national security.  General Reeder's ROI includes this redaction:

> We never went in without the invitations from the elders. We identified the locations, but if we couldn't get elders to invite us in we wouldn't go. And that was really important. Even in the important areas, we didn't go in if the local elders didn't invite us in. (b)(1) - 1.4(D) was on board, and there were areas where he and I would go in and sell the programs to communities and ask who was interested with 200-300 elders and they would raise their hands and we would link them up with a SF team.

SIGAR-(b)(1)-00186.  Here, the Government redacted the name of a person who traveled with

and made public presentations to hundreds of Afghans alongside a top U.S. military officer.  It is

not logical or plausible that releasing this person's name would risk their safety or "reduc[e] the

likelihood that foreign persons will be willing to convey sensitive information in confidence to

the U.S. Government."  Exemption 1 *Vaughn* at 4.

Likewise, Ambassador Boucher's ROI was redacted as follows:

> People say you [Boucher] should write your memoirs. I would say I don't know what my book is about and if I could write the **Pakistan** chapter – the rest would be easy. I am still not as clear on Pakistan as I should be but I will get there someday. The best book I ever read on Pakistan was given to me by (b)(1) - 1.4(D)
> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ He gave me the book called "Report on Waziristan and its Tribes." It is a collection of British dispatches from the late 19ᵗʰ century and how they tried to subdue Pashtuns. It goes through a series of steps they took. One was that they tried to beat the military which they could do. Two, they tried to turn the tribes against themselves – that didn't work. Three, they tried to invite the leaders and chiefs for education, basically hold them hostage. The tribal leaders were smart enough to know what was going on so they sent the sons of their slaves or their underlings so that didn't work very well. It goes through a whole series of measures. What they finally did was put the tribal chiefs on their payroll and when the tribe was acting up or someone in the tribe committed a murder was to be turned over, they cut off the paycheck. I presume the guy's wife would start complaining and his underlings would start complaining that they weren't getting their money that month and they would come to the Brits and cut a deal. Then they would start the payroll again.

SIGAR-(b)(1)-00113. Giving a U.S. diplomat a book is not a sensitive and confidential act of diplomacy, and it is therefore not plausible to believe that identifying the gift-giver would do any harm to U.S. interests. *See* Exemption 1 *Vaughn* at 5. It is also not reasonable to believe that Boucher – a former chief spokesman for the U.S. State Department – would let slip classified information in an on-the-record interview.

These redactions – and SIGAR's unjustifiable reliance on other exemptions detailed elsewhere in this brief – validate the Court's concerns with the Government's citation to Exemption 1 for these withholdings. The *Post* respectfully suggests that the Court should order these materials disclosed.[16]

### F. SIGAR Continues To Improperly Withhold Information in the Public Domain

A federal agency may not withhold information that already is in the public domain. *E.g.*, *Wolf*, 473 F.3d at 378 (D.C. Cir. 2007); *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993); *Cottone*, 193 F.3d at 554. Yet SIGAR continues to refuse to release interviewee names and other information the agency itself already has made public, defying this

---

[16] Given the baseless invocations of Exemption 1 as to these ROIs, the *Post* respectfully requests that the Court perform an *in camera* review of the additional Exemption 1 material to ensure that the additional information withheld under that exemption is properly classified.

Court's instruction.  *See* Mem. Op. at 24 n.10 (ordering that "if SIGAR has redacted or withheld

information that an interviewee has given permission to keep on the record, it must produce that

information to plaintiff").  SIGAR's selective disclosure of the names of people that it repeatedly

and prominently quoted in Lessons Learned Reports is flatly prohibited by the public domain

doctrine.  These facts "lose their protective cloak once disclosed and preserved in a permanent

public record."  *Cottone*, 193 F.3d at 554.

    The *Post* has isolated 23 ROIs involving 22 interviewees who SIGAR identified and

quoted by name in its public reports.[17]  Accordingly, the *Post* lists the following references in

SIGAR's reports[18] that publicly identify interviewees:

- May 2018 Report at 147-48, 164, nn.969 & 1070 (quoting July 22, 2016 interview of
  **Marc Chretien**, a political adviser to the Marines).  The date and quotes match SIGAR-
  LL-07-00025, 27, which redacts the name of the interviewee although the interview was
  on the record.

- May 2018 Report at 168-69 & n.1094 (quoting Aug. 3, 2016 interview of **Bob Crowley**,
  the senior governance and development adviser to the International Security Assistance
  Force ("ISAF") commander).  The date and quotes match SIGAR-LL-07-00030, 31,
  which redacts the name of the interviewee although the interview was on the record.

- May 2018 Report at 115 & n.772 (quoting Oct. 6, 2016 interview of Army Col. **Bradley
  Moses**, former commander of the 3rd Special Forces Group).  The date and quotes match
  SIGAR-LL-07-00078-80, which redacts the name of the interviewee although the
  interview is listed as being "on the record, check back on quotes."

- September 2016 Report at 18 & n.88 (citing Oct. 22, 2015 interview of **Robert Finn**,
  former U.S. Ambassador to Afghanistan).  The date and subject matter match SIGAR-

---

[17] Five of these interviewees explicitly provided their comments on the record; one ROI redacted
the information regarding the interview's ground rules; and twelve contain no indication of
whether the interviewee explicitly agreed to be on the record.  Although five of the ROIs state
that the interview was given on a "not for attribution" basis, the fact that the interviewees were
named in public reports, as SIGAR's own methodology explains, means that SIGAR already has
the interviewee's permission to name them.  *See* Fourth Hubbard Decl. ¶ 41.

[18] The Lessons Learned Reports are cited using the format "[Month] [Year] Report" (e.g.,
"September 2016 Report") and are available at
https://www.sigar.mil/lessonslearned/lessonslearnedreports/.

(b)(1)-00093, which redacts the name of the interviewee although the interview is listed as being "on the record, Must approve quotes."

- May 2018 Report at 54 & nn. 355, 356, 358 (quoting Feb. 1, 2017 interview of former Defense Department official **Michael Miklaucic**). The date and quotes match SIGAR-LL-07-00193, which redacts the interviewee's name although the interview is listed as being "on the record".

- May 2018 Report at 156 & n.1014 (quoting Feb. 17, 2017 interview of **Barnett Rubin**, senior adviser to the U.S. Special Representative for Afghanistan and Pakistan). The date and quotes match SIGAR-LL-07-00151, which redacts both the interviewee's name and its terms (*i.e.*, whether it was on the record).

- May 2018 Report at 104-05 & nn.689-90 (quoting Mar. 8, 2017 interview of retired U.S. Army Col. **Dennis Cahill**). The date and quotes match SIGAR LL-07-00197, which redacts both the interviewee's name and does not state its terms.

- June 2018 Report at 47 & n.272 (quoting April 19, 2016 interview of **Doug Wankel**, the former director of the Kabul Counter Narcotics Task Force at the U.S. Embassy). The date and quotes match SIGAR-LL-04-00064, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 97 & n.670 (quoting June 18, 2015 interview of former U.S. Ambassador to Afghanistan **Ronald Neumann**). The date and quotes match SIGAR-LL-04-00010, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 51 & n.308 (quoting Nov. 1, 2016 interview of **William Wechsler**, former Deputy Assistant Secretary of Defense for Counternarcotics and Global Threats). The date and quotes match SIGAR-LL-04-00138, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at nn.149 & 251 (quoting June 17, 2015 interview of **John Wood**, the former Senior Director for Afghanistan on the National Security Council). The date and quotes match SIGAR-LL-04-00005, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at n.633 (quoting May 19, 2016 interview of **John Wood**). The date and quotes match SIGAR-LL-04-00091, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 39 & n.226 (quoting May 16, 2016 interview of **Andre Hollis**, former Deputy Assistant Secretary of Defense). The date and quotes match SIGAR-LL-04-00082, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 42 & n.246 (quoting June 6, 2016 interview of former senior U.S. Agency for International Development official **Elisabeth Kvitashvili**). The date and

quotes match SIGAR-LL-04-00099, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 83 & n.536 (quoting June 21, 2016 interview of **Anthony Fitzherbert**, a former agricultural adviser to the Afghan government).  The date and quotes match SIGAR-LL-04-00113, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 84 & n.544 (quoting May 4, 2015 interview of **Peter Holland**, a United Kingdom counternarcotics official).  The date and quotes match SIGAR-LL-04-00003, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at 83 & n.532 (quoting April 12, 2016 interview of **Mohammed Zia**, a former Minister of Rural Rehabilitation and Development in the Afghan government). The date and quotes match SIGAR-LL-04-00042, which redacts the name of the interviewee and does not state its terms.

- June 2018 Report at nn.88, 148, 182, 185, 280, 291, 604, 606, 609-11, 629, 781, 863, 906, 933 (citing April 11, 2018 interview of **David Mansfield**, a subject-matter expert who was the lead researcher for the report).  The date and subject matter match SIGAR-LL-04-00152, which redacts the name of the interviewee and does not state its terms.

- September 2016 Report at 26 & n.159 (quoting July 3, 2015 interview of anticorruption expert **Nils Taxell**).  The date and quotes match SIGAR-LL-03-00032, which redacts the name of the interviewee and has the "non-attribution basis" box checked.

- September 2016 Report at 34 & n.218 (quoting May 26, 2015 interview of **Sarah Chayes**, former special assistant to ISAF commander General Stanley McChrystal).  The date and quotes match SIGAR-LL-03-00001, which redacts the name of the interviewee and has the "non-attribution basis" box checked.

- September 2016 Report at 64 & n.458 (quoting Oct. 6, 2015 interview of **Gert Berthold**, a former manager with an anticorruption task force).  The date and quotes match SIGAR-(b)(1)-00156, 160, which redacts the name of the interviewee and has the "non-attribution basis" box checked.

- September 2016 Report at 59-60 & n.423 (citing Sept. 24, 2015 interview of anticorruption expert and author **Shaazka Beyerle**).  The date and subject matter match SIGAR-LL-03-00096, which redacts the name of the interviewee and has the "non-attribution basis" box checked, but also includes a notation saying "confirm whether going on record."

- September 2016 Report at 4 & n.11 (quoting April 5, 2016 interview of U.S. Army Col. **Christopher Kolenda**, a former senior adviser to the Undersecretary of Defense for Policy and to three commanding generals).  The date and subject matter match SIGAR-LL-03-00154, which redacts the name of the interviewee and has the "non-attribution basis" box checked.

Once SIGAR identified these people as having provided interviews for its Lessons Learned reports, it lost any claim to keep those names secret.  The names (and the facts that those people provided interviews to SIGAR) meet all of the criteria for disclosure:  they are "as specific as the information previously released," they "match the information previously disclosed," and they were "made public through an official and documented disclosure."  *Wolf*, 473 F.3d at 378 (citation omitted).

Moreover, having named these people in public reports, SIGAR cannot now claim that they have countervailing privacy interests or that they are confidential "informants" or "whistleblowers."  *See supra* Sections II.B-II.D; *see also, e.g.*, *Memphis Publ'g Co. v. FBI*, 879 F. Supp. 2d 1, 11 (D.D.C. 2012) (Berman Jackson, J.).  In *Memphis Publishing*, this Court noted that a government agency cannot rely on FOIA's blanket exclusion for records about confidential law enforcement informants after it releases other materials under FOIA confirming the informant's status.  *Id.* at 10-12.

The Court should reinforce the directive in its Memorandum Opinion and order SIGAR to release the names of interviewees that SIGAR quoted by name, or otherwise specifically identified, in its Lessons Learned reports and its prior releases of documents to the *Post*, and any redacted quotations that appear verbatim in its reports.

## <u>CONCLUSION</u>

For the foregoing reasons, the *Post* respectfully requests that its renewed cross-motion for summary judgment be granted, that SIGAR's renewed motion for summary judgment be denied, that SIGAR be ordered to release the requested records as described above, and that the *Post* be awarded its costs and reasonable attorneys' fees incurred in this action.

Dated:  January 8, 2021          Respectfully submitted,

BALLARD SPAHR LLP

*/s/ Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Matthew E. Kelley (#1018126)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
kelleym@ballardspahr.com

*Counsel for Plaintiff WP Company LLC*
*d/b/a The Washington Post*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of January, 2021, I caused the foregoing to be filed

and served electronically via the Court's CM/ECF system upon counsel of record.


_/s/ Charles D. Tobin___
Charles D. Tobin