## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
WASHINGTON POST COMPANY,                )
                                        )
              Plaintiff,                )
                                        )
       v.                               )        Civil Action No. 18-2622 (ABJ)
                                        )
SPECIAL INSPECTOR GENERAL               )
FOR AFGHANISTAN                         )
RECONSTRUCTION,                         )
                                        )
              Defendant.                )
_____)

## **MEMORANDUM OPINION**

On March 23, 2017, Craig Whitlock, a reporter from plaintiff Washington Post Company (the "Post"), submitted a Freedom of Information Act ("FOIA") request to the Special Inspector General for Afghanistan Reconstruction ("SIGAR"), the federal agency charged with auditing and supervising the U.S. reconstruction efforts in Afghanistan. Compl. [Dkt. # 1]; *see also* 5 U.S.C. § 552 *et seq.* Plaintiff sought records relating to SIGAR's Lessons Learned Program ("LLP"), specifically the "full, unedited transcripts and complete audio recordings of *__all__* interviews conducted for the Lessons Learned program, regardless of whether they were labeled as 'on the record,' or if the interviewee was granted anonymity, or if they were cited in a particular report or not." Ex. A to Compl. [Dkt. # 1-1] ("FOIA Request") at 1 (emphasis in original).

Plaintiff filed the instant lawsuit on November 14, 2018, and by June of 2019, SIGAR had processed the FOIA request and produced hundreds of responsive records. *See* Status Report (June 17, 2019) [Dkt. # 15]. But it redacted some material and declined to produce other documents in full under various FOIA exemptions, and the parties filed cross motions for summary

judgment.  *See* Def.'s Mot. for Summ. J. [Dkt. # 19] ("Def.'s First Mot."); Pl.'s Cross Mot. for

Summ. J. [Dkt. # 22] ("Pl.'s First Cross Mot.").  The Court granted both motions in part and denied

both in part, and it directed the defendant to provide additional information to justify withholdings

that remained in dispute.  *See Wash. Post Co. v. Special Inspector Gen. for Afghanistan*

*Reconstruction*, 486 F. Supp. 3d 141 (D.D.C. Sept. 2020); *see also* Sept. 15, 2020 Order

[Dkt. # 27] ("Sept. 2020 Order"); Sept. 15, 2020 Mem. Op. [Dkt. # 28] ("Sept. 2020 Mem. Op.").

Pending before the Court are the parties' renewed cross motions for summary judgment,

and the matter has been fully briefed.[1]

## BACKGROUND

The background of this case was laid out in detail in the Court's previous opinion.  *See*

*Wash. Post Co.*, 486 F. Supp. 3d at 148–50 (discussing the history of SIGAR, the purposes of the

Lessons Learned Program, the parties' communications concerning the FOIA request, and the

initial production of responsive documents).  Therefore, the Court will only summarize the facts

pertaining to the remaining issues.[2]

SIGAR is an independent organization established by the National Defense Authorization

Act in 2008.  *See* Declaration of Michael A. Hubbard [Dkt. # 19-4] ("First Hubbard Decl.") ¶ 4;

*see also* Pub. L. No. 110-181.  It has "audit and investigatory authority over all reconstruction

programs and operations in Afghanistan that are supported with U.S. dollars, regardless of the

---

1       Def.'s Renewed Mot. for Summ. J. [Dkt. # 32] ("Def.'s Renewed Mot."); Def.'s Mem. of
P. & A. in Supp. of Renewed Mot. [Dkt. # 32-1] ("Def.'s Mem."); Def.'s Statement of Facts
[Dkt. # 32-7] ("Def.'s SOF"); Pl.'s Renewed Cross Mot. for Summ. J. [Dkt. # 35] ("Pl.'s Renewed
Cross Mot."); Pl.'s Mem. of P. & A. in Supp. of Renewed Mot. [Dkt. # 35-1] ("Pl.'s Mem.");
Pl.'s Statement of Facts [Dkt. # 35-2] ("Pl.'s SOF"); Def.'s Reply in Supp. of Renewed Mot.
[Dkt. # 38] ("Def.'s Reply"); Pl.'s Cross Reply in Supp. of Renewed Cross Mot. [Dkt. # 39]
("Pl.'s Cross Reply").

2       The following facts are undisputed unless otherwise noted.

agency involved," First Hubbard Decl. ¶¶ 4–5, and its mission is "to prevent and detect waste, fraud, and abuse in U.S.-funded reconstruction programs and operations in Afghanistan." *Id.* ¶ 6. SIGAR utilized the Lessons Learned Program ("LLP") to review the reconstruction experience and make recommendations to Congress and federal agencies on ways to improve reconstruction efforts. *Id.* ¶¶ 6–7.

To produce the Lessons Learned reports, SIGAR relied on interviews with "hundreds of individuals with direct and indirect knowledge of U.S. reconstruction programs," First Hubbard Decl. ¶¶ 8–9; and it is the content of these interviews – as well as notes and records of interviews ("ROIs") – that plaintiff seeks from defendant. *See* FOIA Request. When it processed the FOIA request, SIGAR produced only a portion of the responsive records, and plaintiff filed the instant complaint.[3] *See* Compl. It sought declaratory and injunctive relief ordering SIGAR to produce the remaining materials and challenging SIGAR's withholding of certain documents or portions of documents. *Id.* at 14.

After the parties filed their cross motions for summary judgment, the Court ordered defendant to deliver the documents that had been withheld pursuant to Exemption 5 for *in camera* inspection. *See* Min. Order (June 2, 2020). On September 15, 2020, the Court granted judgment in favor of the agency with respect to its withholdings under Exemptions 7(A), 7(E), and 7(F), but it found that more information was needed with respect to Exemptions 1, 3, 5, 6, and 7(C). Sept. 2020 Order at 1–2.

Specifically, the Court ordered that to justify the withholdings under Exemption 1, the State Department must provide "a more fulsome explanation of how the redacted information could

---

3       According to plaintiff, eighteen months after the FOIA request was submitted, SIGAR had released "43 of the 47 'on the record' interviews," "187 of the 363 'on background' interviews," and "7 of 17 audio recordings of interviews." Compl. ¶ 43.

logically be expected to result in a threat to national security." *Wash. Post Co.*, 486 F. Supp. 3d at 158.

With respect to Exemption 3, it held that the State Department must "submit a supplemental declaration indicating who made the FOIA determinations with respect to the National Security Act in this case, and whether that person had the authority to do so." *Wash. Post Co.*, 486 F. Supp. 3d at 168.

As to Exemption 5, the Court stated that SIGAR must provide supplemental information regarding its reliance on the deliberative process privilege. *Wash. Post Co.*, 486 F. Supp. 3d at 170–71.

In connection with Exemptions 6 and 7(C), the Court ruled generally that interviewees who spoke with an understanding that their identities would not be disclosed and third parties identified in interviews had a legitimate privacy interest in keeping their identities from being disclosed, *Wash. Post Co.*, 486 F. Supp. 3d at 160–62, and that the privacy interest outweighed the public interest in their identity. *Id.* at 162. However, SIGAR was ordered to "supplement its declaration indicating whether each individual whose identity is being protected could be properly characterized as a 'private citizen' at the time of the interview and/or the events described during the interview, and whether the interviewee or individual named falls within the proper scope of the exemptions." *Id.* at 163. As to the unique interviewee codes, the interview locations, and the audio recordings that were withheld, SIGAR was told to "either supplement its pleadings with additional information explaining how those pieces of data would tend to identify interviewees, or provide the data, including all reasonably segregable portions of the audio recordings." *Id.* at 163–64.

The Court noted that it did not need to reach the question of SIGAR's withholdings of personally identifying information under Exemption 3 pursuant to section 7(b) of the Inspector General Act of 1978, as amended, ("IG Act"), 5 U.S.C. app. 3 § 7(b), pursuant to 10 U.S.C. § 130b as to SIGAR or as to the United States Special Operations Command ("USSOCOM"), or under Exemption 7(D), given its findings with respect to Exemption 7(C).  *Wash. Post Co.*, 486 F. Supp. 3d at 166–67.  The Court observed in a footnote, though, that its findings under Exemption 7(C) did not apply to "on the record" interviews:

> To the degree that SIGAR is withholding the names of individuals who submitted to interviews "on the record" . . . the Court's analysis does not apply.  Despite knowing the interviews could be off the record – as is supported by the Hubbard declaration – these interviewees chose to be interviewed without any privacy protection.  For that reason, if SIGAR has redacted or withheld information that an interviewee has given permission to keep on the record, it must produce that information to plaintiff.

*Id.* at 161 n.10.

The Court ordered defendant to complete its review, produce documents, and identify and justify any remaining withholdings by October 30, 2020.  Min. Order (Sept. 24, 2020). Defendant provided some of the previously withheld records by that date, including some information it had redacted pursuant to Exemption 5 from nearly forty ROIs.  *See* Joint Status Report (Nov. 10, 2020) [Dkt. # 30].[4]

The parties subsequently renewed their cross motions, and in the process of preparing its submission, defendant determined it could release four additional records.  *See* Def.'s SOF ¶ 19, citing Fourth Decl. of Michael A. Hubbard [Dkt. # 32-2] ("Fourth Hubbard Decl.") ¶ 5.

---

4       Plaintiff disputes that defendant actually released this information, "as it continues to rely on other exemptions to withhold the same information."  Pl.'s SOF ¶ 18.

## LEGAL STANDARD

In a FOIA case, the district court reviews the agency's decisions *de novo* and "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B); *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). "[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). When the court is presented with cross motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson*, 477 U.S. at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). In the FOIA context, "the sufficiency of the agency's identification or retrieval procedure" must be "genuinely in issue" in order for summary judgment to be inappropriate. *Weisberg v. Dep't of*

*Just.*, 627 F.2d 365, 371 n.54 (D.C. Cir. 1980), quoting *Founding Church of Scientology v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979) (internal quotation marks omitted).

"Summary judgment may be granted on the basis of agency affidavits" in FOIA cases, when those affidavits "contain reasonable specificity of detail rather than merely conclusory statements," and when "they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Jud. Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013), quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006). A plaintiff cannot rebut the good faith presumption afforded to an agency's supporting affidavits through "purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

## ANALYSIS

FOIA generally requires federal agencies to disclose their records upon request. 5 U.S.C. § 552(a)(3)(A). The only exception is for records that fall in one, or more, of the nine narrowly construed exemptions. *See id.* § 552(b); *see also FBI v. Abramson*, 456 U.S. 615, 630–31 (1982). When withholding records under FOIA, an agency must demonstrate that it has made "a good faith effort to conduct a search for the requested records," *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990), and that "materials that are withheld . . . fall within a FOIA statutory exemption." *Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246, 252 (D.D.C. 2005), citing *Weisberg v. U.S. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983).

"[W]hen an agency seeks to withhold information, it must provide a relatively detailed justification" for the withholding, *Morley v. CIA*, 508 F.3d 1108, 1122 (D.C. Cir. 2007), quoting *King v. U.S. Dep't of Just.*, 830 F.2d 210, 219 (D.C. Cir. 1987) (internal quotation marks omitted),

through a *Vaughn* index, an affidavit, or by other means.  *Gallant v. NLRB*, 26 F.3d 168, 172–73

(D.C. Cir. 1994).  The general rule in FOIA cases is that

> If an agency's affidavit describes the justifications for withholding the
> information with specific detail, demonstrates that the information withheld
> logically falls within the claimed exemption, and is not contradicted by
> contrary evidence in the record or by evidence of the agency's bad faith,
> then summary judgment is warranted on the basis of the affidavit alone.

*ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

After asserting and explaining the use of particular exemptions, an agency must release

"[a]ny reasonably segregable portion of a record," 5 U.S.C. § 552(b)(9), unless the non-exempt

portions are "inextricably intertwined with exempt portions" of the record.  *Johnson v. Exec. Off.*

*for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002), quoting *Mead Data Cent., Inc. v. U.S. Dep't*

*of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  The agency bears the burden of demonstrating

that no reasonably segregable material exists in the withheld documents.  *Army Times Publ'g Co.*

*v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993).  "In order to demonstrate that all

reasonably segregable material has been released, the agency must provide a 'detailed justification'

for its non-segregability," although "the agency is not required to provide so much detail that the

exempt material would be effectively disclosed."  *Johnson*, 310 F.3d at 776, citing *Mead Data*

*Cent.*, 566 F.2d at 261.

## I.  Exemption 1

FOIA Exemption 1 exempts from production matters that are "specifically authorized

under criteria established by an Executive [O]rder to be kept secret in the interest of national

defense or foreign policy and . . . are in fact properly classified pursuant to such Executive

[O]rder."  5 U.S.C. § 552(b)(1).  The reasons offered to support assertions of Exemption 1 are

afforded "substantial weight" in the national security context; the Supreme Court has stated that

the decisions of people with the authority to withhold information to protect national security "are worthy of great deference," because they are "familiar with 'the whole picture' as judges are not," and because of the interests and risks at stake. *CIA v. Sims*, 471 U.S. 159, 179 (1985). The D.C. Circuit has emphasized that "in the FOIA context, we have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Stud. v. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003); *see also id.* at 926–27 ("[T]he judiciary owes some measure of deference to the executive in [FOIA] cases implicating national security, a uniquely executive purview."). "The [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011), quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007); *see also Morley*, 508 F.3d at 1124 ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified.").

The Circuit has also cautioned, though, that deference "is not equivalent to acquiescence," *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 30 (D.C. Cir. 1998), and an affidavit supporting the invocation of Exemption 1 satisfies an agency's burden "only if it is sufficient 'to afford . . . the district court an adequate foundation to review[] the soundness of the withholding.'" *Id.*, quoting *King*, 830 F.2d at 218. "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not, standing alone, carry the government's burden." *Larson v. U.S. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009).

Defendant initially withheld some responsive ROIs because it determined "that some information contained in the records might be considered so sensitive by other federal agencies that [those ROIs] might be classified or otherwise withheld from public disclosure," and it referred

those documents to the relevant agencies, including the United States Department of State.  First

Hubbard Decl. ¶¶ 34–35.

With a declaration from its Director of the Office of Information Programs and Services,

*see* Decl. of Eric F. Stein [Dkt. # 19-6] ("First Stein Decl."), and an accompanying *Vaughn* Index,

[Dkt. # 19-6] ("First State Dep't *Vaughn* Index"), the State Department took the position that

multiple ROIs were covered by Exemption 1.[5]

Pursuant to Section 1.1 of Executive Order 13,526 ("EO 13,526"), there are four

requirements an agency must satisfy for the classification of national security information:

> (1) an original classification authority classifies the information; (2) the
> U.S. Government owns, produces, or controls the information; (3) the
> information is within one of eight protected categories listed in section 1.4
> of the Order; and (4) the original classification authority determines that the
> unauthorized disclosure of the information reasonably could be expected to

---

[5]    As the Court summarized in its prior opinion:

> Stein explains that in his role as Director, he has been delegated the
> authority to classify documents by the Under Secretary of State for
> Management pursuant to section 5.4(d) of Executive Order 13,526
> ("EO 13,526").  Stein Decl. ¶ 11.  He states that he withheld certain
> documents under Exemption 1 pursuant to that Executive Order, Stein Decl.
> ¶ 7, specifically, pursuant to sections 1.4(b)–(d), which provide that:
>
> > Information shall not be considered for classification unless
> > . . . it pertains to one or more of the following:  (b) foreign
> > government information; (c) intelligence activities
> > (including covert actions), intelligence sources or methods,
> > or cryptology; [or] (d) foreign relations or foreign activities
> > of the United States, including confidential sources . . . .
>
> 75 Fed. Reg. at 709.  And although the documents may not have been
> classified before the agency received the Post's FOIA request, Stein
> explains that section 1.7(d) of the Executive Order "contemplates that in
> certain situations decisions to classify information may need to be made
> after the information has been requested under the FOIA."  Stein Decl. ¶ 10.

*Wash. Post Co.*, 486 F. Supp. 3d at 157.

> result in a specified level of damage to the national security, and the original classification authority is able to identify or describe the damages.

EO 13,526, 75 Fed. Reg. 707 (Dec. 29, 2009).  The Court previously held that the agency satisfied the first three prongs of the test, but failed the fourth because its declarant, as the classifier, was unable to identify any specific harm to national security that could arise from the release of a particular document in whole or in part.  *Wash Post Co.*, 486 F. Supp. 3d at 158 (reasoning that the declaration itself was "devoid of reasons" and the Department's *Vaughn* Index used impermissibly "identical boilerplate language" for each record).

In support of its renewed motion, defendant supplies a twenty-two-page supplemental *Vaughn* Index from the State Department.  *See* Department of State Suppl. *Vaughn* Index [Dkt. # 32-5] ("Suppl. State Dep't *Vaughn* Index").  Unlike the first *Vaughn* Index, the supplement addresses each document in detail describing both its contents as well as why the material was withheld.  *See Wolf*, 473 F.3d at 374–75 (specifically outlining the harms that could be expected from the release of certain categories of records).  For example, the supplemental *Vaughn* Index entry for SIGAR-(b)(1)-00105-00116 states:

> This document is the summary of an interview with Ambassador Richard Boucher, the former Assistant Secretary of State for South and Central Asian Affairs . . . The material withheld reflects information about sensitive communications with Afghanistan and other South and Central Asian governments; U.S. efforts and engagements with Afghanistan and similarly situated countries; and assessments by U.S. officials regarding those communications and engagements as well as foreign government officials.

> The material withheld in this document reflects communications with foreign officials and leaders on subjects including 1) military operations, governance, and economic development in Afghanistan; 2) Pakistani policies, military operations, and relationship with the United States; and 3) the policies of other South and Central Asian countries.  The material withheld likewise reflects evaluations of foreign officials and policies of those countries.  Confidentiality of this information is vital to the conduct of successful foreign relations.   This includes the confidentiality of information about the nature of other countries' activities and engagement

with the United States, when undertaken with an expectation of confidentiality. Diplomatic exchanges are premised upon, and depend upon, an expectation of confidentiality. Mutual trust between governments in this realm is vital to U.S. foreign relations. The inability of the United States to maintain confidentiality in its diplomatic exchanges – particularly, as here, where the discussions involve sensitive national security topics related to multiple countries in the region – would inevitably chill relations with other governments and could reasonably be expected to damage U.S. national security by diminishing our access to vital sources of information. A breach of confidentiality would deny U.S. personnel information that is important to plan and carry out foreign relations and foreign activities. Furthermore, release of information regarding military operations as well as other sensitive governance and policy matters could reasonably be expected to cause harm to the national security by inhibiting or degrading the United States' ability to successfully carry out military operations and defend the national security, particularly in an unstable region. Disclosure of this information at this time could have the potential to inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. national security, including not only those countries specifically identified but other countries that consider themselves similarly placed as well as some countries in which public opinion might not currently favor close cooperation with the United States. Moreover, the risk of harm to national security from disclosure of this information is exacerbated by the political and security instability in the region in question, such that release of this information could pose a direct threat to the national security of the United States.

Suppl. State Dep't *Vaughn* Index at 5.

The other explanations are equally specific and detailed, and the Court concludes that the supplemental *Vaughn* Index contemplates the particular harm to national security that could reasonably be threatened by the release of the withheld information.

Although plaintiff acknowledges that defendant has provided more detail, *see* Pl.'s Mem. at 37, it questions whether some of the remaining redactions correspond to the explanations provided. *See id.* at 37–39. Plaintiff takes particular issue with three of the withholdings under Exemption 1, and it asserts that the "context surrounding many of the redactions . . . makes clear that the Government's explanations are not logical or plausible": (1) SIGAR-(b)(1)-00177-00182, (2) SIGAR-(b)(1)-00183-00188, and (3) SIGAR-(b)(1)-00105-00116. *See* Pl.'s Mem. at 37–39.

12

For example, with respect to SIGAR-(b)(1)-00105-00116, and the redactions from former Ambassador Boucher's ROI, plaintiff argues that the redaction of the name of the person who gave former Ambassador Boucher "the best book [he] ever read on Pakistan . . . is not a sensitive and confidential act of diplomacy, and it is therefore not plausible to believe that identifying the gift-giver would do any harm to U.S. interests . . . [and] [i]t is also not reasonable to believe that Boucher . . . would let slip classified information in an on-the-record interview."  Pl.'s Mem. at 39, citing SIGAR-(b)(1)-00105-00116 at SIGAR-(b)(1)-00113.

In response, defendant supplied another declaration from the State Department, *see* Third Decl. of Eric F. Stein [Dkt. # 38-2] ("Third Stein Decl.").  The declarant explains that the withheld information "addresses security and foreign policy plans and relationships, including relationships with particular officials and leaders in Afghanistan and Pakistan . . . and if released . . . would thereby jeopardize U.S. national security interests . . . including the United States' ability to work with local government leaders."  Third Stein Decl. ¶ 11.

Notwithstanding plaintiff's objections, given the logic and the specificity of the State Department's declarations, the presumption of good faith to which they are entitled, *see SafeCard Servs.*, 926 F.2d at 1200, the deference accorded to withholdings premised on national security concerns, and the lack of any evidence of bad faith on the part of the agency, the Court will grant defendant's renewed motion with respect to Exemption 1.  *See Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984) (summary judgment is warranted if the declaration justifying nondisclosure has "reasonably specific detail" that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith").

## II.      Exemption 7(D)

Notwithstanding the Court's determination that further review under Exemption 7(D) was unnecessary, *see Wash. Post Co.*, 486 F. Supp. 3d at 164 n.13, the parties both briefed the matter again.  *See* Def.'s Mem. at 15–18; Pl.'s Mem. at 19–20.  The additional detail provided and the broad applicability of the ruling below makes it efficient to take up the issue.

Exemption 7(D) states that agencies may withhold:

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source[.]

5 U.S.C. § 552(b)(7)(D).  The agency invoking this exemption bears the burden of "showing that the source is a confidential one." *Citizens for Resp. & Ethics in Wash. v. Dep't of Just.* ("*CREW*"), 746 F.3d 1082, 1101 (D.C. Cir. 2014), citing *Dep't of Just. v. Landano*, 508 U.S. 165, 172 (1993). The agency must either present evidence "that the source did in fact receive an express grant of confidentiality," *CREW*, 746 F.3d at 1101, quoting *Campbell v. Dep't of Just.*, 164 F.3d 20, 34 (D.C. Cir. 1998), or it must "point to more narrowly defined circumstances that . . . support the inference of confidentiality."  *CREW*, 746 F.3d at 1101, quoting *Roth v. Dep't of Just.*, 642 F.3d 1161, 1184 (D.C. Cir. 2011).  The key question "is not whether the requested document is of the type that the agency usually treats as confidential, but whether the particular source spoke with an understanding that the communication would remain confidential," *Landano*, 508 U.S. at 172, and records withheld pursuant to Exemption 7(D) must be analyzed on a

case-by-case assessment of the *source's* confidentiality, not by a boilerplate recitation of the exemption.  *See id.* at 181.

The Court already held that SIGAR had satisfied the predicate requirement under Exemption 7 that the records were compiled for law enforcement purposes.  *See Wash. Post Co.*, 486 F. Supp. 3d at 159–60.  The remaining inquiry is whether SIGAR has shown that it granted an express assurance of confidentiality to each individual whose identifying information was withheld, as it does not maintain that the circumstances of the interviews otherwise supported inferences of confidentiality.  *See* Def.'s Mem. at 16 ("[T]he names and identifying information of informants who requested confidentiality were properly withheld because SIGAR provided express assurances of confidentiality to those informants.").  SIGAR asserts Exemption 7(D) for hundreds of records of interviews ("ROIs").[6]

Defendant provided a third *Vaughn* Index and two additional declarations from Michael Hubbard.  *See* Third SIGAR *Vaughn* Index [Dkt. # 32-3]; Fourth Decl. of Michael Hubbard [Dkt. # 32-2] ("Fourth Hubbard Decl."); and Fifth Decl. of Michael Hubbard [Dkt. # 38-1] ("Fifth Hubbard Decl.").  The *Vaughn* Index is not particularly helpful; it contains a nearly identical explanation for every withholding:  that the informant "requested that his/her identity remain confidential and SIGAR provided express assurances of confidentiality.  The Interview Code linked to the informant's name, and other information that could identify the informant, was redacted."  *See* Third SIGAR *Vaughn* Index.

---

6       Only five of all the records withheld were not withheld pursuant to Exemption 7(D): SIGAR-LL-05-00141-00145, Third SIGAR *Vaughn* at 217; SIGAR-LL-05-00160-00162, *id.* at 221; SIGAR-LL-05-00178-00179, *id.* at 223–24; SIGAR-LL-07-00155-00159, *id.* at 275–76; and SIGAR-LL-MISC-00001-00072.  *Id.* at 292.

But SIGAR's FOIA Officer, Hubbard, explained further:

> SIGAR continues to invoke Exemption 7(D) to withhold the names and identifying information of informants who did not consent to the disclosure of their identity. The records to which this exemption were applied are indicated in the Vaughn Index. SIGAR expressly promised confidentiality to informants who requested it. This was standard practice for the lessons learned interviews. Notations to this effect were made on the ROIs at the time of the interview, such as "off the record," "on background," or "non-attribution." In addition, in the vast majority of instances the informants were not identified on the ROIs. Instead, an interview code was placed on the ROIs when SIGAR promised the informants confidentiality, keyed to a separate list of the informants' names. Courts have held that both of these actions demonstrate that express promises of confidentiality were made.

Fourth Hubbard Decl. ¶ 44, citing *Roth*, 642 F.3d at 1186 and *Clemente v. FBI*, 741 F. Supp. 2d 64, 87 (D.D.C. 2010).

In the fifth declaration, Hubbard supplies more details: "[i]f the non-attribution box was checked 'yes' then that informant requested confidentiality." Fifth Hubbard Decl. ¶ 5. He added, "I am aware that for SIGAR, an inspector general and law enforcement organization, when an informant requests that his or her name not be used without permission, that request is considered mandatory." *Id.* ¶ 12.

In light of these representations, for each record where the "off the record," "on background," or "non-attribution" box was checked, defendant has provided sufficient information to support the use of Exemption 7(D) to shield the informants' identifying information to the extent that was necessary.[7] *See Boehm v. FBI*, 948 F. Supp. 2d 9, 33 (D.D.C. 2013) (holding that where an agency "demarcate[s]" an "express assurance of confidentiality . . . with designations" is sufficient). Also, for those ROIs that bear no name and are coded to a separate

---

[7]    It means that the Court need not re-assess the legitimacy of the assertions of Exemptions 6 and 7(C) to withhold the same information from those records.

list, defendant has provided sufficient evidence to show that these interviewees received an express assurance of confidentiality.  The D.C. Circuit has upheld withholdings under Exemption 7(D) for an agency's "standard practice of identifying confidential informants" with such codes.  *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1328–29 (D.C. Cir. 2000).  Therefore, the Court will grant summary judgment in favor of the defendant with respect to any identifying information in these ROIs.

Plaintiff maintains, though, that defendant has failed to meet its burden to show that any informants who spoke "on the record" requested confidentiality for purposes of this exemption. *See* Pl.'s Mem. at 9–12, 19–20; *see also* Pl.'s Reply at 11.  Therefore, it challenges the continued withholding of identifying information from any ROIs or recordings of interviews that bear the designation "on the record."

Plaintiff points to twenty-three ROIs with an "on the record" designation or with some other memorialization of that agreement between the interviewer and the informant.[8] *See* Pl.'s Mem. at 9 n.2.[9]  It also takes issue with six audio recordings associated with ROIs it maintains were on the record.[10]

---

8       SIGAR-(b)(1)-00062-00067,       SIGAR-(b)(1)-00093-00102,       SIGAR-LL-05-00069, SIGAR-LL-05-00073,    SIGAR-LL-05-00081,    SIGAR-LL-05-00085,    SIGAR-LL-05-00090, SIGAR-LL-05-00094,    SIGAR-LL-05-00097,    SIGAR-LL-05-00105,    SIGAR-LL-05-00108, SIGAR-LL-05-00112,    SIGAR-LL-05-00121,    SIGAR-LL-05-00125,    SIGAR-LL-05-00183, SIGAR-LL-05-00190,    SIGAR-LL-07-00017,    SIGAR-LL-07-00025,    SIGAR-LL-07-00030, SIGAR-LL-07-00035, SIGAR-LL-07-00078, SIGAR-LL-07-00140, and SIGAR-LL-07-00193. *See* Pl.'s Mem. at 9 n.2.

9       Three other ROIs designated as "on the record" were also withheld pursuant to Exemption 3:   SIGAR-(b)(1)-00062-00067, SIGAR-LL-05-00073, and SIGAR-LL-05-00105. The State Department maintains that they contain classified information.  *See* Fifth Hubbard Decl. ¶ 7 n.2, citing First Stein Decl. and Suppl. State Dep't *Vaughn* Index at 11–12.  The Court addresses these withholdings *infra*.

10      SIGAR-(b)(1)-00105-00116 ("Audio  No.  3"),  SIGAR-LL-Misc-00073-00132 ("Audio No.  4"),  SIGAR-(b)(1)-00062-00067 ("Audio  No.  5"),  SIGAR-(b)(1)-00093-00102 ("Audio

Four of the "on the record" ROIs have already been released to plaintiff: defendant previously released SIGAR-LL-07-00035 in full, Fifth Hubbard Decl. ¶ 7, and after it mistakenly redacted informants' identities, defendant reprocessed and released SIGAR-LL-07-00017, SIGAR-LL-07-00140, and SIGAR-LL-07-00193.  *Id.*  Defendant also located an additional record, SIGAR-LL-07-00197, that was mistakenly redacted, and it has also released that record in full to plaintiff.  *Id.*

Since there is nothing in the supplemental *Vaughn* Index or declarations that would establish that any interviewee who agreed to speak "on the record" received an express assurance of confidentiality, and defendant is not arguing that there are circumstances that might support an implied assurance of confidentiality, defendant has failed to justify the withholding of any "on the record" ROI or associated audio recording under the specific terms of Exemption 7(D), and the Court will grant summary judgment for plaintiff on that issue.

## III.   Exemptions 6 and 7(C)

In its 2020 opinion, the Court stated:

> Despite knowing the interviews could be off the record – as is supported by the Hubbard declaration – these interviewees chose to be interviewed without any privacy protection.  For that reason, if SIGAR has redacted or withheld information that an interviewee has given permission to keep on the record, it must produce that information to plaintiff.

*Wash. Post Co.*, 486 F. Supp. 3d at 161 n.10.

SIGAR's declarant now attempts to distinguish between the substance of an interview given "on the record" and the informants' names, saying there were interviews where "the *information* they provided to SIGAR [was] to be used . . . but their identities [were] to remain

---

No. 6"), SIGAR-LL-Misc-00001-00072 ("Audio No. 9"), and SIGAR-LL-Misc-00133-00184 ("Audio No. 10").  *See* Pl.'s Mem. at 9 n.2.  The Court held *supra* that the ROI, SIGAR-(b)(1)-00105-00116, associated with Audio No. 3 was already justifiably withheld under Exemption 1.

confidential." Fourth Hubbard Decl. ¶ 41 (emphasis in original).  He adds, "[d]uring my re-review, I closely examined these records and confirmed that all information an informant gave permission to be 'on the record' was released."  *Id.*  More important, SIGAR's declarant also points out that in twenty-two of the ROIs marked "on the record," "the informant requested that SIGAR not attribute the information to him or her without first obtaining permission."  Fifth Hubbard Decl. ¶ 6.

Plaintiff points out, based on one recording, that a SIGAR interviewer explained to one interviewee:

> *On the record means we're going to attribute it to you.*  On background means, you will be some official – you can decide what you want to be, former advisor to the U.S. military, something like that.  Deep background – we make no association with your organization or your attributes whatsoever.  And then off the record is of course, we turn that thing off, and we don't use that information at all."

Pl.'s Mem. at 10, citing Ex. 2 to Third Decl. of Charles D. Tobin [Dkt. # 35-3] ("Third Tobin Decl.") (emphasis added).  There is no undisputed evidence in the record to enable the Court to determine if this was part of a script used in every interview or merely a response to a question posed by a particular informant.

Notwithstanding the guidance in the footnote in the Court's previous opinion, the parties have each moved for summary judgment on the question of whether identifying information in the "on the record" ROIs can be withheld under Exemption 7(C).  Given the additional information the Court has received concerning the relative rank of the individuals, it will revisit the issue.

SIGAR withheld identifying information from a number of ROIs labeled "on the record" "or memorializing that agreement between interviewer and subject" under Exemption 6 and

7(C).[11]  Pl.'s Mem. at 9 n.2.  The audio recordings associated with SIGAR-LL-Misc-00073-00132

("Audio No. 4"),  SIGAR-(b)(1)-00062-00067  ("Audio No. 5"),  SIGAR-(b)(1)-00093-00102

("Audio No. 6"), SIGAR-LL-Misc-00001-00072 ("Audio No. 9"), and SIGAR-LL-Misc-00133-

00184 ("Audio No. 10"), Pl.'s Mem. at 9 n.2, were also withheld pursuant to Exemptions 6 and

7(C) on the grounds that they not only contained a name, but in five of the audio recordings, the

voice was also identifying.  *See* Def.'s Mem. at 26.

Exemption 6 permits agencies to withhold "personnel and medical files and similar files

the disclosure of which would constitute a clearly unwarranted invasion of personal privacy[.]"

5 U.S.C. § 552(b)(6).  The purpose of Exemption 6 is "to protect individuals from the injury and

embarrassment that can result from the unnecessary disclosure of personal information."  *U.S.

Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982).  "The Supreme Court has made clear

that Exemption 6 is designed to protect personal information in public records, even if it is not

embarrassing or of an intimate nature[.]"  *Nat'l Ass'n of Retired Fed. Emps. v. Horner*,

879 F.2d 873, 875 (D.C. Cir. 1989), citing *Wash. Post Co.*, 456 U.S. at 600.  Exemption 7(C)

protects from disclosure "records or information compiled for law enforcement purposes . . . [if]

the production of such law enforcement records or information . . . could reasonably be expected

to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).

As noted in the previous ruling in this case, courts consider withholdings made pursuant to

Exemptions 6 and 7(C) under a similar balancing test, *see ACLU v. U.S. Dep't of Just.*,

---

11      They  are  SIGAR-(b)(1)-00062-00067,  SIGAR-(b)(1)-00093-00102,  SIGAR-LL-05-
00069,  SIGAR-LL-05-00073,  SIGAR-LL-05-00081,  SIGAR-LL-05-00085,  SIGAR-LL-05-
00090,  SIGAR-LL-05-00094,  SIGAR-LL-05-00097,  SIGAR-LL-05-00105,  SIGAR-LL-05-
00108,  SIGAR-LL-05-00112,  SIGAR-LL-05-00121,  SIGAR-LL-05-00125,  SIGAR-LL-05-
00183, SIGAR-LL-05-00190, SIGAR-LL-07-00025, SIGAR-LL-07-00030, and  SIGAR-LL-07-
00078.  Pl.'s Mem. at 9 n.2.

655 F.3d 1, 6 (D.C. Cir. 2011), and they apply the test from Exemption 7(C) first because the threshold to satisfy the standard is lower.  *See Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989).  To justify withholding under Exemption 7(C), the agency must show that (1) the disclosure of the records must "reasonably be expected to constitute an unwarranted invasion of personal privacy," and (2) the "personal privacy interest" must not be "outweighed by the public interest in disclosure" of the records.  *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 160, 165–66 (2004) ("*NARA*").

## A.  "Private" citizens

In its 2020 opinion, the Court acknowledged the real privacy interest in interviewees' and third parties' identities and the limited public interest in that information.  *Wash. Post Co.*, 486 F. Supp. 3d at 160–62.  But it called for more information concerning the individuals whose identifying information had been redacted on privacy grounds:

> It is apparent from the material provided to the Court that some of the names [withheld] were those of public officials, including high ranking public officials, and therefore, it is not clear that the privacy interests outweigh the public interests in every case.  For these reasons, the agency must supplement its declaration indicating whether each individual whose identity is being protected could be properly characterized as a "private citizen" at the time of the interview and/or the events described during the interview, and whether the interviewee or individual named falls within the proper scope of the exemptions.

*Id.* at 163, citing *Reps. Comm.*, 489 U.S. at 773 ("Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose.  That purpose, however, is not fostered by disclosure of information about private citizens that is

accumulated in various governmental files but that reveals little or nothing about an agency's own conduct.") and *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003).

SIGAR's declarant explains that the individuals whose identities it sought to protect fell into two categories, "informants (i.e., individuals who were interviewed) and third parties (individuals referenced by an informant in the course of the interview)." Fourth Hubbard Decl. ¶ 7. He then divided the informants into four groups: "high-ranking U.S. government employees (military and civilian), low ranking U.S. government employees (military and civilian), private citizens, and foreign nationals." *Id.* ¶ 9. According to Hubbard, at the time of the interviews: 46 were high-ranking U.S. government employees, 123 were low-ranking U.S. government employees, 116 were private citizens, and 146 were foreign nationals. *Id.*[12]

Defendant renewed its motion for summary judgment on the grounds that it "properly withheld the names, titles, ranks, dates of deployment, dates of employment, and other identifying information" of all of the individuals who were interviewed by SIGAR and all of the of third parties identified in the records under Exemption 7(C). *See* Def.'s Mem. at 21. Given the Court's ruling with respect to Exemption 7(D), this issue has been narrowed substantially.

## B. Third parties named in interviews

SIGAR argues that the Court should find that the balance of private and public interests weighs in favor of withholding the names of third parties named in interviews from disclosure. *See* Def.'s Mem. at 21–24. Its declarant directs the Court to the Third *Vaughn* Index as the authority on a third party's status, which groups them into the same four categories as informants,

---

[12]     Hubbard explains that the total number of ROIs and transcripts on the *Vaughn* Index does not match the total number of informants whose names were withheld because "a few ROIs were notes taken at group interviews where the status of each participant was not entirely clear from the record." Fourth Hubbard Decl. ¶ 9 n.3.

where information on their identities is available:  high-ranking government official, low-ranking

government official, private citizen, and foreign national.  *See* Fourth Hubbard Decl. ¶ 28.

The Court stated in its prior opinion:

> While the requests made to SIGAR directly advanced the right of the public
> to be informed about what its government is doing overseas, that interest
> has been largely served by the release of the substantive information
> contained in the ROIs, and it is not enough to outweigh the privacy interests
> that led to the limited excision of the names of the interviewees and third
> parties whose names were mentioned.  Therefore, the Court is inclined to
> grant summary judgment in favor of the defendant with respect to the
> withholding of the majority of the interviewees' and third parties' titles,
> ranks, dates of deployment, and dates of employment.

*Wash. Post Co.*, 486 F. Supp. 3d at 162.

At this point then, it falls to the Court to ascertain whether there are any exceptions to this

principle for third parties.  Defendant relies on *Elec. Priv. Info. Ctr. v. Dep't of Just.* ("*EPIC*"),

490 F. Supp. 3d 246 (D.D.C. 2020), for the proposition that agencies may redact the identifying

information of third parties who are "public figures," even if they solicit publicity and media

attention.  *See* Def.'s Mem. at 24, quoting *EPIC*, 490 F. Supp. 3d at 264–65.  The district court in

that case held that even if the subject of the record is otherwise known to the public, that does not

extinguish the their privacy interest, and that the privacy interest is not outweighed by the public

interest if disclosure would not "contribute significantly to public understanding of the operations

or activities of the government."   *EPIC*, 490 F. Supp. 3d at 265–66, quoting *Consumers'*

*Checkbook, Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*,

554 F.3d 1046, 1051 (D.C. Cir. 2009).

Defendant emphasizes that "[u]nwitting third parties are especially deserving of protection

because it is unlikely they were aware they had been named or what information had been

said about them," Def.'s Reply at 16 n.5, citing Fifth Hubbard Decl. ¶¶ 29, 53 and Fourth Hubbard

Decl. ¶¶ 25–28, and the Court agrees.  Defendant has adequately explained the harm associated with releasing this information,[13] *see EPIC*, 490 F. Supp. 3d at 263, and courts in this district have recognized that the public interest in knowing the identities of third parties, even high-ranking officials, rarely outweighs such privacy interests.[14]  Therefore, the Court will grant summary judgment for defendant for this category of withholdings regardless of the third party's status.

## C.  Identifying information in "on the record" interviews

Identifying information for individuals who were interviewed with express assurances of confidentiality was properly withheld under Exemption 7(D), obviating the 7(C) issue, but the

_____

[13]     Hubbard points out:

> The third parties were presumably unaware they were being named by an informant in a confidential interview.  In fact, SIGAR has not verified whether what was said about the third parties was accurate or inaccurate; whether the informant was taking the opportunity to "settle a score" with a third party, or whether the informant knew that revealing the name of a third party could result in retaliation against that third party.  For example, I noted that one ROI recounted an interview with an informant who named two third parties and accused them of contract fraud.   *See* LL-05-00195. Disclosure of the third parties' identities in connection with this unverified accusation could harm the individuals' or their organizations' relationships with the government, and could place them at risk for demotion, job loss, harassment, and reputational harm.  Other instances of informants naming third parties are likely to be less dramatic, but may still inflict unwarranted or unintended adverse consequences on third parties who had no knowledge they were being implicated in a particular manner.

Fourth Hubbard Decl. ¶ 29.

[14]     *See Martin v. Dep't of Just.*, 488 F.3d 446, 457 (D.C. Cir. 2007) (holding that information identifying third parties is usually exempt from disclosure); *Lazaridis v. U.S. Dep't of State*, 934 F. Supp. 2d 21, 38 (D.D.C. 2013) ("As a general rule, third-party identifying information contained in [law enforcement] records is 'categorically exempt' from disclosure."), citing *Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995); *see also Graff v. FBI*, 822 F. Supp. 2d 23, 34 (D.D.C. 2011) ("Even if a third party's status as a foreign national gives rise to a privacy interest that is somewhat weaker than that of a U.S. citizen, given the structure of the statute, even a weak privacy interest will always outweigh a lack of public interest."), citing *Oguaju v. United States*, 288 F.3d 448, 451 (D.C. Cir. 2002).

Court must still determine whether it would be appropriate to redact any informants' identifying information from the "on the record" interviews.

### i.   The categorization of high and low-ranking government officials

Defendant maintains that it properly withheld information from informants interviewed by SIGAR, *see* Def.'s Mem. at 15–18, including high and low-ranking government officials who could be classified as "public" officials.  *Id.* at 21–28.  Defendant's declarant explained that "[t]here does not appear to be any definition in law or regulation of the term 'high ranking' as applied to government employees," Fifth Hubbard Declaration ¶ 13, and so SIGAR created its own "objective standard":

> In an attempt to use a bright-line definition in the context of the lessons learned program and to minimize subjectivity, SIGAR concluded that a "high ranking" government employee was anyone appointed by the President and confirmed by the Senate.  This includes all ambassadors, generals, and admirals, all cabinet secretaries and heads of agencies, and all deputy secretaries, under secretaries, and assistant secretaries.  In addition, informants who were obviously public figures with policy-making or other independent authority could be "high ranking" government employees, *e.g.*, an individual appointed to an "acting" high-ranking position, or a special envoy.

*Id.* ¶ 14.

In its cross motion for summary judgment, plaintiff claims that defendant mischaracterized some high-ranking public officials as low-ranking public officials, Pl.'s Mem. at 12–14, and that it then improperly balanced their privacy interests against the public interest in the information. *See id.* at 15–19.

Plaintiff accurately points out that the privacy interest diminishes and public interest increases as an official's rank increases, *see* Pl.'s Mem. at 12, quoting *Stern v. FBI*, 737 F.2d 84, 92

(D.C. Cir. 1984), and it takes issue with the designation of five individuals as "low-ranking" or "low level" employees:

- the former Senior Advisor on Afghanistan and Pakistan to the Under Secretary of Defense for Policy;

- the former Senior Director for Afghanistan on the National Security Council;

- the Director for Afghanistan and Pakistan on the National Security Council staff;

- the former special assistant to NATO's commander in Afghanistan, General Stanley McChrystal; and

- a senior adviser to the State Department's Special Representative for Afghanistan and Pakistan.

Pl.'s Mem. at 13–14.[15]   According to plaintiff, based in part on publicly available biographies, these individuals held more important posts than the Third *Vaughn* Index would indicate, and therefore, the representations are "suspect," and defendant's declaration and *Vaughn* Index are "in bad faith and should be given no weight."  Pl.'s Mem. at 14.

While one can argue that these individuals played roles of importance, plaintiff has not identified evidence in the record that would overcome the presumption of good faith that attaches to the declarations.  All are senior advisers to high-level decisionmakers.  So while these credentialed individuals may outrank many government employees, they were not high-ranking government officials with decision-making authority that can be likened to the agency itself.

---

15    Plaintiff also makes a passing challenge to SIGAR's designation of two Army colonels as low-ranking government officials.  *See* Pl.'s Mem. at 13 n.4.  But plaintiff points to no authority as to why this is unreasonable in the FOIA context.

ii.     **High and low-ranking government officials**

SIGAR next argues that both high and low-ranking government officials who were interviewed are still entitled to protection from disclosure, despite the fact that a higher status would diminish their privacy interest.  *See* Def.'s Mem. at 24–25.

The Court has reviewed the Third *Vaughn* Index, and it does not appear that any of the "on the record" interviews were given by individuals who were high-ranking government officials at the time of the interview.  Therefore, it need not balance that more diminished private interest against the potentially greater public interest involved because the only ROIs still in question are the ones on the record.[16]

---

16     "On the record" ROIs:  SIGAR-(b)(1)-00062-00067 ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-(b)(1)-00093-00102 ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-LL-05-00069-00072 ("Informant was active duty military, low ranking, at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00073-00077 ("Informant was active duty military low ranking at the time of the interview and at time of the events discussed."); SIGAR-LL-05-00081-00084 ("Informant was active duty military, low ranking, at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00085-00089 ("Informant was active duty military, low ranking, at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00090 ("The informant was active duty military, low ranking, at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00094-00096 ("Informant was active duty military, low ranking, at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00097-00101 ("Informant was active duty military, low ranking."); SIGAR-LL-05-00105-00107 ("Informant was active duty military, low ranking at the time of interview and at time of events discussed."); SIGAR-LL-05-00108-00111 ("Informant was active duty military, low ranking at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00112-00115 ("Informant was active duty military, low ranking."); SIGAR-LL-05-00121-00124 ("Informant was a private citizen at the time of the interview and a low ranking government employee at the time of the events discussed."); SIGAR-LL-05-00125-00131 ("Informant was active duty military[,] low ranking, at the time of the events discussed and at the time of the interview."); SIGAR-LL-05-00183-00189 ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-LL-05-00190-00194 ("Informant was a foreign national private citizen."); SIGAR-LL-07-00025-00029 ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-LL-07-00030-00032 ("The informant was a private citizen at the time of the interview and a high ranking

However, the Court will go on to determine whether low-level employees who spoke on the record surrendered their privacy interests entirely such that Exemptions 6 and 7(C) cannot be applied to them.  The Court notes first that it is well-established that lower-level government employees in general have a privacy interest in their identities.  "[W]hile it is true that Government officials may have a somewhat diminished privacy interest they do not surrender all rights to personal privacy when they accept a public appointment.'"  *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996) (internal citation, brackets, and quotation marks omitted).  And it is generally accepted in this circuit that the public interest in the identities of low-level employees does not usually outweigh the individuals' privacy rights, as they are not typically decision-makers such that disclosure of their names would shed light on "what the government does."  *See, e.g.*, *Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 1118 (D.D.C. 2005) (upholding the government's Exemption 6 withholdings because "the public interest in learning the names

---

government employee at the time of the events discussed."); and SIGAR-LL-07-00078-00080 ("Informant was active duty military, low ranking at the time of the interview and at the time of the events discussed."); SIGAR-LL-05-00097-00101 ("Informant was active duty military, low ranking."). *See generally* Third SIGAR *Vaughn* Index.

Audio recordings associated with interviews given "on the record":  SIGAR-LL-Misc-00073-00132 ("Audio No. 4") ("Informant was a low ranking government employee at time of the interview and at time of the events discussed."); SIGAR-(b)(1)-00062-00067 ("Audio No. 5") ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-(b)(1)-00093-00102 ("Audio No. 6") ("The informant was a private citizen at the time of the interview and a high ranking government employee at the time of the events discussed."); SIGAR-LL-Misc-00001-00072 ("Audio No. 9") (no informant identified – only identifying information of third parties withheld); and SIGAR-LL-Misc-00133-00184 ("Audio No. 10") ("Informant was a high ranking government employee at the time of the events discussed, and a low ranking government employee at the time of the interview."). *See generally* Third SIGAR *Vaughn* Index..

Because the Court found the withholding of third parties' identifying information was justifiably withheld under Exemption 7(C), this footnote only addresses SIGAR's groupings of informants whose identifying information was withheld under Exemption 7(C).

of . . . lower-echelon employees is small" and plaintiff did not demonstrate how knowledge of the names would help it "understand how the agency performs its statutory duties").

So the question is whether any of those clear rights survived the agreement to speak on the record. The privacy interest is certainly weaker than the interest of an off-the-record informant, but it is not entirely absent. The agency's declarant explained that most of the on the record speakers were willing to have the information they provided used and shared, but they requested that the information not be attributed to them without permission. *See* Fourth Hubbard Decl. ¶ 41. Under those circumstances, and given the lack of any public interest in the disclosure of lower-ranking interviewees' names, any remaining private interest outweighs the public interest. Therefore, identifying information may be withheld from disclosure under FOIA Exemption 7(C), even if the ROI was otherwise on the record for SIGAR's purposes, and the Court will enter judgment in favor of defendant on that issue.

### D.  Private individuals and foreign nationals who were interviewed.

The Court held in its previous opinion that "private" citizens who were interviewed have a legitimate privacy interest in keeping their identities from being disclosed that is not outweighed by the public interest. *Wash. Post Co.*, 486 F. Supp. 3d at 162. Therefore, individuals categorized as private citizens or foreign nationals in defendant's supplemental declaration and *Vaughn* Index fall under the protection of Exemption 7(C),[17] and the Court will grant summary judgment for SIGAR with regard to those records.

---

17    According to Hubbard, at the time of the interviews, 116 informants were private citizens, and 146 informants were foreign nationals. *See* Fourth Hubbard Decl. ¶ 9.

### E.  Audio recordings, unique interview codes, and interview locations

All that remains for the Court to consider under Exemption 7(C), then, is whether SIGAR has adequately supported its redaction of randomly assigned interview codes and the locations where interviews took place, and its withholding of eight audio recordings in full.  While defendant makes a colorable argument that plaintiff no longer challenges these withholdings in its cross motion, *see* Def.'s Reply at 1, "[u]nder the Federal Rules of Civil Procedure, a motion for summary judgment cannot be 'conceded' for want of opposition.  'The burden is always on the movant to demonstrate why summary judgment is warranted.  The nonmoving party's failure to oppose summary judgment does not shift that burden.'"  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016), quoting *Grimes v. Dist. of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring).

Since the Court issued its ruling, defendant released two audio recordings in full,[18] and it matched the remaining six audio recordings it continues to withhold in full to specific transcripts or ROIs that were released to plaintiff with limited redactions.  *See* Fourth Hubbard Decl. ¶ 38.  Of the remaining six recordings, SIGAR's declarant asserts that five of the six contain classified information, *id.*, and the Court has already determined that the ROIs associated with Audios No. 3, 5, 6, and 7, and transcript associated with Audio No. 1 were justifiably withheld pursuant to Exemption 1.  *See* Third SIGAR Vaughn Index; *see also* Suppl. State Dep't *Vaughn* Index.  Defendant has also provided transcripts or notes of parts of those recordings, so SIGAR has performed its duty to segregate and produce releasable information from these interviews.  Fourth Hubbard Decl. ¶ 38.

---

18      Defendant released Audio No. 2 and Audio No. 8 on October 30, 2020.  *See* Fourth Hubbard Decl. ¶ 37.

The remaining audio recording, Audio No. 10, is associated with SIGAR-LL-Misc-00133-00184, *see* Fourth Hubbard Decl. ¶ 39, which plaintiff maintains was designated as "on the record." *See* Pl.'s Mem. at 9 n.2. The informant was a high-ranking employee at the time of the events discussed, and a low-ranking government employee at the time of the interview. *See* Third SIGAR *Vaughn* Index at 293–94. Because the Court has already determined that the privacy interest in the identity of a low-ranking government employee who gave an interview "on the record" outweighs the public interest in that information, defendant justifiably withheld Audio No. 10 under Exemption 7(C).

As to the unique interviewee codes, SIGAR justified withholding the codes that were assigned to informants in lieu of their names: because it "believes . . . a copy of the master list of interview codes and corresponding informant names may have been removed from SIGAR's offices by a former SIGAR employee," Fourth Hubbard Decl. ¶ 34, there is a risk that confidential informants could be identified if the codes were revealed. Therefore, the reliance on Exemption 7(C) is supported.

Finally, SIGAR reconsidered the withholdings of the interview locations and released the bulk of the withheld information to plaintiff. *See* Fourth Hubbard Decl. ¶ 36. Out of hundreds, only the locations for 44 ROIs remain withheld as the "location information [] was so unique that it would immediately identify the informant or, if read in conjunction with the text of the ROI, could reveal the identity of the informant." *Id.* Each ROI with such unique location data is noted in SIGAR's updated *Vaughn* index. *See generally* Third SIGAR *Vaughn* Index.

For these reasons, the Court will grant summary judgment to defendant as to the unique interviewee codes, the interview locations, and the six audio recordings.

## IV.    Exemption 3

Because the Court reached a decision on the personally identifiable information covered by Exemption 7(C) for which SIGAR also asserted Exemption 3,[19] all that remains for the Court to determine under Exemption 3 is whether the State Department adequately supplemented its declaration to support the reaction of information on intelligence methods.

FOIA Exemption 3 exempts from disclosure any materials that are specifically exempted from disclosure by another statute, provided that such statute either requires withholding "in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3); *see also Senate of the Commonwealth of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Just.*, 823 F.2d 574, 582 (D.C. Cir. 1987).

Defendant initially withheld hundreds of documents in part and eight documents in full pursuant to FOIA Exemption 3 based on three federal statutes:  1) section 7(b) of the Inspector General Act of 1978, as amended, 5 U.S.C. App. 3 § 7(b) ("IG Act"), 2) 10 U.S.C. § 130b, and 3) section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1).

---

19      The Court explained:

> Because the Court has already addressed the redaction of information identifying interviewees and other individuals named in ROIs under Exemption 7(C), it need not consider the legality of the redaction of the same information under Exemption 3.   As a result, with regard to information withheld by SIGAR under the IG Act, by USSOCOM pursuant to 10 U.S.C. § 130b, and by the Department of Defense under the National Security Act, all of which appears to be duplicative of information withheld under Exemption 7(C), *see* SIGAR *Vaughn*, the Court's determination with respect [to] Exemption 7(C) will apply; the matter will be resolved after the Court receives the necessary supplemental submissions, and both parties' motions are denied at this time.

*Wash Post Co.*, 486 F. Supp. 3d at 166–67 (footnote omitted).

In its prior opinion, the Court held that defendant satisfied only the first prong of the two-part test for documents held pursuant to this exemption – whether the statute identified by the agency qualifies as an exempting statute under Exemption 3.  *See Wash. Post Co.*, 486 F. Supp. 3d at 166–68.  It also concluded that defendant failed to provide enough information as to whether the withheld material fell within the scope of the National Security Act.  *Id.* at 168.

### A. The State Department supports its reliance on Exemption 3 to redact information on intelligence methods.

In its prior opinion, the Court held that defendant failed to show, pursuant to the requirement in the National Security Act, that the redacted information was withheld at the direction of the Director of National Intelligence, or someone with authority to identify and withhold national intelligence information.  *See Wash. Post Co.*, 486 F. Supp. 3d at 167, citing 50 U.S.C. § 3024(i)(1).  It ordered defendant to provide a "supplemental declaration indicating who made the FOIA determinations with respect to the National Security Act in this case, and whether that person had the authority to do so."  *Id.* at 168.

The agency has submitted the declaration of Ellen E. McCarthy, the Assistant Secretary of State for the Bureau of Intelligence and Research ("INR") in the State Department.  Decl. of Ellen E. McCarthy [Dkt. # 32-6] ("McCarthy Decl.") ¶ 1.  In her capacity as Assistant Secretary of the INR, she has "original classification authority and [is] authorized to classify and declassify national security information up to the level of TOP SECRET pursuant to section 1.3 of Executive Order 13426 . . . and the National Security Act."  *Id.* ¶ 3.

McCarthy avers that she has reviewed the information withheld pursuant to Exemption 3, and she "determined that the information is national intelligence information that is protected by the National Security Act."  McCarthy Decl. ¶ 7.  She adds that the State Department located an additional document, SIGAR-(b)(1)-00156-00161, in the course of her review which should also

be withheld as protected by the National Security Act pursuant to Exemption 3. *Id.* ¶ 8. She specifies that "the redacted information references intelligence sources and methods, including a reference to the specific means by which intelligence goals may be accomplished." *Id.*

The Court finds that this supplemental declaration is sufficient to satisfy the requirements of Exemption 3. Although the agency does not explain who made the original choice to redact the information, it has informed the Court that the Assistant Secretary has, in fact, reviewed the specific redactions and supports them. Therefore, the Court will grant summary judgment in favor of defendant with respect to records withheld under Exemption 3.

## V.    Exemption 5

Finally, defendant withheld portions of eleven ROIs pursuant to FOIA Exemption 5, which bars disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).

A document may be properly withheld under Exemption 5 if it satisfies "two conditions: its source must be a [g]overnment agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989) (Exemption 5 encompasses "the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including . . . the executive deliberative process privilege.") (internal quotation marks omitted), quoting *Tax'n Without Representation v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981).

SIGAR originally invoked the deliberative process privilege on behalf of the National Security Council ("NSC") for portions of eleven ROIs,[20] and for the first time in its renewed motion for summary judgment, it also invoked the presidential communications privilege for portions of seven of them, Def.'s Mem. at 40, though it reduced that number to six in its reply brief.[21]  Def.'s Reply at 33.  Both privileges have been found to be incorporated in Exemption 5. *See Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008).

## A.  Deliberative process privilege

The deliberative process privilege "allows the government to withhold documents and other materials that would reveal advisory opinions, recommendations[,] and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("*Espy*") (internal quotation marks omitted).  The Supreme Court explained that it "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and its purpose "is to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the Government." *Klamath*, 532 U.S. at 8–9, quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).

To accomplish that goal, "[t]he deliberative process privilege protects agency documents that are both predecisional and deliberative." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151

---

20    SIGAR-(b)(1)-00001; SIGAR-(b)(1)-00117; SIGAR-(b)(1)-00132; SIGAR-(b)(1)-00136; SIGAR-(b)(1)-00151;   SIGAR-(b)(1)-00162;   SIGAR-(b)(1)-00172;   SIGAR-LL-01-00104; SIGAR-LL-01-00121; SIGAR-LL-01-00156; and SIGAR-LL-03-00154.  Fourth Hubbard Decl. ¶ 55.

21    These ROIs are:   SIGAR-(b)(1)-00001; SIGAR-(b)(1)-00117; SIGAR-(b)(1)-00151; SIGAR-(b)(1)-00162; SIGAR-(b)(1)-00172; and SIGAR-LL-01-00104.   *See* Fifth Hubbard Decl. ¶ 24.

(D.C. Cir. 2006), citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  A document is predecisional if "'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process.'" *Jud. Watch*, 449 F.3d at 151, quoting *Coastal States*, 617 F.2d at 866.  In other words, "[a] 'predecisional' document is one 'prepared in order to assist an agency decisionmaker in arriving at his decision.'"  *Formaldehyde Inst.*, 889 F.2d at 1122, quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975).

With respect to the "deliberative" prong of the test – the second prong – the exemption "protects not only communications which are themselves deliberative in nature, but all communications which, if revealed, would expose to public view the deliberative process of an agency."  *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982), citing *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63 (D.C. Cir. 1974).  But the agency "cannot simply rely on generalized assertions that disclosure could chill deliberations."  *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (internal quotation marks omitted).

As the D.C. Circuit explained in the *Espy* case:

> Both requirements stem from the privilege's "ultimate purpose[, which] . . . is to prevent injury to the quality of agency decisions" by allowing government officials freedom to debate alternative approaches in private. The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.

121 F.3d at 737 (citations omitted).

### i.     The eleven ROIs are predecisional.

The Court previously held that SIGAR's withholding of sixty-three ROIs pursuant to the deliberative process privilege was not sufficiently justified by the agency's submissions "because

the showing that the material is 'predecisional' is vague and indistinct from the assertion that it is 'deliberative.'" *Wash. Post. Co.*, 486 F. Supp. 3d at 169.  SIGAR then narrowed the ROIs withheld under this exemption to eleven,[22] and it provided supplemental declarations and *Vaughn* Indices. *See* Fourth Hubbard Decl. ¶¶ 55–61; Fifth Hubbard Decl. ¶¶ 22–26; Exemption 5 *Vaughn* Index [Dkt. # 32-4] ("First Exemption 5 *Vaughn* Index"); Second *Vaughn* Index for Exemption 5 Withholdings [Dkt. # 38-3] ("Second Exemption 5 *Vaughn* Index").

SIGAR has now satisfied the predecisional requirement.[23]  For seven of the withheld ROIs,[24] the declarant explains that they were used to inform a specific, forthcoming Lessons Learned Report, called *Strategy and Planning*.  Fourth Hubbard Decl. ¶¶ 57–59.  In other words, the ROIs preceded the "decision" to make the recommendations contained in the report.  Similarly, the remaining four ROIs:

> were conducted to gather information concerning counterinsurgency operations and policies aimed at combating corruption that informed SIGAR's May 2018 report *Stabilization: Lessons from the U.S. Experience in Afghanistan* (SIGAR-(b)(1)-00172; SIGAR-(b)(1)-00151; and SIGAR-(b)(1)-00162) and September 2018 report *Corruption in Conflict: Lessons*

---

22      Defendant also re-reviewed the documents at issue "[i]n light of the change in Administration," and it made additional releases to plaintiff from nine of the eleven ROIs between filing its renewed motion and its reply.  *See* Fifth Hubbard Decl. ¶ 22.

23      In its renewed cross motion, plaintiff does not challenge that the withheld ROIs are predecisional.

24      SIGAR-(b)(1)-00001; SIGAR-(b)(1)-00117; SIGAR-(b)(1)-00132; SIGAR-(b)(1)-00136; SIGAR-LL-01-00104; SIGAR-LL-01-00121; SIGAR-LL-01-00156.  *See* Fourth Hubbard Decl. ¶ 56.

> *from the U.S. experience in Afghanistan* (SIGAR-LL-03-00154; SIGAR-(b)(1)-00151; and SIGAR-(b)(1)-00162).

Fourth Hubbard Decl. ¶ 57.  Based on this showing, the Court is satisfied that the eleven ROIs are predecisional with regard to these three specific reports.[25]

### ii.    The eleven ROIs are not deliberative.

But the agency has fallen short of the showing that any ROI was part of the consultative give and take that led to any decision-making embodied in the report.  They were not drafts or memoranda or emails soliciting input or reviewing proposals for what the reports should contain; they were the raw material upon which the reports were based.

Defendant does not even attempt to bring the records under the applicable legal rubric.  Its declarant states:  because the ROIs are not interviews, but they are summaries of statements made during interviews, the process of their creation "reflects that interviewer's interpretation of those statements, as well as the interviewer's personal judgment regarding what information provided by the informant is important and should be reported to others within SIGAR."  Fourth Hubbard Decl. ¶ 59.  This may be the sort of showing one makes when asserting the attorney work-product privilege, but it is not what is called for here.

Plaintiff argues that the ROIs are not deliberative, because they are factual compilations that do not "reveal something about the agency's deliberative process."  Pl.'s Mem. at 29, quoting

---

25      In the fifth declaration from SIGAR's declarant, he notes that SIGAR "supplemented the justifications for the withholdings in approximately 5 ROIs.  As noted on the Second Vaughn Index for Exemption 5 Withholdings, a limited amount of information was withheld in SIGAR-(b)(1)-00132-00135; SIGAR-(b)(1)-00136-00143; SIGAR-(b)(1)-00151-00155; SIGAR-LL-01-00104-00109;  and  SIGAR-LL-03-00154-00156  because  the  information  pertains  to  the decision-making structure and policy-making process of the NSC."  Fifth Hubbard Decl. ¶ 23 (footnote omitted).  Because the declarant already states that information on these parts of the NSC were included in the May and September 2018 Lessons Learned Reports identified by defendant, *see* Fourth Hubbard Decl. ¶¶ 56–57, these withholdings do not require a separate justification under the deliberative process privilege.

*Hardy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 243 F. Supp. 3d 155, 165 (D.D.C. 2017). "[T]he agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States*, 617 F.2d at 868. SIGAR has failed to do that here; it has not shown that the ROIs were part of the internal give and take that led *to* the reports as opposed to sources of information used *in* the reports. Therefore, those portions of those ROIs withheld under the deliberative process privilege may not be withheld on that basis.

## B. Presidential communications privilege

Defendant also asserts that the presidential communications privilege applies to portions of six of the ROIs withheld pursuant to Exemption 5. Def.'s Reply at 31. Although plaintiff argues that defendant waived this argument because it did not assert this specific justification for the withholdings at an earlier stage in the proceedings, *see* Pl.'s Mem. at 23, citing *Maydak v. Dep't of Just.*, 218 F.3d 760, 764–65 (D.C. Cir. 2000),[26] plaintiff has had a full opportunity to brief its opposition, and the Court will consider the parties' positions on the merits. *See, e.g.*, *Al-Tamimi v. Adelson*, 916 F.3d 1, 6–7 (D.C. Cir. 2019) (despite the failure to raise an argument in an opening brief and instead incorporating it by reference, the plaintiff did not forfeit the argument where the defendants "had a fair opportunity to respond" on the issue and did, in fact, do so).

In *United States v. Nixon,* 418 U.S. 683 (1974), the Supreme Court explained that a "presumptive privilege for Presidential communications . . . is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution."

---

[26]  Plaintiff quotes *Maydak* for the proposition that circuit courts "have plainly and repeatedly told the government that, as a general rule, it must assert all exemptions at the same time, in the original district court proceedings." Pl.'s Mem. at 23, quoting 218 F.3d at 764–65. But the parties are still *in* the original district court proceedings, and they are still at the motion for summary judgment stage, and so the Court does not find this argument compelling.

*Id.* at 708.  "A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately."  *Id.*

None of the documents at issue here constitute communications to or from the President. But statements that reveal presidential communications or deliberations are covered by the privilege, too.  As other courts in this district have recognized, the privilege is not "claimed over the documents themselves, but rather the communications memorialized within them." *Citizens for Resp. & Ethics in Wash. v. Dep't of Homeland Sec.*, No. 06-cv-0173 (RJL), 2008 WL 2872183, at *3 (D.D.C. July 22, 2008); *see also Buzzfeed, Inc. v. FBI*, No. 18-cv-2567 (BAH), 2020 WL 2219246, at *7 (D.D.C. May 7, 2020); *Prop. of the People, Inc. v. Off. of Mgmt. & Budget*, 330 F. Supp. 3d 373, 387 (D.D.C. 2018) ("Courts in this district have also found that the privilege extends to internal agency documents that memorialize privileged communications between the agency and President or immediate White House advisers.").

The privilege is designed to "preserve[] the President's ability to obtain candid and informed opinions from his advisors."  *Loving*, 550 F.3d at 37.  And this means it may extend to "communications made by presidential advisers in the course of preparing advice for the President . . . , even when these communications are not made directly to the President.  *Espy*, 121 F.3d at 752.

> Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves.  The privilege must also extend to communications authored or received in response to a solicitation by members of a presidential adviser's staff, since in many instances advisers must rely on their staff to investigate an issue and formulate the advice to be given to the President.

*Id.*

Given the breadth and level of protection accorded to presidential communications, though, the Circuit has also emphasized that this extension of the privilege must be "limited":

> We are aware that such an extension, unless carefully circumscribed to accomplish the purposes of the privilege, could pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President.  In order to limit this risk, the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected.  Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege.  In particular, the privilege should not extend to staff outside the White House in executive branch agencies.  Instead, the privilege should apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.  Only communications at that level are close enough to the President to be revelatory of his deliberations or to pose a risk to the candor of his advisers.

*Espy*, 121 F.3d at 752 (footnote omitted), citing *Ass'n of Am. Physicians and Surgeons, Inc. v. Clinton*, 997 F.2d 898, 910 (D.C. Cir. 1993); *see, e.g.*, *Ctr. for Biological Diversity v. Off. of Mgmt. & Budget*, 625 F. Supp. 2d 885, 891–92 (N.D. Cal. 2009) (district court declined to extend the privilege to intra-agency communications even though they concerned the preparation of a presentation for the President).

SIGAR asserts the presidential communications for limited portions of six ROIs: SIGAR-(b)(1)-00001;   SIGAR-(b)(1)-00117;   SIGAR-(b)(1)-00151;   SIGAR-(b)(1)-00162; SIGAR-(b)(1)-00172; and SIGAR-LL-01-00104.  *See* Fifth Hubbard Decl. ¶ 24.  It explains that it divided the withheld material into two categories:  PCP-1, which covers "[c]ommunications among and between government officials or staff and between government officials and the

President,"[27] and PCP-2, which covers "[c]ommunications between Transition officials or staff."[28] Fourth Hubbard Decl. ¶¶ 65–71. SIGAR grouped the withheld material into either, or both, categories in the Exemption 5 *Vaughn* Indices. *See* First Exemption 5 *Vaughn* Index; Second Exemption 5 *Vaughn* Index.

After reviewing the withholdings *in camera*, the Court finds that some of the material is covered by the presidential communications privilege, and other portions must be disclosed as follows:

| Document range | Page | Ruling |
|---|---|---|
| SIGAR-(b)(1)-00001-00061 | -00050 | This was a direct communication involving the President. The privilege has been satisfied for this redaction. |
| SIGAR-(b)(1)-00117-00129 | -00126 | This includes a direct communication involving the President. The privilege has been satisfied for this redaction in part; SIGAR must release the final two sentences of the redacted material, from "Donilon was" to "firm answer." |
| | -00128 | This includes communications made by presidential advisers in the course of preparing advice for the President. The privilege has been satisfied for this redaction. |
| SIGAR-(b)(1)-00151-00155 | -00153 | The privilege has not been satisfied for this redaction; SIGAR must release the two sentences of redacted material. |
| | -00154 | This includes a direct communication involving the President, and communications made by presidential advisers in the course of preparing advice for the President. The privilege has been satisfied for this redaction. |

---

27     PCP-1 communications involved one or more of the following individuals who position held at the time of the communication is indicated: Barack Obama, President; George W. Bush, President; James L. Jones, Assistant to the President for National Security Affairs ("National Security Advisor"); Stephen Hadley, Assistant to the President for National Security Affairs ("National Security Advisor"); Tom Donilon, Assistant to the President and Deputy National Security Advisor; Dennis McDonough, Assistant to the President and Deputy National Security Advisor, *see* Fourth Hubbard Decl. ¶ 67; and Joseph Biden, Vice President. *See* Fifth Hubbard Decl. ¶ 25.

28     PCP-2 communications involved one or more of the following individuals whose position held at the time of the communication is indicated: Barack Obama, President-elect; Rahm Emanuel, Chief of Staff designate; James L. Jones, National Security Advisor designate; and Tom Donilon, Deputy National Security Advisor designate. *See* Fourth Hubbard Decl. ¶ 70.

| Document range | Page | Ruling |
|---|---|---|
| SIGAR-(b)(1)-00162-00167 | -00163 | This includes a direct communication involving the President. The privilege has been satisfied for this redaction in part; SIGAR must release the final paragraph of redacted material, from "It became" to "we have?" |
| SIGAR-(b)(1)-00172-00176 | -00172 | The privilege has not been satisfied for this redaction; SIGAR must release the two paragraphs of redacted material. |
| | -00173 | This includes a direct communication involving the President. The privilege has been satisfied for these redactions in part.  The redactions are numbered by their placement on the page.<br><br>Paragraph 1: SIGAR must release the first paragraph of redacted material, from "Because the" to "something else."<br><br>Paragraph 2:  The privilege has been satisfied for this paragraph in full.<br><br>Paragraph 3:  SIGAR must release the first two sentences of this paragraph, from "Then McChrystal" to "on it."  The privilege has been satisfied for the next (third) sentence.  SIGAR must release the fourth sentence, from "It had" to "strategic review."  The privilege has been satisfied for the next (fifth) sentence.  SIGAR must release the final sentence of this paragraph, from "The July" to "the show."<br><br>Paragraph 4:  SIGAR must release this sentence in full, from "The second" to "us down."<br><br>Paragraph 6:  SIGAR must release the three words redacted at the end of this sentence. |
| | -00175 | This includes a direct communication involving the President. The privilege has been satisfied for this redaction in part; SIGAR must release the third sentence of the redacted material, from "So everyone" to "better resourced." |
| | -00176 | This includes a direct communication involving the President. The privilege has been satisfied for this redaction. |
| SIGAR-LL-01-00104-00109 | -00108 | This includes a direct communication involving the President. The privilege has been satisfied for this redaction. |

## VI.   Foreseeable Harm

In 2016, Congress amended FOIA to add an additional requirement:   records that are otherwise protected from disclosure under an exemption must be released unless the agency "reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I).   In articulating the nature of the harm, an agency cannot rely on "'generalized' assertions," *Machado Amadis*, 971 F.3d at 371, or "mere speculative or abstract fears or fear of embarrassment."   *Ctr. for Investigative Reporting v. U.S. Customs and Border Prot.*, 436 F. Supp. 3d 90, 105 (D.D.C. 2019) (citation and quotation marks omitted).

In *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021),[29] the Court of Appeals explained that in the context of Exemption 5, "what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward," and it emphasized that "this inquiry is context specific." *Id.* at 370.

As an initial matter, defendant challenges whether plaintiff has waived any argument that defendant failed to establish foreseeable harm for records withheld pursuant to any FOIA exemption except Exemption 5.   *See* Def.'s Resp. at 1 n.1.   It argues that because plaintiff did not raise the issue in its earlier submissions, it cannot bring the issue before the Court for the first time in its cross reply.   *See id.*, citing *Drauglis v. Kappa Map Grp., LLC*, 128 F. Supp. 3d 46, 56

---

[29]   On July 14, 2021, plaintiff filed a two-page notice informing the Court that the D.C. Circuit had recently decided a case addressing the "foreseeable harm standard . . . for the first time" in *Reporters Committee*.   Pl.'s Notice of Suppl. Authority [Dkt. # 40] ("Pl.'s Notice").   Defendant filed a five-page response on July 20, 2021, Def.'s Resp. to Pl.'s Notice [Dkt. # 41] ("Def.'s Resp."), and on July 27, plaintiff filed a reply.   Pl.'s Reply to Def.'s Resp. to Pl.'s Notice [Dkt. # 42] ("Pl.'s Reply to Notice").   While this is not the first time the D.C. Circuit has taken up the foreseeable harm standard, *see, e.g.*, *Machado Amadis*, 971 F.3d at 371, the Court considers what this latest opinion might have changed in the analysis.

(D.D.C. 2015), and *Kolbusz v. FBI*, No. 1:17-cv-00319 (EGS/GMH), 2021 WL 1845352, at \*26 (D.D.C. Feb. 17, 2021).

Since this is a statutory requirement, and the Court is bound to make its own determination on summary judgment issues, *see Winston & Strawn*, 843 F.3d at 505, the Court will address the issue.

For the withholdings under Exemptions 3, 7(C) and 7(D), the agencies involved did not specifically address foreseeable harm in the declarations.   However, the foreseeable harm requirement, 5 U.S.C. § 552(a)(8)(B), does not require "disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3)."  Therefore, the State Department need not supply additional detail since it fully explained the specific threats to national security and foreign policy that were implicated by the ROIs.

And courts in this district have held that "when invoking Exemption 7(C), an agency need not establish much more than the fact of disclosure to establish foreseeable harm." *Ecological Rts. Found. v. EPA*, Civ. Action No. 19-980 (BAH), 2021 WL 2209380, at \*56 (D.D.C. Feb. 13, 2021). Similarly, the Court concludes that the fact that express assurances of confidentiality underlie the approved withholdings of identifying information under Exemption 7(D) is sufficient to satisfy the foreseeable harm standard.

The submissions supporting the withholdings under Exemption 1 from the State Department also satisfy the reasonable foreseeability of harm standard.   For each record, "particularized indicia of foreseeable harm" is identified.   *Reps. Comm.*, 3 F.4th at 372.   For example:

> Disclosure of this information at this time could have the potential to inject friction into, or cause damage to, a number of our bilateral relationships with countries whose cooperation is important to U.S. national security, including not only Afghanistan and U.S. allies but some countries in which

> public opinion might not currently favor close cooperation with the United States. Moreover, the risk of harm to national security from disclosure of this information is exacerbated by the political and security instability in the region in question, such that release of this information could pose a direct threat to the national security of the United States.

Suppl. State Dep't *Vaughn* Index at 3.

Finally, SIGAR has satisfied the foreseeable harm standard for the presidential communications withheld under Exemption 5. Its declarant explains that the disclosure of such information "burdens the ability of the President and his advisors to engage in a confidential and frank decision-making process and chills or inhibits their ability to have candid discussions, thus impacting the efficiency of government policy-making." Fourth Hubbard Decl. ¶ 73. It relied on a similar explanation for the withholding of communications and deliberations involving the president-elect. *Id.* ¶ 74. The Court finds that, in the context of the presidential communication privilege, this is sufficient. *See Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 10 n.4 (D.D.C. 2020) (holding that the risk of chilling "full and candid discussions" among Presidents and their advisers, as well as Presidents-elect and their advisers, was sufficient identification of foreseeable harm).

## VII.   Segregability

"In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability," although "the agency is not required to provide so much detail that the exempt material would effectively be disclosed." *Johnson*, 310 F.3d at 776, citing *Mead Data Cent.*, 566 F.2d at 261. Just as is the case with other aspects of the FOIA analysis, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," *Sussman v. U.S. Marshall Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007), citing *Boyd v. Crim. Div. of Dep't of Just.*,

475 F.3d 381, 391 (D.C. Cir. 2007), and "[a] court may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Just.*, 518 F.3d 54, 61 (D.C. Cir. 2008), citing *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).

SIGAR reconsidered its withholdings line-by-line, Fourth Hubbard Decl. ¶ 75, and it determined that 63 records could be released in full after determining that no foreseeable harm was posed to an interest protected by a FOIA exemption. *Id.* ¶ 40. The State Department also conducted a line-by-line review of the withholdings protected by FOIA Exemption 1. *See* Suppl. State Dep't *Vaughn* Index. Where an agency has conducted a line-by-line review and provided an affidavit in support, it is entitled to the presumption that it has produced the segregable portions. *See Johnson*, 310 F.3d at 776–77.

## CONCLUSION

For all of these reasons, the Court holds that:

1) For those records withheld under Exemption 1 and Exemption 3 pursuant to the National Security Act, defendant's motion for summary judgment will be granted, and plaintiff's will be denied.

2) For any identifying information withheld under Exemption 7(D) from ROIs coded as "off the record," "on background," or "non-attribution," and those that bear no name and are coded to a separate list, defendant's motion will be granted. Defendant's motion will also be granted with respect to the withholding of unique interview codes and interview locations. Plaintiff's motion will be denied as to those issues. Plaintiff is entitled to summary judgment on the question of whether identifying information may be withheld under Exemption 7(D) from ROIs coded "on the record," but whether the information is to be disclosed is subject to the Court's rulings on Exemptions 7(C) and 6.

3) For identifying information withheld from ROIs under Exemptions 7(C) and 6, defendant's motion will be granted with regard to information identifying low-ranking government officials, private citizens, and foreign nationals who gave interviews, as well as third parties in all categories who were named in the interviews. Plaintiff's motion for summary judgment with respect to the withholding of that information will be denied; the

remaining question of whether identifying information of high-ranking government officials who gave interviews on the record can be withheld is moot since none of the ROIs from which that information has been redacted under this exemption involved officials who were high-ranking at the time of the interview.

4)   For those portions of ROIs withheld under Exemption 5, defendant's motion will be denied, and plaintiff's motion will be granted with respect to the applicability of the deliberative process privilege.  For those portions of ROIs withheld under Exemption 5 and the presidential communications privilege, defendant's motion will be granted in part and denied in part, and plaintiff's motion will be granted in part and denied in part as set forth in Section V.B. above.

5)   On the question of whether the defendant has complied with 5 U.S.C. § 552(a)(8) and whether the defendant has produced all reasonably segregable material, summary judgment will be entered in favor of the defendant, and plaintiff's motion will be denied.

A separate order will issue.


_____
AMY BERMAN JACKSON
United States District Judge


DATE:  September 30, 2021

48